DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
DREW E. BREUDER (S.B. #198466)
dbreuder@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:    (310) 246-6779

THEODORE J. BOUTROUS JR. (S.B. #132099)
tboutrous@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  (213) 229-7296
Facsimile:    (213) 229-7242

Attorneys for Home Box Office, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPTIMUM PRODUCTIONS, a California corporation; and JOHN BRANCA and JOHN MCCLAIN, in the respective capacities as CO-EXECUTORS OF THE ESTATE OF MICHAEL J. JACKSON,<br><br>Plaintiffs,<br><br>v.<br><br>HOME BOX OFFICE, a Division of TIME WARNER ENTERTAINMENT, L.P., a Delaware Limited Partnership; HOME BOX OFFICE, INC., a Delaware corporation; DOES 1 through 5, business entities unknown; and DOES 6 through 10, individuals unknown,<br><br>Defendants. | Case No.<br><br>Los Angeles County Superior Court Case No. 19SMCP00075<br><br>**DECLARATION OF STEPHANIE S. ABRUTYN IN SUPPORT OF NOTICE OF REMOVAL** |

## DECLARATION OF STEPHANIE S. ABRUTYN

I, Stephanie S. Abrutyn, declare and state:

1.    I am Senior Vice President and Chief Counsel, Litigation, for Home Box Office, Inc.  I make this declaration in support of Home Box Office, Inc.'s Notice of Removal.  This declaration is made based on my personal knowledge of the matters set forth herein as well as records kept in the ordinary course of business.

2.    Home Box Office, Inc. is a Delaware corporation with its principal place of business located at 1100 Avenue of the Americas, New York, New York 10036.

3.    In addition to Home Box Office, Inc., Plaintiffs' Petition to Compel Public Arbitration ("Petition") names as a defendant "Home Box Office, a division of Time Warner Entertainment [Company], L.P., a Delaware Limited Partnership" ("TWE").[1]  Petition at 1.  Based on a review of records kept in the ordinary course of business, Home Box Office, Inc., formed on December 3, 2002, has never had an ownership interest in TWE.  In addition, since approximately March 2009, no company affiliated with Home Box Office, Inc. has had any ownership or other interest in TWE.

4.    On February 28, 2019, a copy of Plaintiffs' Petition was served in New York on CT Corporation System, Home Box Office, Inc.'s agent for service of process.  A true and correct copy of the Proof of Service Transmittal form for Home Box Office, Inc., as well as the summons and attachments, is attached hereto as Exhibit A.

5.    On February 28, 2019, Plaintiffs also appear to have served a copy of the Petition on Home Box Office, Inc.'s registered agent for service of process in

---

[1] Plaintiffs appear to have inadvertently omitted "Company" from the full name of the Time Warner entity alleged to be a party to the contract at issue in the Petition. *See* Petition, Ex. B at 1 (referencing July 22, 1992 agreement with "Time Warner Entertainment Company, L.P.").

Delaware, The Corporation Trust Company, and a summons identifying TWE as the "Person Served." A true and correct copy of this second Proof of Service Transmittal form ("Second Proof of Service"), summons to TWE, and attachments is Exhibit B hereto. As the document indicates, the Second Proof of Service—like the proof of service attached as Exhibit A—is directed to "Home Box Office, Inc.", not TWE.

6. According to the website for the Division of Corporations for the New York State Department of State ("NY SOS website"), TWE is "Inactive." The NY SOS website also indicates that TWE does not currently have a registered agent for service of process, as TWE's registered agent is listed as "revoked." A true and correct copy of a March 13, 2019 print-out of the search results for TWE from the NY SOS website is attached hereto as Exhibit C.

7. According to the website for the Delaware Department of State, Division of Corporations ("Delaware SOS website"), the "Status" field for TWE lists that entity as "Merged" with a "Status Date" of "9/30/12." Under the "Filing History," the website lists a "Survivor" name of "Time Warner Cable Enterprises LLC" with an "Effective Date" of "9/30/12." A true and correct copy of a March 13, 2019 print-out for TWE from the Delaware SOS website is attached hereto as Exhibit D.

8. Time Warner Cable Enterprises LLC is not owned by or affiliated with Home Box Office, Inc.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed on this 13th day of March 2019 at New York, New York.

Stephanie S. Abrutyn

ABRUTYN DECLARATION IN SUPPORT OF NOTICE OF REMOVAL

# Exhibit A

CT Corporation

**Service of Process Transmittal**
02/28/2019
CT Log Number 535009139

**TO:** Stephanie Abrutyn, Senior Vice President & Chief Counsel
Home Box Office, Inc.
Office H9-36B, 1100 Avenue of the Americas
9th Floor
New York, NY 10036-

**RE:** **Process Served in New York**

**FOR:** Home Box Office, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | OPTIMUM PRODUCTIONS, a California corporation; and JOHN BRANCA and JOHN MCCLAIN, in the respective capacities as CO-EXECUTORS OF THE ESTATE OF MICHAEL J. JACKSON, PLTF. vs. HOME BOX OFFICE, ETC., ET AL., DFTS. // TO: HOME BOX OFFICE, INC., ETC. |
| **DOCUMENT(S) SERVED:** | SUMMONS, ATTACHMENT(S), PETITION, EXHIBIT(S), STIPULATION AND ORDER, NOTICE |
| **COURT/AGENCY:** | LOS ANGELES COUNTY - SUPERIOR COURT, CA<br>Case # 19SMCP00075 |
| **NATURE OF ACTION:** | Breach of Contract (Non-Disparagment Clause)and Breach of the Covenant of Good Faith and Fair Dealing |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, New York, NY |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 02/28/2019 at 14:07 |
| **JURISDICTION SERVED :** | New York |
| **APPEARANCE OR ANSWER DUE:** | Within 30 calendar days after this summons and legal papers are served on you |
| **ATTORNEY(S) / SENDER(S):** | Howard Weitzman<br>KINSELLA WEITZMANISER KUMP & ALDISERT LLP<br>808 Wilshire Boulevard, 3rd Floor<br>Santa Monica, CA 90401<br>310-566-9800 |
| **REMARKS:** | The documents received have been modified to reflect the name of the entity being served. |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780134615589 |
| | Image SOP |
| | Email Notification,  Michael Sofia  Michael.sofia@warnermediagroup.com |
| | Email Notification,  Eve Konstan  eve.konstan@hbo.com |
| | Email Notification,  Steve Sapienza  steve.sapienza@hbo.com |
| | Email Notification,  RYAN STOCKTON  ryan.stockton@warnermediagroup.com |
| | Email Notification,  Jessica Davidovitch  Jessica.Davidovitch@hbo.com |

Page 1 of  2 / HP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

CT Corporation

**Service of Process Transmittal**
02/28/2019
CT Log Number 535009139

**TO:**    Stephanie Abrutyn, Senior Vice President & Chief Counsel
Home Box Office, Inc.
Office H9-36B, 1100 Avenue of the Americas
9th Floor
New York, NY 10036-

**RE:**    **Process Served in New York**

**FOR:**    Home Box Office, Inc.  (Domestic State: DE)

Email Notification,  Stephanie Abrutyn  Stephanie.Abrutyn@hbo.com

Email Notification,  RANDY FERGUSON  randy.ferguson@warnermediagroup.com

Email Notification,  LISA FONTANEZ  lisa.fontanez@warnermediagroup.com

Email Notification,  PEDRO MEDRANO  pedro.medrano@warnermediagroup.com

**SIGNED:**    C T Corporation System
**ADDRESS:**    28 Liberty St
42 Floor
New York, NY 10005-1400
**TELEPHONE:**    212-590-9070

Page 2 of  2 / HP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Electronically FILED by Superior Court of California, County of Los Angeles on 02/21/2019 10:31 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mariscal, Deputy Clerk

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:** HOME BOX OFFICE, a Division of TIME
*(AVISO AL DEMANDADO):* WARNER ENTERTAINMENT, L.P., a
Delaware Limited Partnership, and HOME BOX OFFICE, INC., a
Delaware corporation, and DOES 1 through 5, business entities
Additional Parties Attachment form is attached.
**YOU ARE BEING SUED BY PLAINTIFF:** OPTIMUM PRODUCTIONS, a
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* California corporation; and
JOHN BRANCA and JOHN MCCLAIN, in the respective capacities as CO-
EXECUTORS OF THE ESTATE OF MICHAEL J. JACKSON

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Los Angeles
1725 Main Street
Santa Monica, California 90401, Santa Monica Courthouse

**CASE NUMBER:**
*(Número del Caso):*

**19SMCP00075**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: Howard Weitzman
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Kinsella Weitzman Iser Kump & Aldisert LLP (see attachment for additional attorneys)
808 Wilshire Blvd. Third Floor, Santa Monica, CA 90401                    310-566-9800

DATE: 02/21/2019                      Clerk, by _____ , Deputy
*(Fecha)*          Sherri R. Carter Executive Officer / Clerk of Court *(Secretario)*     Marcos Mariscal   *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [✓] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
   HOME BOX OFFICE INC. a Delaware
3. [✓] on behalf of *(specify):* corporation

   under: [✓] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
           [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
           [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
           [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
Westlaw Doc & Form Builder

**SUM-200(A)**

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER: |
|---|---|

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

unknown, and DOES 6 through 10, individuals unknown

Page ___1___ of ___1___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2009]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

Westlaw Doc & Form Builder™

SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE          CASE NUMBER:

## ATTACHMENT TO SUMMONS

Additional Attorneys for Optimum Productions and for John Branca and John McClain as Executors of the Estate of Michael J. Jackson

FREEDMAN + TAITELMAN LLP
Bryan J. Freedman (SBN 151990)
  bfreedman@ftllp.com
1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
Telephone: 310.201.0005
Facsimile: 310.201.0045

*(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, not line numbers)*:

This page may be used with any Judicial Council form or any other paper filed with the court.          Page _____

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]

**ADDITIONAL PAGE**
**Attach to Judicial Council Form or Other Court Paper**

Westlaw Doc & Form Builder

CRC 201, 501

19SMCP00075

Electronically FILED by Superior Court of California, County of Los Angeles on 02/21/2019 10:37 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mariscal, Deputy Clerk

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
Howard Weitzman (SBN 38723)
  hweitzman@kwikalaw.com
Dale F. Kinsella (SBN 63370)
  dkinsella@kwikalaw.com
Jonathan P. Steinsapir (SBN 226281)
  jsteinsapir@kwikalaw.com
Zachary T. Elsea (SBN 279252)
  zelsea@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

FREEDMAN + TAITELMAN LLP
Bryan J. Freedman (SBN 151990)
  bfreedman@ftllp.com
1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
Telephone: 310.201.0005
Facsimile: 310.201.0045

Attorneys for Optimum Productions and for John
Branca and John McClain as Executors of the
Estate of Michael J. Jackson

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| OPTIMUM PRODUCTIONS, a California corporation; and JOHN BRANCA and JOHN MCCLAIN, in the respective capacities as CO-EXECUTORS OF THE ESTATE OF MICHAEL J. JACKSON,<br><br>Plaintiffs,<br><br>vs.<br><br>HOME BOX OFFICE, a Division of TIME WARNER ENTERTAINMENT, L.P., a Delaware Limited Partnership, and HOME BOX OFFICE, INC., a Delaware corporation, and DOES 1 through 5, business entities unknown, and DOES 6 through 10, individuals unknown,<br><br>Defendants. | Case No. 19SMCP00075<br><br>PETITION TO COMPEL PUBLIC ARBITRATION OF CLAIMS OF<br><br>1. BREACH OF CONTRACT (NON-DISPARAGEMENT CLAUSE); AND<br><br>2. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING<br><br>AND ALL OTHER RELATED ARBITRABLE CLAIMS AND ISSUES<br><br>Code of Civil Procedure §§ 1281.2, 1290 |

PETITION TO COMPEL ARBITRATION

## INTRODUCTION

Michael Jackson is innocent. Period. In 2005, Michael Jackson was subjected to a trial—where rules of evidence and law were applied before a neutral judge and jury and where both sides were heard—and he was exonerated by a sophisticated jury. Ten years after his passing, there are still those out to profit from his enormous worldwide success and take advantage of his eccentricities. Michael is an easy target because he is not here to defend himself, and the law does not protect the deceased from defamation, no matter how extreme the lies are. Michael may not have lived his life according to society's norms, but genius and eccentricity are not crimes. Nothing and no one can rewrite the facts which show that Michael Jackson is indeed innocent of the charges being levied at him by HBO in its "documentary" *Leaving Neverland*. No one-sided "documentary" can substitute for a real documentary, or for a trial where both sides are heard, competent evidence is presented, and witnesses are cross-examined.

Those behind this posthumous character assassination are:

HBO: a company, recently acquired by AT&T, so desperate for eyeballs that its growing irrelevance to the cord-cutting generation was crystallized when its chief rival bluntly stated in its January earnings report that it considers a popular online game to be a more serious competitor than HBO. In producing this fictional work, HBO ignored its contractual obligations to Michael and his companies by disparaging both him and the Dangerous World Tour that HBO had previously profited from immensely.

Wade Robson and James Safechuck: two admitted perjurers, one of whom is a self-described "master of deception," whose litigations have played out in the courts as a failed melodrama for more than five years. With more holes in their stories than anyone can count, both view Michael Jackson, the man who they previously swore was an inspiration and did nothing to them, as a lottery ticket through accusations never brought during Michael's life. They never brought these claims during Michael's life, because they knew Michael would have held them both legally accountable for their defamation, just as Michael had held the "reporter" Victor Gutierrez—who seems to be the true author of these two men's fictional tales—liable before a jury for millions of dollars when he falsely made similar claims about Jackson.

2

PETITION TO COMPEL ARBITRATION

Dan Reed: the HBO-deployed "documentarian" and director of *Leaving Neverland* who violated every rule of responsible journalism and documentary filmmaking. He all but embedded himself with the accusers' legal team to the point where he refused to devote even one minute of a 240-minute film to any of the mountainous evidence showing that Robson and Safechuck are lying. He refused to offer any counter-point to their fabrications, and refused to talk to anyone whose statements might not fit the storyline of the fictional film he was dead-set on making from the outset. Dan Reed made no attempt to review the legal records from Robson's and Safechuck's litigations with the Estate, where the judge found that Robson had lied under oath during the litigations on key issues; and where Robson was caught red-handed hiding crucial evidence from the court, from the Jackson Estate, and even *from his own lawyers*. Reed even ignored the fact that these men are *still* pursuing claims against the Jackson Estate for hundreds of millions of dollars so they have hundreds of millions of reasons to lie.

While the conduct of the above participants speaks for itself, special emphasis must be placed on HBO. HBO refused to even meet with representatives of the Jackson Estate—the primary beneficiaries of which are Michael's three children—who made no threats but just asked for a meeting to discuss problems with the "documentary." HBO is not in search of the truth— only in search of "content" and "engagement" as its bosses at AT&T have publicly ordered.

The real victims here are the primary beneficiaries of the Estate, Michael's three children, who are forced to endure this attack on their father, ten years after they buried him, and when he has no chance to respond.

Michael Jackson can never be silenced. His music and artistry live, as does his innocence. They will long outlast false claims, gossip, and allegations spread by those who seek to make money off him. In the end, this "documentary" will say much more about HBO than it ever could about Michael Jackson.

PETITION TO COMPEL ARBITRATION

## GENERAL ALLEGATIONS REGARDING HBO'S BREACH OF ONGOING CONTRACTUAL OBLIGATIONS TO THE JACKSON ESTATE

*The just and proper jealousy with which the law protects the reputation of a living man forms a curious contrast to its impotence when the good name of a dead man is attacked. ... The dead cannot raise a libel action, and it is possible to bring grave charges against their memory without being called upon to justify these charges in a court of law or to risk penalties for slander and defamation. The possibilities of injustice are obvious.* – "Libeling the Dead," Glasgow Herald (July 27, 1926), as quoted in Don Herzog, *Defaming the Dead* (Yale Univ. Press 2017)

### A.   Michael Jackson Was Proven Innocent

1.      Michael Jackson passed away almost ten years ago on June 25, 2009, as a result of a criminal homicide by his "doctor." Almost exactly four years earlier, on June 14, 2005, Jackson was exonerated by a unanimous jury of twelve men and women in Santa Maria, California, on discredited charges that he had committed unspeakable acts.

2.      Michael Jackson's acquittal was not the result of some technical "reasonable doubt" argument. The phrase "reasonable doubt" appeared *only once* in Jackson attorney Tom Mesereau's opening statement (at the *very end* of it). Rather, much to the media's legal experts' ridicule at the time, Mesereau *affirmatively assumed the burden of proving Jackson innocent in the case.* Among his first words to the jury in his opening statement were: "I say to you right now, I am going to make some promises in this case, I am going to fulfill them, and I want you to judge me accordingly at the end. *These charges are fake, silly, ridiculous.*" Mesereau left no doubt about what he was promising to prove: "*We will prove [that child molestation] never, ever happened.*" Three-and-a-half months later, the jury found that Mesereau had kept his promises. The jury found that Michael Jackson was no child molester. The jury found that Mesereau was right: the charges against Jackson were "fake, silly, and ridiculous."

3.      The jury that cleared Michael was a diverse mix of American citizens, including several *highly educated persons and persons with particular expertise* in the subject matter—e.g., the head of the local Social Services Agency, a former high school principal with a Master's Degree in Counseling, a math teacher with a Master's Degree in mathematics, a civil engineer, and residents of a neighboring military base. And these jurors have confirmed in recent interviews that

4

they would reach the same decision today.

4. Jackson's 2005 acquittal ended a 12 year crusade by Thomas Sneddon, the former district attorney for Santa Barbara County. Sneddon looked under every rock and pebble for supposed "victims" of Jackson. At taxpayer expense, he literally sent investigators all over the United States and all over the world to follow "leads" about supposed "victims." Sneddon's investigators went to the Philippines, to Australia, to England, etc. Sneddon orchestrated multiple raids of Jackson's homes at Neverland Ranch and in Los Angeles over the course of a decade. They found nothing. As *Rolling Stone*'s Matt Taibbi—no fan of Jackson as his other writings confirm—explained in an article shortly after the verdict: "Virtually every piece of [Sneddon's] case imploded in open court, and the chief drama of the trial quickly turned into a race to see if the DA could manage to put all of his witnesses on the stand without getting any of them removed from the courthouse in manacles."

5. Given Sneddon's unsupported allegations in the years he chased Jackson, the FBI also investigated Michael Jackson extensively. The FBI's 300-page file on Jackson, made available through the Freedom of Information Act, makes clear that the FBI never found anything to show that Jackson was a child molester (because he was not).

6. The legal analyst and author, Jeffrey Toobin, explained after the verdict that "you don't need a law degree to understand this verdict. It is an absolute and complete victory for Michael Jackson, utter humiliation and defeat for Thomas Sneddon, the district attorney who has been pursuing Michael Jackson for more than a decade, who brought a case that was not one that this jury bought at all. This one's over."

7. Sneddon's crusade against Michael may have been "over" in Toobin's words, but the damage it caused to Michael was not.

**B.  Michael Jackson's Legacy and Humanitarian Efforts**

8. Michael Jackson had long been a champion for the rights of children, giving *hundreds of millions of dollars* to children's charities during his lifetime, along with a substantial bequest of tens of millions of dollars to children's charities in his Will. In light of his commitment to improving the lives of children around the world, the fact that Michael was chased for twelve

years on frivolous molestation charges devastated him. As one writer wrote, he was "an emaciated mess" at the end of the trial.

9.      Michael Jackson had no childhood of his own. From the age of 10, he was the primary breadwinner for his very large family, and never enjoyed a normal childhood. As he explained in the only medium (songwriting) where *he could* explain himself: "It's been my fate to compensate, for the childhood I've never known ... Before you judge me, try hard to love me, Look within your heart then ask, Have you seen my Childhood?" He was arguably the most famous person on the planet but possibly also one of the loneliest.

10.     Almost immediately after his acquittal, Michael Jackson left the country and largely disappeared from public life for several years. In early 2009, he reemerged ready to embark on a comeback with a series of resident shows at London's O2 Arena to be called "This Is It." Despite his ordeals and absence from public life, Michael's magic had not left him. As we all saw in the posthumously released film, *Michael Jackson's This Is It*, documenting his rehearsals for the O2 shows in London, Michael Jackson could still dance, sing, and enchant an audience in a way that no one else ever has and no one else ever will again.

11.     On June 25, 2009, Michael Jackson passed away. In the wake of Michael's death, the public outpouring and mourning throughout the world was unprecedented. AOL called it a "seminal moment in internet history." Approximately 15% of Twitter posts (5,000 tweets per minute) mentioned Jackson after the news broke. To this day, most still vividly recall where they were when they heard the news that Michael Jackson had died.

12.     In Michael Jackson's death, there was hope that he finally was at peace, and that his name could no longer be smeared by a media who had spent decades obsessing over him and selling any story about him, no matter how outrageous. As a then 27-year-old dancer and protégé of Michael Jackson named Wade Robson summed up the mood of so many in a statement on June 26, 2009, the day after Michael's death. Michael Jackson is "one of the main reasons I believe in the pure goodness of human kind ... I will miss him immeasurably."

C.      **HBO, Netflix and the Changing "Pay Television" Business**

13.     Meanwhile, about a year before Michael's death, a company called Netflix began to

PETITION TO COMPEL ARBITRATION

slowly move away from its highly-successful DVD rent-by-mail business towards an internet streaming business. To say that its move was successful would be among the greater understatements of the last decade. In the last several years, Netflix and those following a similar model like Amazon Prime and Hulu have completely disrupted the Pay Television business.

14. Netflix and other streamers are now at the forefront of original content and documentaries, and have even contracted directly with major movie studios for "first-run" motion picture content, which was once the entire lifeblood of Pay Television networks like HBO. In short, Netflix threatens the very survival of Pay Television. None are more threatened than the longtime pay industry leader, HBO.

15. As an entire generation of "cable cutters" has opted for "over the top" services, HBO has been struggling to play catch up. Nothing crystallized HBO's growing irrelevance more than a Netflix earnings report in January stating that Netflix considers the popular online game Fortnite a more serious competitor than HBO.

**D.    HBO's Mandate from AT&T**

16. In June 2018, HBO's parent, Time Warner, was acquired by AT&T.

17. AT&T's CEO for its new "WarnerMedia" division (including Warner Brothers and HBO), John Stankey directed HBO to win the "streaming wars" and obtain substantially more content in an obvious recognition of the success of Netflix, Amazon and others. Stankey ordered HBO's CEO Richard Plepler: "We need hours a day," referring to the time he wanted viewers engaging with HBO content. "It's not hours a week, and it's not hours a month. We need hours a day." Moreover, according to Vanity Fair, Stankey "made clear that in the current era of mega scale, HBO on its own is not enough."

18. As the *New York Times* reported, in a July 2018 meeting with Plepler, "Stankey described a future in which HBO would substantially increase its subscriber base and the number of hours that viewers spend watching its shows. To pull it off, the network will have to come up with more content, transforming itself from a boutique operation, with a focus on its signature Sunday night lineup, into something bigger and broader."

19. Content has been a real problem during Richard Plepler's tenure as CEO of HBO.

With the one exception of *Game of Thrones*, all of the cutting-edge, and now classic, original content that is associated with HBO—*The Sopranos, The Wire, Deadwood, Six Feet Under, Entourage, Sex and the City, Curb Your Enthusiasm*, etc.—was from the era when Chris Albrecht ran HBO. With Albrecht's departure in 2007, Richard Plepler took over. And Plepler has almost entirely failed where Albrecht succeeded: original content. With Netflix and others in the industry now, HBO picked the wrong time to fail in original content.

20.     The only HBO show left that can truly drive significant subscribers is *Game of Thrones*. And its final season, with just six episodes, will end in May 2019. After that, HBO will no longer carry any "must have" content. In short, HBO is facing existential problems.

21.     Although recognizing that the programming budget of Netflix and Amazon dwarfs that of HBO's, Stankey has refused to commit to substantially increasing HBO's programming budget. Without a substantially increased budget, HBO will have to turn to a less expensive way to create buzz and content.

22.     And so Richard Plepler needs content for HBO that will draw streamers, and he needs to obtain that content inexpensively. In that desperation, Plepler has been willing to violate just about all of his companies' internal policies and procedures. As relevant here, Plepler decided to willfully violate HBO's obligations to Michael Jackson, obligations that Plepler no doubt knew about given that he arrived at HBO in early 1992 as Senior VP of Communications and advisor to the CEO. That was the same year that HBO partnered with Jackson to broadcast a concert from the Dangerous World Tour, which was by far HBO's biggest event in the early years of Plepler's employment.

23.     Like so many before him, Richard Plepler decided to turn on Michael Jackson for the money. In so doing, he and HBO teamed up with a documentarian that they had worked with for years, Dan Reed. And they decided to tell the "stories" of two serial perjurers—Wade Robson and James Safechuck. Those two men's stories had already been completely discredited in public lawsuits where they sought hundreds of millions of dollars from the Jackson Estate—lawsuits that these two men are *still pursuing today*, despite HBO's patently false protests that the two are not telling their stories for money. And the good news for HBO was that the script for the

8

PETITION TO COMPEL ARBITRATION

documentary had already been written by Robson's and Safechuck's *shared* lawyers. The *same lawyer* drafted detailed declarations for both men. The salacious and false details of those declarations, written by the same lawyer for both men, are then used as the script for the "documentary."

E.    **HBO Covenants to a Broad Non-Disparagement Clause With Jackson In Exchange for a Historic Right to Air Jackson's Live Concert**

24.    HBO, on the one hand, and Michael Jackson and his entities, including Plaintiff Optimum Productions' predecessor entity, TTC Touring Corporation, on the other, have a longstanding contractual relationship. Under that relationship, HBO's production and airing of *Leaving Neverland* ("the Film") is not only reckless and irresponsible, it is also a violation of the express terms of HBO's and Optimum's contract.

25.    Following the release of his fourth studio album as an adult, *Dangerous*, Jackson appeared at a packed press conference at Radio City Music Hall to announce that he was embarking on the Dangerous World Tour in order to benefit Jackson's Heal the World Foundation and other charity groups.

26.    Jackson planned live performances on five continents. The tour was ultimately a huge success, reaching approximately 3.5 million fans through 69 live performances. The tour, however, did *not* include any performances in the United States.

27.    Jackson had never previously allowed any complete concerts to be aired or broadcast on television in the United States. For the Dangerous World Tour, however, Jackson decided to allow a full two-hour performance to be filmed and aired on television for his tens of millions of fans in the United States.

28.    The exclusive right to air the first-ever televised concert performance of the biggest star in the world was a huge prize for any network. Ultimately, in what was reported by the *New York Times* to be potentially the "largest financial deal for a concert performance on television," HBO secured the exclusive right to air Jackson's Bucharest concert. The terms of the license that Jackson and Optimum's predecessor entity granted to HBO were memorialized in a written contract (the "Agreement"), a copy of which is attached as Exhibit B (only the financial terms

9

PETITION TO COMPEL ARBITRATION

have been redacted).

29.    HBO's Chairman and CEO at the time, Michael Fuchs, touted the television event, explaining to the *New York Times* that, "With no U.S. tour planned in the near future, this special HBO event could be the only chance that American audiences will have to see Michael Jackson in full concert for years."

30.    HBO aired its two-hour television event, *Michael Jackson in Concert in Bucharest: The Dangerous Tour*, at 8 p.m. on Saturday, October 10, 1992. As *Variety* reported at the time, the airing of this concert from the Dangerous Tour was the network's highest-rated special ever, with approximately 3.7 million U.S. households tuning in to HBO to watch Jackson's performance.

31.    In addition to monetary consideration, HBO and its team of sophisticated lawyers agreed to certain covenants in the Agreement to air Jackson's first-ever televised live performance. Specifically, as "a material inducement to Licensor [TTC Touring Corporation] in granting the license to HBO" to air Jackson's Bucharest performance, HBO agreed to certain non-disparagement provisions detailed in an "Exhibit I" to the Agreement.

32.    By 1992, Michael Jackson was the most popular and most recognizable entertainer in the world. He had also long been the subject of outrageous tabloid reporting: he slept in a hyperbaric chamber, he beat his pet chimpanzee, he bought "the elephant man's" bones, etc. Because of that, it was important to him that the people he did business with not disparage him and feed these tabloids. There were plenty of other media outlets doing that, and Jackson had no need for outlets he worked with doing the same.

33.    In those non-disparagement provisions, HBO promised that "HBO shall not make any disparaging remarks concerning Performer or any of his representatives, agents, or business practices or do any act that may harm or disparage or cause to lower in esteem the reputation or public image of Performer." Other provisions in the Agreement require HBO to notify and consult with Jackson and Optimum Productions if it wishes to air additional programming about Jackson.

34.    HBO agreed that the covenants by which HBO promised to be bound would run both during and "after HBO's contact or HBO's relationship with Licensor and/or Performer."

35.    Richard Plepler began work at HBO in early 1992 as Senior VP of

10

PETITION TO COMPEL ARBITRATION

Communications and advisor to the CEO. Plepler must have known, or should have known, about HBO's contract with Jackson, as *Michael Jackson in Concert in Bucharest: The Dangerous Tour* was the biggest event for HBO that year. Yet in his desperation, Plepler willfully ignored HBO's obligations to Michael Jackson.

> **F.  HBO Violates the Agreement's Non-Disparagement Covenant and Suggests, Among Many Other Things, That Jackson Was Abusing Children <u>In Connection With</u> the Dangerous World Tour**

36.  On January 25, 2018, at the Sundance film festival, the HBO produced "documentary" called *Leaving Neverland* (the "Film") premiered. The Film rehashes long discredited allegations that Jackson sexually assaulted children several decades ago.

37.  But the Film is no "documentary" at all. As HBO and the Film's director, Dan Reed, have *conceded*, they disregarded every norm of documentary filmmaking and journalistic integrity in producing this film. Despite the Film's *four hour* length—ample time for an exhaustive examination of the facts—HBO and Reed made *no effort* to investigate the veracity of Robson's and Safechuck's claims, nor to scrutinize them in the Film itself. Nor do HBO and Reed explore the men's motivations for making their allegations: they are currently pressing claims in the California courts against the Jackson Estate *for hundreds of millions of dollars*. HBO and Reed also do not bother to point out that these men *were caught lying under oath repeatedly in their litigations with the Jackson Estate* (set aside the fact that they also had previously testified for Jackson in criminal proceedings and explained that no inappropriate conduct between them and Jackson occurred). The trial judge found one of Robson's lies so incredible that the trial judge disregarded Robson's sworn declaration and *found that no rational trier of fact could possibly believe Robson's sworn statements*. Specifically, Robson falsely swore under oath that he did not know about the Jackson Estate until March 2013, despite having met with John Branca, the Co-Executor of the Jackson Estate in 2011 trying unsuccessfully to pitch himself to direct a Jackson-themed Cirque du Soleil show. When Robson learned about the existence of the Jackson Estate was *the key issue* on his attempt to get around the statute of limitations. Yet in his efforts to try to sue the Estate for hundreds of millions of dollars, Robson had no problem lying under oath about

11

PETITION TO COMPEL ARBITRATION

the key issue, as the trial judge found. HBO and Reed interviewed *no other witnesses*, despite the fact that several witnesses have contradicted Robson's and Safechuck's claims.

38.    Indeed, HBO and Reed failed to contact two named persons who are identified in the film as supposed victims of Jackson's abuse. Yet since the Film was announced, both of these other men have publicly and prominently stated that the Film's allegations that they were abused are utterly false. In fact, *one person mentioned repeatedly by name* in the Film as a supposed "victim" of Jackson's who "replaced" Robson has called the Film "a work of fiction." That person was *never* contacted by HBO or Reed to respond to what the Film says *about him*.

39.    HBO's Film violates the plain words of Agreement with Jackson and Optimum: The Film makes false and "disparaging remarks concerning [Michael Jackson] [and] disparage[s] or cause[s] to lower in esteem the reputation or public image of [Michael Jackson]."

40.    Worse still is HBO's duplicity with respect to *the very tour from which it profited*. The Film expressly alleges that Jackson was abusing children *in connection with and on the Dangerous World Tour*. For example, during one scene of the Film, Wade Robson's mother, Joy "Joey" Robson, explains that she got very upset with Michael when he told her that he would not be taking Wade on the Dangerous World Tour. Mrs. Robson continues that she was especially upset because Michael had taken another boy and his family on the tour. Footage of the boy and Jackson on the Dangerous World Tour is then shown. Wade Robson then says that that is when he realized he had been "replaced" by that boy, i.e., any reasonable viewer would interpret that to mean that Michael Jackson was sexually abusing the boy on the Dangerous World Tour. That young man, *mentioned by name repeatedly in the Film*, has publicly stated that the Film is "a work of fiction," and has stated repeatedly and eloquently that Michael Jackson never did anything inappropriate with him on the Dangerous World Tour, or at *any* other time. The Film effectively ignores that.

41.    To summarize, HBO profited off the Dangerous World Tour by airing a concert from the tour and promoting Michael Jackson's talents. Now, HBO is profiting off the Dangerous World Tour by airing a "documentary" that falsely claims Michael Jackson was abusing children on the same tour. It is hard to imagine a more direct violation of the non-disparagement clause.

42. HBO decided to willfully violate its commitments and covenants to Jackson and his entities. In violation of both basic norms of documentary journalism and the explicit terms of the Agreement, HBO has disparaged Jackson's legacy by airing a one-sided hit piece against Jackson based *exclusively* on the false accounts of two proven, serial perjurers.

43. The fact that HBO's CEO, Richard Plepler was fully aware of HBO's contractual relationship with Jackson and Optimum and yet willfully ignored them is inexcusable. HBO's airing of the film, including its double-faced depiction of the Dangerous World Tour, constitutes a malicious and willful breach of the anti-disparagement covenants in the Agreement.

44. As Richard Plepler himself once said, "A lie goes halfway around the world before the truth puts its boots on, and we bear some responsibility for that." Indeed.

**G.    Wade Robson and James Safechuck**

45. HBO's and Plepler's willful violation of their non-disparagement obligations to Jackson and Optimum are made the worse given that the Film relies *solely* on the word of two serial perjurers.

46. Wade Robson and James Safechuck are admitted perjurers. They previously testified that Jackson never touched them inappropriately in any manner whatsoever. By 2013 and 2014, they were in financial dire straits. Safechuck was in serious need of money, the failed dreams of a successful acting and music career having long since passed him by. For his part, Robson was at the end of his choreography career. He had burned so many bridges that the only thing he had left was his connection with Michael Jackson. But in 2011, the Jackson Estate had turned him down for the lead choreography job in a Cirque du Soleil show, a job that he told Cirque he "wanted badly." By 2012, Robson's wife was threatening to divorce him because of his inability to work.

47. So, in 2013 and 2014, Robson and Safechuck changed their stories. No doubt reading reports from *Forbes* and others, and seeing programs like *60 Minutes* that reported on the unprecedented success of the Jackson Estate—stories that all ran in the year before these men changed their stories—Robson and Safechuck filed suits against the Jackson Estate.

48. Having claimed to have perjured themselves repeatedly prior to filing their suits

against the Jackson Estate—and claiming to want to now "speak only the truth"—Robson and Safechuck still could not keep their stories straight after filing suit. Robson, in particular, *was caught committing perjury repeatedly in 2013 through 2017*, in his litigations against the Estate. For just a few examples among many that the Estate discovered:

a. The trial judge in Robson's initial case against the Estate found one of Robson's lies—on *the* key issue in that case, i.e., when he learned about the Estate for statute of limitations purposes—so clear that the judge took the *extraordinary step* of disregarding Robson's sworn statements on a summary judgment motion. *The judge found that no rational fact-finder could possibly believe Robson's sworn statement* (i.e., his lie under oath) given the *unequivocal evidence* to the contrary and issued judgment in the Estate's favor as a result.

b. In another of the many, many lies in which Robson was caught during his litigations with the Jackson Estate, he swore under oath in 2016 that he had but *one written communication* with anyone about his abuse allegations from May 2012 until the date of his sworn statement. Another Wade Robson fabrication. Through third party discovery— largely from Robson's mother, Joey, and his sister Chantal—it was revealed that Robson had *thousands* of such communications, talking to anyone and everyone about his evolving story of "abuse" (many of the communications were inquiries to his mother where he told her he was asking her to help him reconstruct "my story with Michael"). In fact, Robson had even written a book about his supposed abuse by Jackson in the year before filing his lawsuit—which he hid from the Jackson Estate *and hid from his own attorneys*. When shopping his book in late 2012 and early 2013, Robson communicated with numerous publishers about his supposed abuse (contrary to his lie under oath that he had had only *one* written communication about his "abuse"). Robson first met with his lawyers about filing a lawsuit against the Jackson Estate in March 2013, just a few weeks after being told by his book agent that no one was interested in publishing Robson's ludicrous story.

49. More precisely, no one was interested in publishing Robson's fabricated and internally inconsistent tale *until* HBO, Channel 4 (UK), and Dan Reed came along.

14

50.    In all, owing to HBO's and Reed's willful blindness, the Film neglects to subject the accusations against Jackson to *any scrutiny whatsoever*, and it ignores the countless facts and circumstances evincing that these stories have been trumped up by Robson, Safechuck, and their shared litigation attorneys as part of an ongoing campaign of lawsuits where they are attempting to recover hundreds of millions of dollars in damages against the Jackson Estate and affiliated companies for the *supposed* abuse they suffered.

51.    A critical consideration by HBO of Robson and his accusations against Jackson would have revealed the absurdity of these claims. When Jackson faced criminal prosecution in 2005 for a now-discredited accusation of abuse as to which he was fully exonerated, an adult Robson testified *under oath* that Jackson had not molested him or engaged in any other inappropriate behavior. Robson never wavered in the face of withering cross-examination from one of our State's finest prosecutors (a senior deputy to Sneddon).

52.    Many other times in the past, Robson similarly spoke out to defend Jackson and deny that he was abused. Robson maintained his support of Jackson even after the singer's death. Consistent with his belief in Michael's innocence, for years after Jackson's death, Robson solicited work relating to Jackson—for a Jackson tribute on *So You Think You can Dance*; from Kenny Ortega asking whether he could help on the film *Michael Jackson's This Is It*; on an MTV tribute produced by Janet Jackson; and from the Jackson Estate itself in 2011 on a Jackson-themed Cirque du Soleil show, all so that he could further honor his friend and mentor, and make money doing it. Had he actually been horrifically abused as he now claims, why would he want to spend at least a year of his life dedicated to creating a show centered around his abuser's life and art?

53.    Wade Robson has proudly declared himself in writing to be a "master of deception." At her deposition, his own mother said that she agreed, explaining that Wade should "have had an Oscar" because of his ability to stare people in the face and spin lies. Mrs. Robson is right of course: Wade Robson should win an Oscar for his acting in *Leaving Neverland*.

54.    Although Robson and Safechuck now claim to want to speak the truth publicly to help out other "victims," their prior actions show otherwise. Robson first filed his lawsuit "under seal" in the hope that the Estate would quickly pay him off before it could be unsealed and made

PETITION TO COMPEL ARBITRATION

public. The Estate had no interest in being extorted, and the suit was then unsealed.

55.     Safechuck followed the same dubious playbook. He *had also testified under oath years before that Jackson did not molest him*. Not until decades later, when Safechuck saw Robson on the *Today Show* in May 2013 discussing his multi-million dollar lawsuit against the Jackson Estate, did Safechuck suddenly discover that he had been abused as a child. Hoping to cash in as well, Safechuck hired *the same attorneys* who represent Robson and filed copycat claims for abuse, again seeking hundreds of millions of dollars in damages.[1]

### H.     Dan Reed and His Idea to Make a Documentary About Michael Jackson

56.     A real documentarian would have explored the above, including the many lies in which Robson and Safechuck were caught *even after* they supposedly discovered their "truth" in 2013 and 2014 respectively. A real "documentarian" would have explored the financial motivations of these two men, including the fact that they continue to seek hundreds of millions of dollars from the Jackson Estate and only brought their claims when they were in serious financial trouble (in Robson's case because the Estate refused to hire him as lead choreographer for a Cirque show). Yet the "documentarian" hired by HBO had no interest in the truth.

57.     Dan Reed is a self-described "documentarian" who has a history of making documentaries about salacious sexual topics, such as like *Babies: Britain's Super Sperm Donors* and *Celebrity Sexploitation*. Reed became especially well known for producing a film glorifying a vigilante "pedophile hunter" who once entrapped a man online who had been suffering from severe depression due to the breakup of his marriage, financial strains, and the separation from his son. After the subject of Reed's film orchestrated the man's arrest, the suspect committed suicide.

58.     According to an interview, Dan Reed was looking for subjects for a documentary when a friend asked him, "What are the big, unresolved stories that everyone's heard of?"

---

[1] The sheer frivolousness of Safechuck's lawsuits led them to be thrown out so early that he had fewer chances to lie under oath. He successfully avoided having his deposition taken or producing any documents. Nevertheless, his sworn declaration in support of his lawsuit contained numerous *proven lies*. One need only check Wikipedia and the record of Jackson's 2005 trial in Santa Maria to see that Safechuck was lying about several issues.

PETITION TO COMPEL ARBITRATION

According to Reed, the friend then said, "What about Michael Jackson? That's a big story and no one really knows what happened." Of course, as explained above, we do know what happened. The FBI investigated Michael Jackson and found nothing. A district attorney in Santa Barbara County prosecuted Jackson, and it was a total failure. The jury completely exonerated Jackson.

59.    But Reed and HBO ignored the facts of the prior allegations. Rather, they turned their focus to two men alone—Wade Robson and James Safechuck, who as discussed above, have lied repeatedly under oath (both before and after filing their lawsuits) and whose motivation for making allegations is seeking hundreds of millions against the Jackson Estate (claims that they are continuing to press today).

60.    And Reed and HBO knew exactly what graphic story they could tell. Robson and Safechuck had laid out their accusations in writing against Jackson in *vivid* detail, i.e., all the lurid "shocking" details of their abuse were in public declarations *written by their shared lawyers*. The fact that stories are told in lurid and salacious detail does not make them true, as some in the media apparently believe. This is especially the case when the stories were first written out by lawyers *whose very job it is to litigate child sexual abuse cases*.

I.    **HBO Turns a Blind Eye to Facts Made Available To Them**

61.    HBO and Reed willfully disregarded *mountains of other evidence* eviscerating Robson's and Safechuck's credibility, all of which the Jackson Estate would have provided if the filmmakers had sought a comment on these claims, which they did not.

62.    HBO and Reed never approached the Estate, Jackson's family, Jackson's friends or children, or anyone else, to scrutinize Robson's and Safechuck's claims. The two inter-related reasons they kept their hit piece secret are rather obvious: (1) They knew that Robson's and Safechuck's stories would collapse on scrutiny; and (2) They knew that if the Jackson Estate had known such a documentary was coming, they could have had time to prepare for it with a piece of their own. This is also why neither was identified in the announcement of the Film; and it was *the Estate* in its initial public statement that "outed" the subjects of the Film.

63.    In a perhaps naïve hope that HBO would do the right thing, the Jackson Estate wrote Richard Plepler a detailed, ten-page letter explaining many (but far from all) of the problems

17

with the Film and the two men at the center of it. The Jackson Estate did not make threats; it just asked to sit down with HBO so that it could be heard before the documentary aired on HBO.[2]

64.    HBO never even had the decency to respond to the letter. The day after sending the letter, however, HBO's programming President Casey Bloys arrogantly told the press that:

"There are no plans to take a meeting [with the Jackson Estate]. We are airing the 'documentary' and the letter is not going to change that."

65.    Casey Bloys explained that he and HBO had decided *not to even explore potential credibility problems with the Film* because "it's a very powerful documentary." Any halfway decent filmmaker can make a "powerful documentary" about anything if the filmmaker *admittedly refuses* to consider the credibility of the persons in the documentary. A "documentary" that *willfully ignores any evidence contrary to its thesis* can of course still be a "powerful documentary." But at the same time, any such "powerful documentary" would have more in common with tabloid sensationalism than with *bona fide* journalism. We challenge HBO and the public to name a *reputable* documentarian and a *reputable* network that would willfully refuse to discuss such serious accusations *with no one other than the accusers*. Name one.

66.    Other than ethics and journalistic norms, the main check on making a "powerful documentary" with false accusations, without talking to anyone other than the accusers and their families, is the law of defamation. And *that* is the heart of the issue. As noted at the beginning of this pleading, it has long been the rule in Anglo-American law that there is no civil liability for defamation of the deceased. HBO and Dan Reed are using that very unfortunate rule of law to ignore all norms of journalism, and to justify *their abject refusal to talk to anyone* who might discredit Robson and Safechuck's made-up stories.

67.    Casey Bloys bragged to a publication that the Film had been vetted by HBO's "many lawyers." We assume HBO's "many lawyers" did two minutes of legal research to discover that HBO had nothing to worry about—*you can literally say anything about a dead person and*

---

[2] That letter is attached as Exhibit A to this Petition. Notably, every single assertion in it can be backed up by source documents for anyone interested in actually learning the truth.

18

PETITION TO COMPEL ARBITRATION

*you face no civil liability whatsoever*. You do not need Westlaw to understand that; Google will suffice. The fact that HBO's lawyers figured that out is nothing for Casey Bloys to brag about.

68.    But HBO's "many lawyers" missed their non-disparagement obligations to Jackson and Optimum. And HBO cannot just "blame the lawyers" for this mistake. Its CEO, Richard Plepler was almost certainly aware of why the Film violated obligations HBO had to Michael Jackson, yet Plepler appears to have willfully ignored those obligations. Sadly, Plepler's mandate from AT&T, and his need to find content no matter what, seems to have led him to ignore the company's obligations and basic ethics and decency.

**J.    HBO Refuses to Communicate with Petitioners**

69.    The Agreement includes a mandatory arbitration clause. It reads as follows:

> (iv) Arbitration. Any dispute arising out of, in connection with or relating to this Agreement shall be submitted for binding and final arbitration before a retired judge of the Superior Court of the state of California for the County of Los Angeles who shall be mutually selected by the parties. In the event that the parties cannot agree on the selection of such a retired judge within 30 days after one of the parties notifies the other in writing that there is any such dispute to be resolved, each party shall select such a retired judge, and the two retired judges so selected shall then select a third retired judge who shall serve as the sole judge in connection with such dispute. If the two party-appointed judges are unable to select a third judge within 30 days after their appointment, the sole retire judge in connection with such dispute shall be selected by the Superior Court of the State of California for the County of Los Angeles. The retired judge so selected shall conduct the arbitration in conformity with the rules of, and as if it were conducted by, the American Arbitration Association.

70.    On February 7, 2019, through their counsel, the Co-Executors of the Estate of Michael Jackson and Optimum Productions sent a letter to HBO's Chief Executive Officer regarding *Leaving Neverland*. Though HBO was surely already aware of them, the letter catalogued the many glaring deficiencies with and recklessness of the Film, as well as the mountain of evidence disproving the false story peddled by Robson and Safechuck.

71.    In the letter, counsel for the Co-Executors of the Jackson Estate and Optimum Productions requested a meeting with HBO to discuss a solution. HBO has never responded. Rather, ***HBO stated publicly and in no uncertain terms that it will not communicate with the Jackson Estate or its related entities with respect to any issues relating to the Film***. As noted

19

above, HBO's Casey Bloys made it unequivocally clear that HBO has no interest in the truth or in discussing the film with Petitioners.

72.     HBO has therefore completely shut down Petitioners' attempt to reach out to HBO and request arbitration of this dispute.

73.     HBO's spin machine may argue that the Jackson Estate is only demanding arbitration in order to shroud proceedings in secret. False. The Jackson Estate is demanding arbitration because that is what its contract with HBO requires. Unlike HBO, Michael Jackson, his successors, and affiliated companies keep their promises. They agreed to arbitrate and that is what they will do. However, in order to alleviate the predictable nonsense that will come from HBO's spin machine that the Jackson Estate only wants an arbitration so that proceedings are shrouded in secrecy, the Jackson Estate expressly requests that HBO agree to a *public* arbitration. Indeed, the Robson and Safechuck litigations were carried out in the public courts, and all of the *false, graphic and detailed* statements about how Jackson supposedly abused Robson and Safechuck—which have caused such a stir in the press—were all available in the public records. Had HBO actually looked at the public records of the lawsuits, it would have discovered that, along with the fact that the credibility of Robson and Safechuck were absolutely devastated in the trial court. Unfortunately, however, it is obvious HBO did no diligence at all.

## PARTIES, JURISDICTION AND VENUE

74.     Jurisdiction is proper in the Superior Court of the State of California for the County of Los Angeles pursuant to section 410.10 of the Code of Civil Procedure. Venue is proper in Los Angeles County, California, pursuant to section 1292 of the Code of Civil Procedure because the agreement was made in Los Angeles County, the arbitration clause calls for performance in Los Angeles County, and all parties do substantial business in Los Angeles County.

75.     Petitioner Optimum Productions ("Optimum") is a California corporation. Optimum is the successor in interest to TTC Touring Corporation ("TTC"), a California corporation. TTC and Optimum merged in or around December 2010, with Optimum as the successor corporation. A true and correct copy of the "Agreement of Merger" on file with the California Secretary of State is attached hereto as Exhibit C. Petitioners John Branca and John

20

McClain are the duly-appointed and currently-serving Co-Executors of the Estate of Michael Jackson, and are parties in that capacity.

76.    Respondent Time Warner Entertainment, L.P., is a Delaware limited partnership. As of 1992, "Home Box Office" was a Division of Time Warner Entertainment, L.P. Respondent Home Box Office, Inc., is a Delaware corporation. On information and belief, it is the successor-in-interest to the "Home Box Office" Division of Time Warner Entertainment, L.P.

77.    Respondent Does 1 through 5 are business entities whose identities or roles are unknown who induced the two named Respondents to breach their contractual obligations to Petitioners and intentionally or negligently interfered with those obligations.

78.    Respondent Does 6 through 10 are individuals whose identities or roles are unknown who induced the two named Respondents to breach their contractual obligations to Petitioners and intentionally or negligently interfered with those obligations.

## FIRST CAUSE OF ACTION TO BE ARBITRATED: BREACH OF CONTRACT

### (Against all Defendants)

79.    Petitioners incorporate by reference all prior allegations of this pleading.

80.    Petitioner Optimum's predecessor entity, TTC, entered into a valid and enforceable contract with "Home Box Office" a Division of Respondent Time Warner Entertainment, L.P.  A true and correct copy of the Agreement is attached hereto as Exhibit B. Michael Jackson was an intended third party beneficiary of the Agreement.

81.    Petitioners John Branca and John McClain are the duly-appointed and currently-serving Co-Executors of the Estate of Michael Jackson, and have therefore succeeded to Michael Jackson's rights under the Agreement.

82.    On information and belief, Respondent Home Box Office, Inc., is the successor-in-interest to the "Home Box Office" Division of Respondent Time Warner Entertainment, L.P., and has therefore succeeded to the obligations of the "Home Box Office" Division of Respondent Time Warner Entertainment, L.P.

83.    Respondents have breached their obligations to Petitioners under the Agreement for the reasons set out above, including but not limited to by disparaging Michael Jackson and

21

disparaging the Dangerous World Tour.

84.   Petitioners have performed all their material obligations under the Agreement, which may be dependent upon the breached obligations, except as may have been excused or waived.

85.   Respondents' breaches of the Agreement have caused damages to Petitioners in an amount to be prove in an arbitration, with such damages potentially exceeding $100 million should Respondents' succeed in the damage they are intending to cause to the legacy of Michael Jackson and the businesses associated with the Jackson Estate.

## SECOND CAUSE OF ACTION TO BE ARBITRATED:

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against all Defendants)

86.   Petitioners incorporate by reference all prior allegations of this pleading.

87.   In the Agreement, as in every contract or agreement, there is an implied promise of good faith and fair dealing such that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

88.   Respondents have breached the duty of good faith and fair dealing by unfairly interfering with Petitioners' right to receive the benefits of the Agreement.

89.   Petitioners have performed all their material obligations under the Agreement, which may be dependent upon the breached duty of good faith and fair dealing, except as may have been excused or waived.

90.   Respondents' breaches of the duty of good faith and fair dealing have caused damages to Petitioners in an amount to be prove in an arbitration, with such damages potentially exceeding $100 million should Respondents' succeed in the damage they are intending to cause to the legacy of Michael Jackson and the businesses associated with the Jackson Estate.

### PRAYER FOR RELIEF

WHEREFORE, Petitioners pray for relief against Respondent as follows:

1.   That the Court compel HBO to participate in a non-confidential arbitration consistent with the terms of the Agreement to arbitrate claims for breach of the non-disparagement

clause in the Agreement and breach of the covenant of good faith and fair dealing therein. In that arbitration, the Jackson Estate will seek all damages proximately caused by HBO's reprehensible disparagement of Michael Jackson, which could exceed $100 million should HBO succeed in the damage it is intending to cause to the legacy of Michael Jackson. Petitioners further pray that the arbitrator award punitive damages in the maximum amount permissible if and when Petitioners show their entitlement to such damages.

DATED: February 21, 2019

KINSELLA WEITZMAN ISER
KUMP & ALDISERT LLP


By:  _____/s/Howard Weitzman_____
    Howard Weitzman
    Attorneys for Optimum Productions and John
    Branca and John McClain as Executors of the
    Estate of Michael J. Jackson

10386.00347/623076

PETITION TO COMPEL ARBITRATION

# EXHIBIT A


KINSELLA
WEITZMAN
ISER
KUMP &
ALDISERT LLP

**Howard Weitzman**
Direct Dial: (310) 566-9811
Direct Fax: (310) 566-9871
E-Mail: hweitzman@kwikalaw.com

February 7, 2019

<u>**VIA E-MAIL AND OVERNIGHT DELIVERY**</u>

Richard Plepler
Chief Executive Officer
Home Box Office, Inc.
1100 Avenue of the Americas - 15th Floor
New York, NY 10036
(212) 512-1960
E-Mail: richard.plepler@hbo.com

> Re:   <u>Michael Jackson</u>

Dear Mr. Plepler:

We are counsel to the Co-Executors of the Estate of Michael J. Jackson, as well as various wholly-owned entities which own intellectual property and other intangible rights associated with the late Michael Jackson (collectively the "Estate" or the "Jackson Estate").

We write regarding *Leaving Neverland,* an admittedly one-sided, sensationalist program—referred to as a "documentary" by HBO and others—that HBO apparently funded and intends to air this Spring. The Estate first learned about this program in early January when its premiere at Sundance was announced in the press. As you must know, contrary to all norms of documentary filmmaking, the Estate was *never* contacted by the supposed "documentarian," Dan Reed (or anyone else associated with the program) to provide the Estate's views on, and responses to, the absolutely false claims that are the subject matter of the program. Likewise, no one else who might offer evidence to contradict the program's premise was consulted either, as Dan Reed has publicly admitted.

When the program was first announced, HBO and its producing partners did not disclose the identities of the two subjects of the documentary, but referred to them only as "two men." However, from even the brief descriptions of the "two men" in the announcement, the Estate knew exactly who they were: Wade Robson and James Safechuck. The Estate knew this not because it had any inside "sources" about the documentary—it had none—but because these two men have been peddling their false "story" for years now, most notably in a series of failed legal actions against the Estate. The Estate did not hesitate to advise the media of their identity. The Estate was one-hundred percent confident that there were no other purported "victims" who this documentary could be about (because, contrary to Robson's and

Richard Plepler
February 7, 2019
Page 2


Safechuck's lawyers' predictions when they first filed their lawsuits for hundreds of millions of dollars in 2013, no "flood" of further identifiable "victims" ever came forward beyond these two). HBO and its producing partners were then forced to acknowledge that the Estate had "guessed right" and that the two subjects of the film were indeed those two admitted perjurers who had filed lawsuits against the Estate, all of which have now been dismissed with prejudice (but as noted below are pending on appeal).

The Estate spent years litigating with Robson and Safechuck, and had *four different lawsuits* by these two men *dismissed with prejudice*. (Today, Robson owes the Estate almost seventy thousand dollars in court costs, and Safechuck owes the Estate several thousand dollars as well.) In those litigations, the Estate discovered troves of information about Robson and Safechuck that made it unequivocally clear that they had no credibility whatsoever. We discuss some of that information below, but the information discussed in this letter is just the tip of the iceberg on these two. Had HBO actually complied with the most basic of journalistic ethics—rather than just accept their salacious allegations at face value—it would have discovered so much more long before it ever got involved in this disgraceful project. Obviously, *that* is the reason that Dan Reed and HBO's producing partners *initially tried to hide the identities of Robson and Safechuck*. This ambush was carried out because Dan Reed knew that Michael Jackson's family and friends, his Estate, and his millions of fans who are *deeply knowledgeable* about the case would have discredited Robson and Safechuck before filming began.

### HBO Is Being Used As Part of Robson's and Safechuck's Litigation Strategy

Robson and Safechuck are pursuing appeals of the judgments against them, appeals that will probably be heard this year. As *many* other press outlets noted when their lawsuits were still pending in the trial court, Robson, Safechuck, and their shared attorneys have long engaged in a deliberate campaign to try their case in the media, most often through leaks of false information to some of the most salacious online tabloids. Had HBO done any research into this, it would have easily discovered that every year or so while the litigation was pending, before a major issue was to be decided, the tabloids would suddenly be full of false claims being peddled by Robson's and Safechuck's attorneys about Michael Jackson. The trial court never let this avalanche of false claims affect it, and we have no doubt that the Court of Appeal will not be affected by it either. That said, Robson's and Safechuck's lawyers will continue attempting to try their cases in the media.

As noted, Robson and Safechuck are now appealing the dismissal of their multi-million dollar lawsuits. Not coincidentally, their appeals are likely to be heard later this year. HBO's "documentary" is simply just another tool in their litigation playbook, which they are obviously using in a (very misguided) effort to somehow affect their appeals. Sadly, it appears that HBO—a once great and respected network—has now been reduced to the pay television version of *Hard Copy* (with a little mix of *The Jerry Springer Show*). Most pathetically, HBO has been reduced to a pawn in part of Robson's and Safechuck's attorneys' litigation strategy.

Richard Plepler
February 7, 2019
Page 3

### HBO and Dan Reed Intentionally Chose Not to Interview Anyone Who Would Detract From Their Story

*Leaving Neverland* rehashes accusations against the late Michael Jackson of committing the most heinous crimes any person can be accused of in modern society. Given the seriousness of those allegations, one would have expected that HBO and its producing partners would contact: (1) the Jackson family; (2) persons who worked with Jackson during the relevant time period; (3) other young men and women who spent time with Jackson as children (including ones mentioned by name in the "documentary"); (4) friends of Michael Jackson who knew him for his whole life; (5) the many persons who know Safechuck and Robson well but do not believe them; (6) Tom Mesereau and his investigator, Scott Ross, who Robson happily met with for hours in 2005 to tell them about his experiences with Michael, with Mesereau finding Robson so credible that he made Robson the first witness for the defense in Jackson's 2005 trial; and (7) the Estate, who spent years litigating *the very claims* discussed in the "documentary" by Safechuck and Robson. Yet, shockingly, HBO and its producing partners *never attempted to contact* any of these people. The fact that HBO and its producing partners did not even deign to reach out to any of these people to explore the credibility of the false stories Robson and Safechuck told violates all norms and ethics in documentary filmmaking and journalism. It is a disgrace.

In fact, Dan Reed admitted in the question and answer session at Sundance that he *never* even attempted to contact the many, many other young men and women who spent time with Jackson as children, yet continue to defend him to this very day. And at least two of these young men are *referenced by name in the film* with the implications that they "replaced" Robson and Safechuck as Jackson's "abuse victims." Both have gone on record since the documentary was announced to explain that they were never abused by Jackson. One of them, who Robson *explicitly* claimed in the film "replaced" him, has released several "tweets" denouncing the documentary as a work of fiction. Yet neither of them—among the many others who spent time with Jackson as children—were ever approached by Dan Reed and HBO.

In other words, HBO's "documentary" is based *solely* on the word of two admitted perjurers. HBO and its partner, Dan Reed, never even attempted to explore whether these two men might not be telling the truth. We have read reports that these two men are supposedly "credible" in the documentary because they tell their story so fluidly. Yet they have been practicing their stories and rehearsing their lines (which changed throughout the litigation as discussed below) for years now. Thus, it is no surprise that these two men—who have also both acted professionally—tell their false story well. The bottom line is that any halfway skilled filmmaker could make a "documentary" telling any outrageous story about a dead man if they can just find two people willing to tell that story *and then not challenge those two at all*. That is particularly the case when one of the men—Wade Robson—is a self-described "master of deception"; and his own mother testified under oath that he should "have had an Oscar" given how good a liar he is (as discussed below).

Richard Plepler
February 7, 2019
Page 4


### In Interviews, Dan Reed Is Using HBO in Order to Bolster the Credibility of the Program Despite Making Blatantly False Statements in Those Same Interviews

Notably, HBO's reputation is being used as one of the main reasons that the "documentary" should be taken seriously. The producer of this program, Dan Reed, is telling the media that one of *the principal reasons* the documentary is credible is because of HBO's reputation. When asked whether an attorney had vetted the film, he responded, "that's what happens on every single film I make or, to my knowledge, that anyone makes, *certainly for HBO*."[1] The usual checks on filmmakers are ethical and normative ones, such as fact-checking (e.g., are their stories consistent? *see* below), investigating the motivations of people (e.g., do they have a financial motivation to say what they are saying?), talking to others with knowledge who may have something different to say, etc. But as is apparent from our discussion below, HBO apparently no longer cares about these ethical and normative checks on documentary filmmaking and journalism anymore. If HBO does care about such things, this documentary will never air on HBO.

In the same interviews where he touts HBO's involvement as a reason for his "documentary's" supposed "credibility," Mr. Reed has also made *blatantly false statements* about Robson and Safechuck in an effort to bolster their credibility. For example, in the same *Huffington Post* interview discussed above, Mr. Reed agrees with the interviewer that "one of the most impactful things in the documentary is the way [Robson's and Safechuck's] stories align ... even though they didn't know each other until now." In another interview, Reed "confirms" that "for legal reasons, [Robson and Safechuck] were kept apart, long before you even approached them about making the movie." Reed expands on that and says that this was done so "they couldn't exchange stories. Sundance was the first time [as adults] that they'd met. It's the first time they've had any significant time together."[2] *This is utterly false*. In Robson's 2016 deposition, he testified that he had spoken to Safechuck in 2014, the year Safechuck filed his lawsuit against the Estate. When asked what the two men had spoken about, Robson refused to answer the question—his attorney instructed him to remain silent because Robson's and Safechuck's common attorneys were involved in the conversations between the two men in 2014. Accordingly, we can never know what they talked about and how they aligned their stories with their attorneys' help. Given that they were both seeking hundreds of millions of dollars against the Estate, they had hundreds of millions of reasons for aligning their stories.

---

[1] https://www.huffingtonpost.com/entry/leaving-neverland-michael-jackson-dan-reed_us_5c500044e4b0d9f9be689ab0

[2] https://www.rollingstone.com/movies/movie-features/leaving-neverland-director-dan-reed-michael-jackson-interview-785817/

Richard Plepler
February 7, 2019
Page 5

In any event, the idea that two men who are represented by the same attorneys for the last six years would have stories that "align" is hardly surprising. You really cannot be so naïve that you would not understand this.

Finally, we must note that we can only assume that the legendary Sheila Nevins had nothing to do with the decision to go forward with this "documentary." It is a shame that she is no longer involved in these types of decisions for HBO. That HBO, the once iconic network, would fund, produce and distribute this pathetic and untruthful vehicle for these admitted liars to revisit false allegations made *as part of their effort to revive their dismissed lawsuits* is just plain sad.

### Robson and Safechuck Were Repeatedly Caught Lying During Their Failed Lawsuits Against the Jackson Estate

Wade Robson testified *in detail* as an adult before a jury in 2005 that Michael Jackson never did anything wrong with or to him. He was then subjected to a withering cross-examination by Ron Zonen, one of California's most-seasoned prosecutors. Yet, despite that, Wade Robson never wavered. Moreover, even after his testimony, there are many videos of him (readily available online) where he praises Michael Jackson as an inspiration and denies that Michael ever molested him.

But even setting that aside, Robson was also caught *lying repeatedly* in the dismissed litigations with the Estate. For example, in order to try to get around the statute of limitations for monetary claims against the Estate, Robson testified under oath that "[p]rior to March 4, [2013,] I did not understand or was even aware that an Estate [of Michael Jackson] had been opened for administration." That was a lie. In truth, Robson had personally met with John Branca, one of the Estate's executors, at Mr. Branca's office in 2011 in a (failed) effort to solicit work with the Estate on a Michael Jackson-themed *Cirque du Soleil* show. Prior to meeting with Mr. Branca, Robson's talent agent told him that he had to contact "John Branca, the person in charge of MJ's estate." Not surprisingly, the trial judge dismissed Robson's claims against the Estate, finding that *no rational person* could believe Robson's declaration that he did not know about Michael Jackson's Estate until March 4, 2013 when he, in fact, had met with John Branca, the Co-Executor of the Estate. In plain English, the judge found that Robson had lied in his sworn declaration. (The idea that Robson would want to spend years of his life creating and directing a Michael Jackson-themed show, when he was in fact a victim of horrendous abuse by Jackson, is itself hard to take seriously.)

Robson's meeting with Mr. Branca was hardly the first time that he tried to capitalize on his relationship with Michael Jackson after Michael's death when he thought it would help him make money. In the days after Michael's death, Robson released a statement praising Michael as *"one of the main reasons I believe in the pure goodness of human kind."* He then tried to solicit work from Kenny Ortega, the director of *Michael Jackson's This Is It*, to help work on the movie. Robson was able to secure work with Janet Jackson, in her 2009 MTV Video Music Awards tribute to Janet's late brother Michael. In videos behind the scenes

Richard Plepler
February 7, 2019
Page 6

of the tribute show (easily found online), Robson is seen praising Michael Jackson in the most effusive terms.

During the litigation with Jackson's companies, Robson was also caught trying to hide evidence before his cases were dismissed. For example, Robson *lied under oath* and stated that, other than one brief email in late 2012, he had had *"no written communications"* with anyone (other than his attorneys) about his newly-concocted allegations that he was abused by Jackson. This turned out to be a complete and utter lie. Robson had actually shopped a book about his allegations in the year prior to filing his lawsuit—a book he tried to hide from the Estate. That book told a completely different story of how he was first abused by Jackson. When asked about some of these discrepancies at his deposition, Robson explained that his memories had "evolved" since writing the draft of the book in late 2012 and early 2013. He explained that "post disclosing the abuse in 2012 and beginning that healing journey, they've evolved as far as I remember more details about scenarios. As it goes along, you know, it evolves, *details get added to.*"[3]

Moreover, despite lying under oath in his lawsuit that he had had *"no written communications"* with anyone about his supposed abuse, he was eventually ordered by the trial court to produce all such documents. Robson produced hundreds (if not thousands) of written communications (emails, texts, etc.) with his family and friends about his false abuse allegations. He never explained why he lied and said he had *no* such communications.

Most notably, many of these communications were with his mother where he *admittedly* was trying to reconstruct his own "memories" of the time period when he was supposedly abused—i.e., in his own words, to "add" the "details" that he did not know when he was drafting his book. In one email, he lists over twenty different questions to his mother asking her about the specific details of his interactions with Michael Jackson. Some of these include: "Can you explain all that you remember of that first night at Neverland? What happened when we drove in what did we do? And that first weekend at Neverland?" Notably, in the "documentary," Robson now recounts "his" supposed "memories" of these events in great detail. But Mr. Reed and Robson never explain that he had to first ask his mother scores of questions before he could tell his story. Indeed, despite telling the story of his first night at Neverland in the documentary as if it is his own memory, at his deposition, he admitted that he "did not know" if his memory of that night "came from [his] own recollection or [if] it was told to [Robson] by someone else."

Simply put, Robson is an *admitted perjurer* who proudly called himself (in his draft book) a "master of deception." Robson is such a good liar that *his own mother* testified under

---

[3] We would be happy to provide you with any source documents, such as depositions, documents produced in discovery, etc. It is a shame Mr. Reed and your colleagues at HBO were not interested in such documents when producing their "documentary."

Richard Plepler
February 7, 2019
Page 7

oath at her deposition that she could not tell when he was lying; she even *volunteered* that "*he should have had an Oscar*" given how convincing his lies were. It may just be that he deserves an Oscar for HBO's "documentary" as well.

Robson's fabricated story, of course, is that Jackson's abuse caused him to have two self-described nervous breakdowns in 2011 and 2012. Those breakdowns, according to Robson, caused him to realize that he had been abused by Jackson decades before. But there is a much more simple explanation for Robson's breakdowns. He has a family history of suicidal, major depression on his father's side. Robson's father committed suicide in 2002. Robson's first cousin on his father's side committed suicide in 2012. Unfortunately, major depression is a very heritable disease. Thus, it is no surprise that Robson had these breakdowns. And it is even less surprising that he has continued to have breakdowns given that when Robson saw a psychiatrist in 2011 he was prescribed anti-depressant medication. But he *refused to ever take that medication*. To be clear, we ascribe no "fault" or "weakness" whatsoever to those who suffer or who have suffered from clinical depression. That said, we must note Robson's mental illness, and his abject and stubborn refusal to get appropriate medical treatment for it, *because* Robson's claim is that his "nervous breakdowns" are *strong evidence* of his abuse by Jackson. But those breakdowns are much more easily explained by Robson's family history of major depression and his own (apparent) diagnosis of depression *for which he stubbornly and irrationally refused to take the medication prescribed to him* by a medical doctor to treat it.

As for Safechuck, by his own admission, he did not "realize" that he had been abused until after he saw Robson on the *Today Show* in May 2013 being interviewed by Matt Lauer about Robson's newly-concocted story of abuse. All of a sudden, Safechuck realized that he had been abused. He then contacted Robson's lawyers and filed copycat lawsuits against the Estate for millions of dollars. And like Robson, he too had testified under oath that Jackson never did anything inappropriate with him. His two cases against the Estate were also dismissed.

Safechuck's frivolous lawsuits were dismissed so early in the proceedings that significant discovery was never taken in his case, and he was able to avoid having his deposition taken and producing documents. But even in his sworn declarations in the litigations, there are clear signs that he is lying and trying to construct a false story of abuse from his vague memories of his interactions with Jackson. For example, Safechuck claimed in his sworn declaration that he was first abused on the Paris leg of the *Bad* Tour, which he correctly identifies as taking place in late June 1988 (as a simple Wikipedia search would reveal). He later says that after the *Bad* tour ended, Michael flew him out to New York "in February 1989" where Michael was performing at the Grammy's. Safechuck states in his declaration that he was abused on this New York trip for the Grammy's. However, the Grammy's were not in New York in 1989; they were in Los Angeles that year (and in 1990). And Michael did not perform at the Grammy's in 1989. However, Michael *did* perform at the Grammy's in New York in *February 1988*, i.e., *before* Safechuck claims he was first abused

Richard Plepler
February 7, 2019
Page 8

in June 1988. Yet he somehow claims that he was abused on a New York trip to the Grammy's *that occurred before he claims he was first abused*. Safechuck's "error" here is obviously reflective of an effort to create a story of abuse out of whole cloth. Or in other words, Safechuck is just making it up as he goes along.

In the "documentary" and in his declaration for the litigation, Safechuck spins a tale about how he refused to testify for Jackson in 2005, despite threats from Jackson and his legal team. Setting aside the absurdity of Jackson and his sophisticated legal team trying to convince an unwilling and unstable witness to testify on such a sensitive issue, Safechuck's story is demonstrably false. In particular, Safechuck declares that Michael and his legal team called him *"towards the end of the criminal trial"* trying to pressure him to testify. But this statement cannot be true. Early on in the trial, the Judge precluded the prosecution from allowing *evidence* regarding alleged molestation of Safechuck and others because the "evidence" of such molestation was unreliable. The exceptions were that the Judge did allow testimony from certain disgruntled workers that they had heard that Michael had molested Wade Robson, Macaulay Culkin and Brett Barnes. That is why *those three specifically* testified, and all of them denied the molestation (including Robson of course), and were subject to cross-examination by prosecutors but did not waver. And *that is why* Jackson and his attorneys would *not* have ever tried to pressure an unwilling and unstable Safechuck to testify, particularly "towards the end of the criminal trial" as Safechuck so falsely claims in the documentary and under oath.

\* \* \*

Given all of this, which are facts readily available to anyone doing minimal due diligence, why would HBO produce a documentary based solely on the words of these two liars and director/producer Dan Reed? Why would HBO produce this documentary *without even seeking comment and response* from the Jackson Estate who spent years successfully litigating these false allegations with Robson and Safechuck? Is there any other artist who HBO would do this to? Is there any other artist who HBO would not even seek comment from when making such serious accusations?

Michael Jackson was subjected to a decade-long investigation by an overly-zealous, ethically-challenged, and ultimately disgraced prosecutor in Santa Barbara County, Tom Sneddon, who looked anywhere and everywhere for supposed "victims" of Jackson's. Yet, he never found those "victims." Indeed, the 2005 criminal trial of Jackson was a complete farce, and Michael Jackson was completely exonerated. As anyone who has studied that trial knows, the jury utterly repudiated the prosecution's case. In both his opening and closing statements, Jackson's attorney, Tom Mesereau, took the unusual step of telling the jury that they should acquit Jackson because Mesereau and his team *had proven Jackson innocent*. In other words, he did not try the case as a "reasonable doubt" case. Mr. Mesereau tried the case with the purpose and goal of proving Jackson innocent. And he did exactly that. As recently as 2017, several jurors were re-interviewed about the case in light of Robson's about-face, and they all agreed that they would still acquit Jackson today. The jurors have been interviewed many

Richard Plepler
February 7, 2019
Page 9

times; they are articulate bright people, not the gullible idiots that Dan Reed tries to paint them as in his "documentary." Yet HBO is relying on the uncorroborated stories of two admitted perjurers over the weight of the American justice system.

Of course, the tabloid media's fascination with Michael Jackson and telling more-and-more ridiculous stories about him is nothing new. The great American intellectual, James Baldwin, wrote about "the Michael Jackson cacophony" all the way back in 1985 when the media first began subjecting him to "the jaws of a carnivorous success." As Baldwin saw it, Michael "will not swiftly be forgiven for having turned so many tables, for he damn sure grabbed the brass ring, and the man who broke the bank at Monte Carlo has nothing on Michael." By 1985, when Baldwin wrote those words, Michael Jackson was a 27-year-old African-American from Gary, Indiana who had "turned the tables" on the entire power structure in the music business. Leveraging his unprecedented success, Michael insisted that MTV and mainstream radio play his music and that of other African-American artists like him. Michael also insisted that his record company assign him ownership of his own master recordings. In other words, Michael Jackson, the young artist, insisted on controlling his own art and not leaving it to the whims of big business. And more still—the 27 year-old Michael did not just own his own music publishing, he had the gall to outbid other more established players in the industry for one of the crown jewels of music publishing, the ATV catalogue (which famously included the Beatles catalogue).

We suspect that even James Baldwin could not have imagined that his words would still ring so true today, over thirty years later. Michael Jackson has yet to "be forgiven for having turned so many tables" even ten years after he left this world forever. Even the once great HBO—who had partnered with Michael to immense success—is subjecting the deceased Michael Jackson to "the jaws of a carnivorous success" in death, devoting *four hours* of its programming to the words of two serial perjurers, whose sole agenda has been to extract money from Jackson's rightful heirs and chosen beneficiaries.

That HBO has now joined the tabloid media's "Michael Jackson cacophony"—ten years after his death—is truly sad. We know that HBO is facing serious competitive pressures from Netflix, Amazon and other more modern content providers, but to stoop to this level to regain an audience is disgraceful. We know HBO and its partners on this documentary will not be successful. We know that this will go down as the most shameful episode in HBO's history. We know that Michael's devoted fans, and all good people in the world, will not swiftly forgive HBO for its conduct.

Richard Plepler
February 7, 2019
Page 10

Mr. Plepler, as you yourself said in late 2017: "A lie goes halfway around the world before the truth puts its boots on."[4] The media coverage alone of this disgraceful "documentary" has proven you right.

We would be happy to meet with HBO to discuss a solution. We have plenty of further information and witnesses that would expose these two for who they are. If HBO wants to maintain its industry position as a valid source of news and fact, it owes an obligation to the public—not to mention the deceased Michael Jackson with whom HBO had previously partnered with during his lifetime—to actually investigate these matters.

Barring that, this "documentary" will say a lot more about HBO than it ever could about Michael Jackson.

Very truly yours,

/s/

Howard Weitzman

HW/JPS

cc:    Jonathan P. Steinsapir, Esq.
       Bryan Freedman, Esq.
       Eve Konstan, Esq. General Counsel, HBO
       Glenn Whitehead, Esq., EVP, Business & Legal Affairs, HBO

10386.00347/618197

---

[4] https://deadline.com/2017/10/hbo-richard-plepler-confederate-backlash-vanity-fair-summit-1202181519/

# EXHIBIT B

CV. BY:GREENBERG, GLUSKER    ; 7-31-92 ; 2:46PM ;HBO    →    3105530687;# 2



MICHAEL JACKSON
Jack792.1a
VE073192(2)

As of July 22, 1992

TTC Touring Corp.
c/o Greenberg, Glusker, Fields, Claman & Machtinger
1900 Avenue of the Stars
Suite 2000
Los Angeles, CA  90067

Attention: Sandra A. Dewey, Esq.

RE: MICHAEL JACKSON IN CONCERT

Gentlemen:

The following shall confirm the terms and conditions of the agreement between Home Box Office, a Division of Time Warner Entertainment Company, L.P. ("HBO") and TTC Touring Corp. ("Licensor") for the above-mentioned program.

Performer: Michael Jackson.

Program: An approximately 120 minutes in length in-concert program featuring Performer (the "Program"), which Licensor shall record at Performer's live concert in Bucharest, Romania currently scheduled for October 1, 1992 (the "Performance"). The Program shall thereafter be delivered to HBO for exhibition by HBO on October 10, 1992 (or at such later date as set forth in the "Cancellation" paragraph below). The Program shall contain up to approximately ten (10) minutes (but in no event more than twelve (12) minutes) of footage (which shall include, if it is used, the video, approximately three (3) minutes in length, featuring Performer which is shown at the beginning of the Performance before Performer appears on stage) other than in-concert footage of Performer during the Performance (the "Non-Concert Footage"); provided that (i) the entirety of the Non-Concert Footage shall be placed immediately at the beginning of the Program; and (ii) the remainder of the Program shall consist solely of uninterrupted in-concert footage of Performer during the Performance.

Delivery: The Program shall be delivered to HBO no later than October 8, 1992; provided that Licensor shall use reasonable efforts to deliver the Program earlier (the "Delivery Date"). The Program shall be held by HBO for the sole purpose of preparing for HBO's use hereunder such videotapes of the Program as HBO requires. HBO is not granted the right to own the Program. After delivery of

-1-

RCV BY:Greenberg Glusker et  ; 7-31-92 ; 1:31PM ;HBO NY 14 FL          →              5530687;# 5

TTC Touring Corp.
As of July 22, 1992

the Program, HBO may not alter or edit the Program in any way.  If there are technical or legal reasons why the Program requires alteration or editing, HBO shall immediately notify Licensor of such problems, and Licensor shall be responsible for the immediate correction thereof.  Within thirty (30) days after the Exhibition Date (as hereinafter defined), HBO shall return to Licensor all videotapes of the Program in its possession and any promotional or advertising materials delivered to HBO by Licensor in connection with this Agreement; provided that HBO may keep a videotape for archival purposes only.

**Rights:**   Licensor hereby irrevocably licenses to HBO, its successors and assigns, the exclusive rights to exhibit the Program one time only on each transmission feed (without overlap) on the HBO programming service without regard to the number of channels comprising such service by means of Non-Standard Television in the Territory on October 10, 1992 (or at such later date as set forth in the "Cancellation" paragraph below (the "Exhibition Date")) and at no other time.

**License Fee:**  In consideration for the license granted by Licensor to HBO hereunder, HBO shall pay to Licensor ███████████ ██████████████████████████████████████████, payable as follows:

(i)    one third (1/3) by wire transfer within five (5) days after Licensor's execution and delivery of this Agreement;

(ii)   one third (1/3) two weeks prior to the Delivery Date; and

(iii) one third (1/3) within five (5) days after the Delivery Date.

**Holdbacks:**  (A) Neither Performer, nor Licensor, nor any entity or person owned or controlled by Performer and/or Licensor shall cause, authorize, or permit any exhibition, distribution, promotion, publicity or advertisement of the Program, any portion thereof, or any outtakes from the videotaping of the Performance, as follows:

(i) In the Territory, by means of Non-Standard Television, during the twelve (12) month period immediately following the Exhibition Date (the "Holdback Period");

(ii) in the Territory, by means of Standard Television until after the Holdback Period;

-2-

RCV. BY:Greenberg Glusker et  ; 7-31-92 ; 1:31PM ;HBO NY 14 FL          →          5530687;# 6

TTC Touring Corp.
As of July 22, 1992


(iii) in the Territory, by means of Non-Theatrical Distribution, until after the Holdback Period;

(iv) in the Territory, by means of Consumer Video Devices until thirty (30) days after the Exhibition Date; and

(v) outside the Territory by means of any media until one (1) day after the Exhibition Date; provided that it is understood and agreed between the parties hereto that Licensor has entered into an arrangement with Radio Vision International, Inc. pursuant to which Radio Vision International, Inc. has been granted the right to record the Performance and to authorize the broadcast of such recordation twice in certain territories in Europe only (once "live" and once during the six (6) month period following the live broadcast).

(B) Notwithstanding anything to the contrary contained in clause (A), above, Performer or Licensor shall have the right to cause, authorize and permit the exhibition, promotion, publicity or advertisement of the following:

(i) Excerpts from Performer's 1992/1993 tour for purposes of advertising or promoting the 1992/1993 tour or the sale of Performer's records; provided that, no one excerpt or clip of such footage shall exceed two (2) songs in the aggregate;

(ii) a "making of" documentary of Performer's 1992/1993 tour containing not more than twenty (20) minutes of concert footage from Performer's 1993/1993 tour; provided, that such documentary shall not be promoted, advertised or exhibited in the Territory by any means or media until three (3) months after the Exhibition Date;

(iii) any outtakes from the Program, to be used solely in connection with Performer's commercial endorsements (except as set forth in clause (iv) below), not to exceed thirty (30) seconds in length each; and

(iv) any outtakes from the Program, to be used solely in connection with mini documentaries about Performer (except as set forth in clause (iii), above), provided that such outtakes shall not exceed (A) thirty (30) seconds in length each and (B) five (5) minutes in length in the aggregate, for inclusion in each such mini documentary.

Cancellation: (i) If the Performance is canceled for any reason within Licensor's or Performer's control, or within the control of

-3-

RCV. BY:Greenberg Glusker et  ; 7-31-92 ; 1:32PM ;HBO NY 14 FL        →        5530687;# 7

TTC Touring Corp.
As of July 22, 1992

any employee, agent, representative or designee of either of them, Licensor shall, within ten (10) business days after receipt of an invoice therefor, reimburse HBO for any portion of the License Fee heretofore paid.   For purposes of this Agreement, any strike, epidemic, act of God, illness, injury or any other condition beyond Licensor's or Performer's control causing a cancellation (each, a "Force Majeure Event") shall be deemed an event beyond Licensor's and Performer's control. (ii) If the Performance is canceled as a result of any Force Majeure Event, neither Licensor nor HBO shall have any liability whatsoever to the other; provided, that if and only if the Performance and the videotaping thereof are not rescheduled (as set forth in this paragraph), Licensor shall, within ten (10) business days after receipt of an invoice, reimburse HBO for any portion of the License Fee heretofore paid which has not been expended or irrevocably committed by Licensor on the actual production of the Program by the date of cancellation of the Performance.   Licensor shall account to HBO in writing simultaneously with said reimbursement for any amounts so expended. Notwithstanding the foregoing, Licensor shall have the right to reschedule the videotaping of the Program during one of the performances during Performer's 1992/1993 tour; provided that the Exhibition Date must be within two (2) weeks following October 10, 1992; and provided further that the venue of such rescheduled performance shall be subject to HBO's approval.

As used throughout this Agreement:

"Non-Standard Television" means any and all forms of television exhibition, whether now existing or developed in the future, other than exhibitions by means of Standard Television, Consumer Video Devices, and Non-Theatrical Distribution. Non-Standard Television shall include, without limitation, exhibition by means of cable, wire or fibre of any material, "over-the-air pay" or STV in any frequency band, any and all forms of regular or occasional scrambled broadcast for taping, master antenna, satellite master antenna, low power television, closed-circuit television, single and multi-channel multi-point distribution service, and direct to TVRO satellite transmission, and radio (only for purposes of simulcast), all on a subscription, pay-per-view, license, rental, sale or any other basis.

"Standard Television" means television distributed by a UHF or VHF television broadcast station, the video and audio portions of which are intelligibly receivable without charge by means of standard home roof-top or television set built-in antennas.

-4-

RCV.BY:Greenberg Glusker et  ; 7-31-92 ; 1:33PM ;HBO NY 14 FL          →          5530687;# 8

TTC Touring Corp.
As of July 22, 1992

"TVRO" means a television earth station capable of receiving satellite transmissions.

"Consumer Video Devices" means any form of video device, now existing or hereafter devised, including video discs and video cassettes, for exhibition by means of a playback device causing a visual image of the Program on the screen of a television receiver or any comparable device, whether now existing or hereafter developed, located in consumer homes, including, without limitation, distribution for sale or rent, on a retail subscription, club, mail order or other direct consumer basis.

"Non-Theatrical Distribution" means distribution of the Program by any means or method to educational and/or institutional organizations, airlines for in flight and trains for in-transit distribution, ships-at-sea, remote corporate locations and U.S. military bases.

"Territory" means the United States of America, its territories, possessions and commonwealths.

Promotional Activities:  For purposes of advertising, promoting and publicizing the Program, HBO shall have the right to: (i) use and authorize others to utilize Performer's name, approved likeness; approved recorded singing voice and approved recorded speaking voice; provided, that Performer's recorded singing and/or speaking voice as contained in the Performance and in any interviews conducted by HBO with Performer are hereby deemed approved; and provided further that all other approvals must be obtained from Licensor, and shall be given within five (5) business days of receipt by Licensor of HBO's submission for approval of such likeness and recorded singing and/or speaking voice and failure by Licensor to respond within such five (5) business day period shall be deemed approval; (ii) require Licensor to provide a reasonable number of photographs of Performer; and (iii) screen and utilize audio/visual materials as are reasonably available to Licensor or Performer (as well as clips from the Program) for purposes of creating and airing commercials and on-air promotion.  In the event that HBO shall determine that such audio/visual materials are not sufficient, Licensor agrees to videotape additional materials as requested by HBO of Performer on stage, subject to Performer's availability; provided that  HBO shall be responsible for reimbursing Licensor for out-of-pocket expenses incurred in videotaping such additional materials.  After the Exhibition Date and until the expiration of the Holdback Period, for purposes of advertising, promoting and publicizing the fact that the Program and Performer have appeared on the HBO programming service (but not

-5-

RCV· BY:Greenberg Glusker et  : 7-31-92 ; 1:34PM ;HBO NY 14 FL                →                 5630687;# 9

TTC Touring Corp.
As of July 22, 1992

for the purpose of directly soliciting new subscribers, e.g., in
connection with a specific special offer or an "800" or "900"
telephone number), HBO shall have the right to use (i) excerpts
from the Program, each excerpt not to exceed ten (10) seconds in
length; provided, however, that Licensor shall have the right to
approve (A) such excerpt(s), provided that Licensor shall supply at
least five (5) minutes in the aggregate of such excerpts
(consisting solely of Performer's performance in the Program) on or
before the Exhibition Date and (B) the material which contains any
such excerpt(s) (which approval of such material shall not be
unreasonably withheld); and (ii) Performer's name and/or approved
likeness in printed promotional or advertising material, provided
that Licensor shall have the right to approve the material which
contains any such name and/or likeness.   In connection with
Licensor's approval of material created by HBO and containing
excerpts from the Program, the name and/or likeness of Performer,
such approval shall be notified to HBO no later than five (5)
business days of receipt by Licensor of HBO's submission for
approval; and provided further that failure by Licensor to respond
within such five (5) business day period shall be deemed approval.

Copyright:  Licensor shall be the sole and exclusive owner of all
right, title and interest in, to and with respect to the Program
including, without limitation, the copyright therein and thereto.
Licensor shall register or cause to be registered the copyright in
the Program in the United States Copyright Office and shall protect
the copyright in the Program throughout the Territory.   Licensor
shall deliver to HBO an executed and notarized Memorandum of
Exclusive License, in the form attached hereto.   For such purpose
only, HBO is hereby irrevocably appointed the attorney-in-fact of
Licensor to execute, verify, acknowledge and deliver any and all
such instruments which Licensor shall fail or refuse to execute,
verify, acknowledge or deliver within ten (10) business days.  HBO
shall deliver to Licensor copies of any documents or instruments
executed, verified, acknowledged and delivered by HBO as attorney-
in-fact of Licensor.

Licensor's Representations and Warranties:  Licensor represents and
warrants that:

        (1)  The  Program,  any  element  thereof,  or  any
advertising, promotional or publicity material supplied by Licensor
hereunder will not contain any language or material which, to the
best of Licensor's knowledge, is libelous, slanderous or defamatory
and will not, to the best of Licensor's knowledge, violate,
infringe upon, or give rise to any adverse claim with respect to,
any common law or other right whatsoever (including, without

-6-

RCV-BY:Greenberg Glusker et  ; 7-31-92 ; 1:34PM ;HBO NY 14 FL          ⇀           5590687;#10

TTC Touring Corp.
As of July 22, 1992

limitation, any copyright, trademark, service mark, literary, dramatic, comedic, musical or photoplay right, right of privacy or publicity or contract right) of any person, firm or corporation, or violate any applicable law;

(ii) Licensor has the right to enter into this Agreement, to grant the rights herein licensed and to perform fully all of its obligations hereunder;

(iii)    Licensor has acquired all rights necessary to Licensor's license of rights to HBO hereunder including, without limitation, music synchronization rights, music master recording rights, still photos, film or videotape footage licenses or other appropriate licenses of all elements of the Program; and

(iv) None of the rights herein licensed to HBO has been transferred to any third party; to the best of Licensor's knowledge, said rights are free of any liens, claims and encumbrances whatsoever in favor of any other party; and to the best of Licensor's knowledge, there are no claims, litigation or other proceedings pending or threatened which would adversely affect HBO's rights hereunder.

HBO's Representations and Warranties:  HBO represents and warrants that it has the right to enter into this Agreement and perform fully all of its obligations hereunder.

Indemnification:  (i)  Licensor shall indemnify and hold harmless HBO, its parent, subsidiary and affiliated companies, distributors, assigns, licensees and the respective shareholders, directors, officers, employees and agents of the foregoing (the "HBO Indemnified Parties") from and against any and all claims, actions, suits, costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, reasonable outside legal fees and expenses) of whatsoever kind and nature imposed on, incurred by or asserted against any of the HBO Indemnified Parties arising out of any breach by Licensor of any representation, warranty or covenant made, or obligation assumed, by Licensor pursuant to this Agreement.  The provisions of this subsection (i) shall apply, without limitation, to claims brought by HBO against Licensor.

(ii) HBO shall indemnify and hold harmless Licensor, its parent, subsidiary and affiliated companies, distributors, assigns, licensees and the respective shareholders, directors, officers, employees and agents of the foregoing (the "Licensor Indemnified Parties") from and against any and all claims, actions, suits,

-7-

RCV·BY:Greenberg Glueker et  ; 7-31-92 ; 1:35PM ;HBO NY 14 FL          →          5580687;#11

TTC Touring Corp.
As of July 22, 1992


costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, reasonable outside legal fees and expenses) of whatsoever kind and nature imposed on, incurred by or asserted against any of the Licensor Indemnified Parties arising out of (A) any breach by HBO of any representation, warranty or covenant made, or obligation assumed, by HBO pursuant to this Agreement; (B) any use by HBO of any advertising or promotional materials not approved by Licensor or Performer; or (C) the production, exploitation or exhibition of any materials created by HBO. The provisions of this subsection (ii) shall apply, without limitation, to claims brought by Licensor against HBO.

Miscellaneous:

(1) Notices. All notices and other communications between the parties hereto shall be in writing and deemed received (i) when delivered in person or by telex or electronic means, or (ii) five (5) days after deposited in the United States mails, postage prepaid, certified or registered mail, addressed to the other party at the address set forth below (or at such other address as such other party may supply by written notice):

Licensor ("Licensor's Address"):

TTC Touring Corp.
c/o Greenberg, Glueker, Fields, Claman & Machtinger
1900 Avenue of the Stars
Suite 2000
Los Angeles, CA  90067

Attention: Bertram Fields, Esq. and
            Sandra A. Dewey, Esq.


with copies to:      MJJ Productions, Inc.
                     10960 Wilshire Boulevard, Ste. 2206
                     Los Angeles, California  90024

                     Attention:  Ms. Norma Staikos

                     Breslauer, Jacobson, Rutman & Sherman
                     10345 Olympic Boulevard
                     Los Angeles, California  90064

                     Attention:  Mr. Richard Sherman


-8-

RCV·BY:Greenberg Glusker et ; 7-31-92 ; 1:36PM ;HBO NY 14 FL                 ⇥              5530687;#12

TTC Touring Corp.
As of July 22, 1992


HBO:

Home Box Office, a Division of
Time Warner Entertainment Company, L.P.
1100 Avenue of the Americas
New York, New York  10036

Attention:  Senior Vice President, Business Affairs

with a separate copy delivered to:

Senior Vice President and General Counsel

(ii) Confidential Information.  It is understood that HBO shall comply with the confidentiality provisions set forth in Exhibit I attached hereto and incorporated herein by this reference.

(iii) Governing Law.  This Agreement should be governed by, and construed in accordance with, the laws of the State of California, applicable to contracts entered into and to be fully performed therein.

(iv) Arbitration.  Any dispute arising out of, in connection with or relating to this Agreement shall be submitted for binding and final arbitration before a retired judge of the Superior Court of the State of California for the County of Los Angeles who shall be mutually selected by the parties.  In the event that the parties cannot agree on the selection of such a retired judge within 30 days after one of the parties notifies the other in writing that there is any such dispute to be resolved, each party shall select such a retired judge, and the two retired judges so selected shall then select a third retired judge who shall serve as the sole judge in connection with such dispute.  If the two party-appointed judges are unable to select a third judge within 30 days after their appointment, the sole retired judge in connection with such dispute shall be selected by the Superior Court of the State of California

-9-

RCV BY:GREENBERG GLUSKER    ; 7-29-92 ; 1:27PM ;512 5587    →    31055300071;#28

TTC Touring Corp.
As of July 22, 1992


for the County of Los Angeles.  The retired judge so selected shall
conduct the arbitration in conformity with the rules of, and as if
it were conducted by, the American Arbitration Association.

Very truly yours,

HOME BOX OFFICE, A division of
Time Warner Entertainment Company, L.P.

By:


ACCEPTED AND AGREED TO:

TTC TOURING CORP.

By:
Federal ID #_____

-10-

RCV BY:GREENBERG GLUSKER    ; 7-29-92 ; 1:27PM ;512 5587    →    3105530687;#29

## MEMORANDUM OF EXCLUSIVE LICENSE

### KNOW ALL PERSONS BY THESE PRESENTS;

In consideration of Ten Dollars, receipt of which is hereby acknowledged, paid by Home Box Office, a Division of Time Warner Entertainment Company, L.P. ("HBO"), and for other good and valuable consideration, the undersigned ("Licensor") does hereby irrevocably license to HBO, its successors and assigns, the exclusive rights to distribute the television program tentatively entitled "MICHAEL JACKSON IN CONCERT" (the "Program") as follows:

Licensor hereby irrevocably licenses to HBO, its successors and assigns, the exclusive rights to exhibit the Program one time only on each transmission feed (without overlap) on the HBO programming service without regard to the number of channels comprising such service by means of Non-Standard Television in the Territory (the "Exhibition Date").

Licensor shall not cause, authorize, license or permit any exhibition, distribution, promotion, publicity or advertisement of the Program, or any portion thereof, as follows:

(i) in the Territory, by means of Non-Standard Television, during the twelve (12) month period immediately following the Exhibition Date (the "Holdback Period"), subject to the terms and provisions of a certain arrangement between Licensor and Fox/MTV;

(ii) in the Territory, by means of Standard Television, until after the Holdback Period;

(iii) in the Territory, by means of Non-Theatrical Distribution, until after the Holdback Period;

(vi) in the Territory, by means of Consumer Video Devices, until thirty (30) days after the Exhibition Date; and

(v) outside the Territory by means of any media, until one (1) day after the Exhibition Date; provided that it is understood and agreed between the parties hereto that Licensor has entered into an arrangement with Radio Vision International, Inc. pursuant to which Radio Vision International, Inc. has been granted the right to record the September 29th concert and to authorize the broadcast of such recordation thereof twice in certain territories

-1-

RCV BY:GREENBERG GLUSKER       : 7-28-92 : 1:27PM :512 5587              →              31055530687;#30

in Europe only (once "live" and once during the six month period following the live broadcast).

"Non-Standard Television" means any and all forms of television exhibition, whether now existing or developed in the future, other than exhibitions by means of Standard Television, Consumer Video Devices and Non-Theatrical Distribution. Non-Standard Television shall include, without limitation, exhibition by means of cable, wire or fibre of any material, "over-the-air pay" or STV in any frequency band, any and all forms of regular or occasional scrambled broadcast for taping, master antenna, satellite master antenna, low power television, closed-circuit television, tape, cassette and disc distribution (excluding Consumer Video Devices), single and multi-channel multi-point distribution service, and direct to TVRO satellite transmission, and radio (only for purposes of simulcast) all on a subscription, pay-per-view, license, rental, sale or any other basis.

"Standard Television" means television distributed by a UHF or VHF television broadcast station, the video and audio portions of which are intelligibly receivable without charge by means of standard home roof-top or television set built-in antennas.

"TVRO" means a television earth station capable of receiving satellite transmissions.

"Consumer Video Devices" means any form of video device, now existing or hereafter devised, including video discs and video cassettes for exhibition by means of a playback device causing a visual image of the Program on the screen of a television receiver or any comparable device, whether now existing or hereafter developed, located in consumer homes, including, without limitation, distribution for sale or rent, on a retail subscription, club, mail order or other direct consumer basis.

"Non-Theatrical Distribution" means distribution of the Program by any means or method to educational, institutional organizations, airlines for in flight and trains for in-transit distribution, ships-at-sea, remote corporate locations and U.S. military bases.

"Territory" means the United States of America, its territories, possessions and commonwealths.

This memorandum of exclusive license is executed in accordance with and is subject to the terms and conditions of the license

-2-

RCV BY:GREENBERG GLUSKER     ; 7-29-92 ; 1:28PM ;512 5507                →              3105539687;#31

agreement dated as of July 22, 1992 between the undersigned and HBO (the "Agreement") relating to the license to HBO of the above-mentioned rights in the Program. All capitalized terms used herein and not defined shall have the meanings set forth in the Agreement.

IN WITNESS WHEREOF, the undersigned has caused these presents to be signed by its duly authorized officer on the 24th day of July , 1992.

TTC TOURING CORP.

By _____

STATE OF California      )
                         : ss.:
COUNTY OF Los Angeles    )

On the 24th day of July , 1992 before me personally came Richard Shumman , to me known, who, being by me duly sworn, did depose and say that he/she resides at 10345 W Pico Blvd; that he/she is the Secretary of TTC Touring Corp., the corporation described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by order of the board of directors of said corporation.

_____
Notary Public

OFFICIAL NOTARY SEAL
KATHY A. SHANNON
Notary Public — California
LOS ANGELES COUNTY
My Comm. Expires OCT 06, 1995

-3-

RCV.BY:GREENBERG GLUSKER     ; 7-29-92 ; 1:28PM ;512 5587        →        3105530667;#32

EXHIBIT I
to
Agreement between Home Box Office
and TTC Touring Corp. dated as of
July 22, 1992

## CONFIDENTIALITY PROVISIONS:

Prior to and/or during HBO's contact or relationship with Licensor, HBO (which shall be deemed to include HBO's officers, directors, agents and employees) may be given access to or become acquainted with Performer and/or with "Confidential Information" (as such term is defined below) which is of great value to Licensor and Performer. HBO further acknowledges that maintaining the confidentiality of all such Confidential Information is critically important to Licensor and Performer, and that HBO's agreement to these confidentiality provisions is a material inducement to Licensor in granting the license to HBO which is the subject of this agreement.

HBO shall not, in any manner nor at any time (either during or after HBO's contact or HBO's relationship with Licensor and/or Performer), use or disclose, directly or indirectly, even in the course of casual discussions, to anyone other than representatives of Licensor or other persons designated by Licensor any of the following described information (the "Confidential Information"): any information, data, documents, or other materials of any kind or nature in any way related to Performer from any source or for any reasons, including without limitation, as acquired by HBO in the course of HBO's contact with Licensor and Performer. Confidential Information shall also include, without limitation, any information relating to Licensor's business affairs or operations, the business affairs, operations and/or personal life of Performer, the business affairs, operations and/or private lives of any and all members of Performer's family, and/or the business affairs or operation of any and all entities in which Performer has a controlling interest, which information is generally not known to the public. Confidential Information shall also include, without limitation, any and all photographs, films, videos, music or other recordings, including negatives, prints or copies thereof, relating to Performer or his likeness or any of his corporations and/or other entities, and/or corporations or other entities doing business or in any way related to Performer, and/or any of his or their activities. All such Confidential Information shall be deemed to be private, secret and sensitive and shall be kept confidential and secret unless Licensor otherwise advises HBO in writing in each instance. HBO acknowledges that Confidential Information may be contained in written materials, in written or verbal communications, and/or in HBO's unwritten knowledge.

HBO shall not photograph, tape, film or otherwise record (i) the voice or any likeness or activities of Performer, (ii) any concert performances or other musical performances of Performer, or rehearsals therefor, or (iii) any other activities related to Performer, without Licensor's written consent in each instance, and HBO acknowledges that any such photographs, tapes, film or other recordings, if approved in writing, shall be owned by Licensor and shall be deemed Confidential Information.

65487017 29-155629.210

RCV BY:GREENBERG GLUSKER    ; 7-29-92 ; 1:29PM ;512 5587    →    31055300807;#33

HBO shall not, without Licensor's prior written consent in each instance, publish, directly or indirectly, or cause or induce the publication of, any Confidential Information, including, without limitation, give any interviews, write or prepare or assist in the preparation of any books, articles, programs or any other oral or written communications concerning Performer or any corporations or entities doing business with or in any way related to Performer and/or any of his or their activities. HBO understands and acknowledges that if HBO has any question as to whether a particular piece of information is confidential, HBO is obligated to obtain Licensor's written approval prior to disclosing any such information. HBO shall not make any disparaging remarks concerning Performer or any of his representatives, agents or business practices or do any act that may harm or disparage or cause to lower in esteem the reputation or public image of Performer or any person, firm or corporation related to or doing business with Performer.

HBO acknowledges and agrees that HBO does not have, nor shall HBO at any time claim, any interest whatsoever in the name "Michael Jackson" or in any name similar thereto or in any goodwill associated therewith. Further, any and all Confidential Information, including, without limitation, any and all pictures, photographs, tapes, music, recordings, records, documents or other information relating to any entertainment services, or other services performed by Performer or by any other firm or corporation doing business with or in any way related to Performer, whether prepared by HBO or otherwise coming into HBO's possession or control, shall be and remain Licensor's and/or Performer's sole and exclusive property, free of any claim or interest of any third party, and shall not be removed, reproduced, summarized, copied, excerpted or utilized in any manner whatsoever without Licensor's prior written consent in each instance. HBO hereby irrevocably and perpetually assigns to Licensor and/or Performer all rights, title and interest of every kind or nature, both tangible and intangible, in or arising out of such Confidential Information or other material which is created by HBO (including, without limitation, any photographs, videos and/or recordings of Performer) to the extent that Licensor and/or Performer do not already own such rights. HBO agrees to immediately return all such Confidential Information to Licensor immediately on discovery of possession thereof, or following request therefor by Licensor.

HBO acknowledges that a breach of the provisions of these confidentiality provisions will cause Licensor and/or Performer irreparable harm for which there is no adequate remedy at law, and therefore, in addition to any and all other rights or remedies available to Licensor and/or Performer, Licensor and/or Performer shall be entitled to injunctive relief and all other remedies provided in such event by law or equity. Such remedies shall include, without limitation, the right to prevent dissemination of any Confidential Information before such Confidential Information is published. In the event of any unauthorized publication of Confidential Information, Licensor and/or Performer shall automatically own the copyright thereto.

45487O1729-155620.210                           2

RCV BY:GREENBERG GLUSKER    ; 7-29-92 ; 1:30PM ;512 5587    →    3105530887;#34

HBO agrees to indemnify and hold Licensor, Performer and any of its and his corporations or other entities harmless from and against any claims, losses, liabilities, damages and expenses (including, without limitation, attorneys' fees and related costs) incurred by the foregoing parties as a result of HBO's breach, or the breach of HBO's agents, employees or representatives, of any covenants, representations or warranties contained herein.

In the event that either party to this agreement brings an action to enforce the terms of these confidentiality provisions or to declare rights with respect to such provisions, the prevailing party in such action shall be entitled to an award of costs of litigation, including attorneys' fees and related costs, to be paid by the losing party in such amount as may be determined by the court having jurisdiction in such action.

4548701729-155620.210

3

# EXHIBIT C

01052044

THE COMPLETE MERGER FILING IS UNDER
CORPORATE NUMBER 1211598

1309469 out

Agreement of Merger

**FILED** *sus*
in the office of the Secretary of State
of the State of California

**DEC 29 2010**

This Agreement of Merger is entered into between Optimum Productions, a California corporation (herein "Surviving Corporation") and TTC Touring Corp. a California corporation (herein "Merging Corporation).

1. Merging Corporation shall be merged into Surviving Corporation.

2. The outstanding shares of Merging Corporation shall be canceled without consideration.

3. The outstanding shares of Surviving Corporation shall remain outstanding and are not affected by the merger.

4. Merging Corporation shall from time to time, as and when requested by Surviving Corporation, execute and deliver all such documents and instruments and take all such action necessary or desirable to evidence or carry out this merger.

5. The effect of the merger and the effective date of the merger are as prescribed by law.

IN WITNESS WHEREOF the parties have executed this Agreement.

Optimum Productions

_____
John Branca, President/CEO

_____
John McClain, Secretary/CFO

TTC Touring Corp

_____
John Branca, President/CEO

_____
John McClain, Secretary/CFO

{00465822.DOCX \ 1}

Electronically FILED by Superior Court of California, County of Los Angeles on 02/21/2019 12:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mariscal,Deputy Clerk

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Howard Weitzman          SBN: 38723<br>Kinsella Weitzman Iser Kump & Aldisert LLP (See Attachment hereto)<br>808 Wilshire Blvd. Third Floor, Santa Monica, CA 90401<br>TELEPHONE NO.:310-566-9800      FAX NO.:310-566-9850<br>ATTORNEY FOR (Name):Plaintiffs Optimum Productions, John Branca and John McClain | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**LOS ANGELES
STREET ADDRESS:1725 Main Street
MAILING ADDRESS:1725 Main Street
CITY AND ZIP CODE:Santa Monica, 90401
BRANCH NAME:Santa Monica Courthouse

CASE NAME:OPTIMUM PRODUCTIONS v. HOME BOX OFFICE

| CIVIL CASE COVER SHEET<br>[X] Unlimited    [ ] Limited<br>(Amount        (Amount<br>demanded     demanded is<br>exceeds $25,000)  $25,000 or less) | Complex Case Designation<br>[ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>19SMCP00075<br>JUDGE:<br>DEPT: |
|---|---|---|

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[X] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time consuming to resolve    e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a.[ ] monetary  b.[X] nonmonetary; declaratory or injunctive relief  c.[ ] punitive
4. Number of causes of action (specify):(1) Breach of Contract (2) Breach of Covenant of Good Faith and Fair Dealing
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date:February 21, 2019
Howard Weitzman
(TYPE OR PRINT NAME)

▶ /S/ Howard Weitzman
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov*<br>Westlaw Doc & Form Builder |
|---|---|---|

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**   .    .    **CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
  Contract/Warranty Breach–Seller Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment (*non-domestic relations*)
  Sister State Judgment
  Administrative Agency Award (*not unpaid taxes*)
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-harassment*)
  Mechanics Lien
  Other Commercial Complaint Case (*non-tort/non-complex*)
  Other Civil Complaint (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

CM-010 [Rev. July 1, 2007]      **CIVIL CASE COVER SHEET**      Page 2 of 2

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND
# STATEMENT OF LOCATION
# (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Court Filing Location (Column C) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

<table>
<tr><td rowspan="2"></td><td><b>A</b><br>Civil Case Cover Sheet<br>Category No.</td><td><b>B</b><br>Type of Action<br>(Check only one)</td><td><b>C</b><br>Applicable Reasons -<br>See Step 3 Above</td></tr>
</table>

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage | 1, 11 |
| | | ☐ A7221 Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240 Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270 Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

LACIV 109 (Rev 2/16)  10986 09342/623254.1
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3

Page 1 of 4

SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017 Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034 Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation      Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032 Quiet Title | 2, 6 |
| | | ☐ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2, 6, 11 |

SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE

CASE NUMBER

| A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|
| Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| Petition re Arbitration (11) | ☒ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, ⑤ |
| Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | ☐ A6160  Abstract of Judgment | 2, 6 |
| | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2, 3, 9 |
| | ☐ A6123  Workplace Harassment | 2, 3, 9 |
| | ☐ A6124  Elder/Dependent Adult Abuse Case | 2, 3, 9 |
| | ☐ A6190  Election Contest | 2 |
| | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | ☐ A6100  Other Civil Petition | 2, 9 |

Judicial Review

Provisionally Complex Litigation

Enforcement of Judgment

Miscellaneous Civil Complaints

Miscellaneous Civil Petitions

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON:<br><br>☐ 1. ☐ 2. ☐ 3. ☐ 4. ☒ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | ADDRESS:<br>1801 Century Park West |
|---|---|

| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90067 |
|---|---|---|

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the WEST _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: February 21, 2019

/S/ Howard Weitzman

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER: |
|---|---|

## ATTACHMENT TO CIVIL COVER SHEET

Additional Attorneys for Optimum Productions and for John Branca and John McClain as Executors of the Estate of Michael J. Jackson

FREEDMAN + TAITELMAN LLP
Bryan J. Freedman (SBN 151990)
bfreedman@ftllp.com
1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
Telephone: 310.201.0005
Facsimile: 310.201.0045

*(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, **not** line numbers):*

This page may be used with any Judicial Council form or any other paper filed with the court.

Page _____

Form Approved by the
Judicial Council of California
MC-020 (New January 1, 1987)

**ADDITIONAL PAGE**
**Attach to Judicial Council Form or Other Court Paper**

Westlaw Doc & Form Builder

CRC 201, 501

Unlimited Civil - General Independent Calendar (IC)

1.  Alternative Dispute Resolution (ADR) Information Packet (3/1/17)          4 pages
2.  Voluntary Efficient Litigation Stipulations (4/1/11)                       9 pages

# Superior Court of California
# County of Los Angeles



# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKET

The person who files a civil lawsuit (plaintiff) must include the ADR information Packet with the complaint when serving the defendant. Cross-complainants must serve the ADR Information Packet on any new parties named to the action together with the cross-complaint.

There are a number of ways to resolve civil disputes without having to sue someone. These alternatives to a lawsuit are known as alternative dispute resolution (ADR).

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediations, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help resolve disputes without having to go to court.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

### Advantages of ADR
- Often faster than going to trial
- Often less expensive, saving the litigants court costs, attorney's fees and expert fees.
- May permit more participation, allowing parties to have more control over the outcome.
- Allows for flexibility in choice of ADR processes and resolution of the dispute.
- Fosters cooperation by allowing parties to work together with the neutral to resolve the dispute and mutually agree to remedy.
- There are fewer, if any, court appearances. Because ADR can be faster and save money, it can reduce stress.

### Disadvantages of ADR - ADR may not be suitable for every dispute.
- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.
- ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.
- The neutral may charge a fee for his or her services.
- If the dispute is not resolved through ADR, the parties may then have to face the usual and traditional costs of trial, such as attorney's fees and expert fees.

### The Most Common Types of ADR

- **Mediation**

  In mediation, a neutral (the mediator) assists the parties in reaching a mutually acceptable resolution of their dispute. Unlike lawsuits or some other types of ADR, the parties, rather than the mediator, decide how the dispute is to be resolved.

  - **Mediation is particularly effective** when the parties have a continuing relationship, like neighbors or business people. Mediation is also very effective where personal feelings are getting in the way of a resolution. This is because mediation normally gives the parties a chance to express their feelings and find out how the other sees things.

  - **Mediation may not be effective** when one party is unwilling to cooperate or compromise or when one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

▣  **Arbitration**

In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is typically less formal than a trial, and the rules of evidence may be relaxed. Arbitration may be either "binding" or "non-binding." Binding arbitration means the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Non-binding arbitration means that the parties are free to request a trial if they reject the arbitrator's decision.

Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

▪  **Mandatory Settlement Conference (MSC)**

**Settlement Conferences are appropriate in any case where settlement is an option.**
Mandatory Settlement Conferences are ordered by the Court and are often held near the date a case is set for trial. The parties and their attorneys meet with a judge who devotes his or her time exclusively to preside over the MSC. The judge does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement.

The Los Angeles Superior Court Mandatory Settlement Conference (MSC) program is free of charge and staffed by experienced sitting civil judges who devote their time exclusively to presiding over MSCs. The judges participating in the judicial MSC program and their locations are identified in the List of Settlement Officers found on the Los Angeles Superior Court website at http://www.lacourt.org/. This program is available in general jurisdiction cases with represented parties from independent calendar (IC) and Central Civil West (CCW) courtrooms. In addition, on an ad hoc basis, personal injury cases may be referred to the program on the eve of trial by the personal injury master calendar courts in the Stanley Mosk Courthouse or the asbestos calendar court in CCW.

In order to access the Los Angeles Superior Court MSC Program the judge in the IC courtroom, the CCW Courtroom or the personal injury master calendar courtroom must refer the parties to the program. Further, all parties must complete the information requested in the Settlement Conference Intake Form and email the completed form to mscdept18@lacourt.org.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

## Additional Information

To locate a dispute resolution program or neutral in your community:

- Contact the California Department of Consumer Affairs (www.dca.ca.gov) Consumer Information Center toll free at 800-952-5210, or;
- Contact the local bar association (http://www.lacba.org/) or;
- Look in a telephone directory or search online for "mediators; or "arbitrators."

There may be a charge for services provided by private arbitrators and mediators.

A list of approved State Bar Approved Mandatory Fee Arbitration programs is available at
http://calbar.ca.gov/Attorneys/MemberServices/FeeArbitration/ApprovedPrograms.aspx#19

To request information about, or assistance with, dispute resolution, call the number listed below. Or you may call a Contract Provider agency directly. A list of current Contract Provider agencies in Los Angeles County is available at the link below.

http://css.lacounty.gov/programs/dispute-resolution-program-drp/

County of Los Angeles Dispute Resolution Program
3175 West 6th Street, Room 406
Los Angeles, CA 90020-1798
TEL: (213) 738-2621
FAX: (213) 386-3995

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

❖**Los Angeles County Bar Association Litigation Section**❖

❖ **Los Angeles County Bar Association
Labor and Employment Law Section**❖

❖**Consumer Attorneys Association of Los Angeles**❖

❖**Southern California Defense Counsel**❖

❖**Association of Business Trial Lawyers**❖

❖**California Employment Lawyers Association**❖

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

**STIPULATION – EARLY ORGANIZATIONAL MEETING**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
   (INSERT DATE)                              (INSERT DATE)
   complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR PLAINTIFF)
Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)
Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)
Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)
Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)
Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)
Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

    i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

    ii. Include a brief summary of the dispute and specify the relief requested; and

    iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

    i. Also be filed on the approved form (copy attached);

    ii. Include a brief summary of why the requested relief should be denied;

LACIV 036 (new)<br>LASC Approved 04/11<br>For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE. | CASE NUMBER: |
|---|---|
|  |  |

    iii.    Be filed within two (2) court days of receipt of the Request; and

    iv.    Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.    No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.    If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.    If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.    If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.    The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.    Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.    Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.    References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

---

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 2 of 3

| SHORT TITLE. | CASE NUMBER |
|---|---|
| | |

## The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ (ATTORNEY FOR _____ )

➤ (ATTORNEY FOR _____ )

➤ (ATTORNEY FOR _____ )

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

## STIPULATION – DISCOVERY RESOLUTION

Page 3 of 3

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

    a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

    b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER |
|---|---|
| | |

## The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR _____ )

➤ _____
(ATTORNEY FOR _____ )

➤ _____
(ATTORNEY FOR _____ )

## THE COURT SO ORDERS.

Date: _____

_____
JUDICIAL OFFICER

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>FAX NO. (Optional):<br>ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

LACIV 094 (new)
LASC Approved 04/11
For Optional Use

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Santa Monica Courthouse<br>1725 Main Street, Santa Monica, CA 90401 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**02/21/2019**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ Marcos Mariscal _____ Deputy |
| NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL CASE | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>19SMCP00075 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|
| ✓ | Craig D. Karlan | N | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

Sherri R. Carter, Executive Officer / Clerk of Court

on 02/22/2019
(Date)

By Marcos Mariscal _____ , Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.



court@expressnetworkas.com
messenger@expressnetworkas.com
process@expressnetworkas.com

**(888) 232-6077**

| Form#: | 00011 |
| QC#: | |
| Date: | 2/27/2019 |

**Firm Name:** KINSELLA WEITZMAN ISER et al
**Address:** 808 Wilshire Boulevard, Suite 300
**City / Zip:** Santa Monica, California 90401
**Tel:** (310) 566-9800    **Fax:** (310) 566-9850

**Contact Name:** CANDACE HOFFMAN
**Direct Tel:** (310) 566-9833    **Ext.#:**
**Email:** choffman@kwikalaw.com
**Billing Ref:** 10386-347

## COURT SERVICES

[X] Filing   [ ] Research/Copy   [ ] Drop Off/Pick-Up   [ ] Recording

**CASE NAME:**

**CASE #**

**TO FILE**

**ADDRESS**

**CITY / STATE / ZIP CODE**          **TEL#**

[ ] Filing Window   Dept.# _____   Courtroom# _____

**DOCUMENTS**

[ ] Filing Fees Attached      [ ] Advance Fees $ _____

[ ] First Appearance Fee PAID on _____

[ ] SAME DAY FILING   [X] NEXT DAY FILING

[ ] Return by Messenger   [X] On Route   [ ] Mail Back   [ ] Fax / Email

## SERVICE OF PROCESS

**NAME OF PARTY BEING SERVED**
Home Box Office, Inc. c/o CT Corporation Systems

[✓] Business          [ ] Residence
**ADDRESS**
28 Liberty St., Fl. 42
**CITY / STATE / ZIP CODE**          **TEL#**
New York, NY          (212) 894-8940

[✓] Personal Service   [ ] Substitute Service   [ ] Drop Service

**PHYSICAL DESCRIPTIONS**

**DOCUMENTS**
1. Summons
2. Petition to Compel Public Arbitration of Claims
3. Notice of Case Assignment
4. Civil Cover Sheet and Addedum
5. Alternative Dispute Resolution (ADR) Packet
6. Voluntary Efficient Litigation Stipulations

[ ] Witness Fees Attached   [ ] Advance Fees $ _____   Service Deadline: _____

**NAME ON PROOF OF SERVICE**
Home Box Office, Inc., a Delaware corporation

[ ] Special (ASAP)   [ ] Same Day   [X] Rush/Next Day   [ ] Regular

## MESSENGER SERVICE

**PICK-UP FROM**                    [My Location]

**ADDRESS**

**CITY / STATE / ZIP CODE**          **TEL#**

**SENDER'S NAME**

[ ] St. Shot *   [ ] Rush (2-3 hrs)   [ ] Deferred (4-6 hrs)
* Special - P/U after 2 p.m. for same day delivery. Special handling and/or Time restricted.

**DELIVER TO**                    [My Location]

**ADDRESS**

**CITY / STATE / ZIP CODE**          **TEL#**

**ATTENTION TO**

[ ] Return Same Day.   [ ] Return Next Day   [ ] No Signature Required OK to Leave

## ADDITIONAL INSTRUCTIONS

| Signature (Delivery) / Name of Person Served: | Print Name: | Time: | Driver1: |
| Signature (Return): | Print Name: | Time: | Driver2: |
| Driver Report: | | Wait Time: | Weight:        Lbs. |

www.*e*xpressnetworkas.com

v1.3_012316

# Exhibit B

**CT Corporation**

# Service of Process Transmittal
02/28/2019
CT Log Number 535008075

**TO:**   Stephanie Abrutyn, Senior Vice President & Chief Counsel
Home Box Office, Inc.
Office H9-36B, 1100 Avenue of the Americas
9th Floor
New York, NY 10036-

**RE:**   **Process Served in Delaware**

**FOR:**   Home Box Office, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | OPTIMUM PRODUCTIONS, ETC., ET AL., PLTFS. vs. HOME BOX OFFICE, ETC., ET AL., DFTS. // TO: Home Box Office, Inc. |
| **DOCUMENT(S) SERVED:** | SUMMONS, PETITION, EXHIBIT(S) |
| **COURT/AGENCY:** | Los Angeles County - Superior Court, CA<br>Case # 19SMCP00075 |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 02/28/2019 at 12:36 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | WITHIN 30 CALENDAR DAYS AFTER THIS SUMMONS AND LEGAL PAPERS ARE SERVED ON YOU |
| **ATTORNEY(S) / SENDER(S):** | HOWARD WEITZMAN<br>KINSELLA WEITZMAN ISE KUMP & ALDISERT LLP<br>808 WILSHIRE BOULEVARD, 3rd FLOOR<br>SANTA MONICA, CA 90401<br>310-566-9800 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780134615589 |
| | Image SOP |
| | Email Notification,  Michael Sofia  Michael.sofia@warnermediagroup.com |
| | Email Notification,  Eve Konstan  eve.konstan@hbo.com |
| | Email Notification,  Steve Sapienza  steve.sapienza@hbo.com |
| | Email Notification,  RYAN STOCKTON  ryan.stockton@warnermediagroup.com |
| | Email Notification,  Jessica Davidovitch  Jessica.Davidovitch@hbo.com |
| | Email Notification,  Stephanie Abrutyn  Stephanie.Abrutyn@hbo.com |
| | Email Notification,  RANDY FERGUSON  randy.ferguson@warnermediagroup.com |
| | Email Notification,  LISA FONTANEZ  lisa.fontanez@warnermediagroup.com |

Page 1 of  2 / SV

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process Transmittal**
02/28/2019
CT Log Number 535008075

TO:    Stephanie Abrutyn, Senior Vice President & Chief Counsel
Home Box Office, Inc.
Office H9-36B, 1100 Avenue of the Americas
9th Floor
New York, NY 10036-

RE:    **Process Served in Delaware**

FOR:   Home Box Office, Inc.   (Domestic State: DE)

Email Notification,  PEDRO MEDRANO  pedro.medrano@warnermediagroup.com

SIGNED:      The Corporation Trust Company
ADDRESS:     1209 N Orange St
Wilmington, DE 19801-1120
TELEPHONE:   302-658-7581

Page 2 of  2 / SV

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Electronically FILED by Superior Court of California, County of Los Angeles on 02/21/2019 10:37 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mariscal, Deputy Clerk

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:** HOME BOX OFFICE, a Division of TIME
**(AVISO AL DEMANDADO):** WARNER ENTERTAINMENT, L.P., a
Delaware Limited Partnership, and HOME BOX OFFICE, INC., a
Delaware corporation, and DOES 1 through 5, business entities
Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:** OPTIMUM PRODUCTIONS, a
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):** California corporation; and
JOHN BRANCA and JOHN MCCLAIN, in the respective capacities as CO-
EXECUTORS OF THE ESTATE OF MICHAEL J. JACKSON

| FOR COURT USE ONLY |
| --- |
| (SOLO PARA USO DE LA CORTE) |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is: | CASE NUMBER: |
| (El nombre y dirección de la corte es): | (Número del Caso): |

Superior Court of California. County of Los Angeles
1725 Main Street
Santa Monica, California 90401, Santa Monica Courthouse

**CASE NUMBER:** 19SMCP00075

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: Howard Weitzman
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):

Kinsella Weitzman Iser Kump & Aldisert LLP (see attachment for additional attorneys)
808 Wilshire Blvd. Third Floor, Santa Monica, CA 90401                     310-566-9800

| DATE: 02/21/2019 | Clerk, by | Marcos Mariscal | , Deputy |
| (Fecha) | Sherri R. Carter Executive Officer / Clerk of Court (Secretario) | | (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

HOME BOX OFFICE, a Division of time warner entertainment
3. ☑ on behalf of (specify): L.P. a Delaware Limited Partnership

under: ☑ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
      ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
      ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
      ☐ other (specify):
4. ☑ by personal delivery on (date): 2/28/19

Page 1 of 1

[SEAL]

10386.00347/623240.1
Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
Westlaw Doc & Form Builder

SUM-200(A)

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER: |
|---|---|

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

unknown, and DOES 6 through 10, individuals unknown

Page __1__ of __1__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

Westlaw Doc & Form Builder

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER: |
|---|---|

## ATTACHMENT TO SUMMONS

Additional Attorneys for Optimum Productions and for John Branca and John McClain as Executors of the Estate of Michael J. Jackson

FREEDMAN + TAITELMAN LLP
Bryan J. Freedman (SBN 151990)
  bfreedman@ftllp.com
1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
Telephone: 310.201.0005
Facsimile: 310.201.0045

*(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, **not** line numbers):*

This page may be used with any Judicial Council form or any other paper filed with the court.

Page _____

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]

**ADDITIONAL PAGE**
**Attach to Judicial Council Form or Other Court Paper**

Westlaw Doc & Form Builder

CRC 201.501

19SMCP00075

Electronically FILED by Superior Court of California, County of Los Angeles on 02/21/2019 10:37 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mariscal,Deputy Clerk

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
Howard Weitzman (SBN 38723)
  hweitzman@kwikalaw.com
Dale F. Kinsella (SBN 63370)
  dkinsella@kwikalaw.com
Jonathan P. Steinsapir (SBN 226281)
  jsteinsapir@kwikalaw.com
Zachary T. Elsea (SBN 279252)
  zelsea@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

FREEDMAN + TAITELMAN LLP
Bryan J. Freedman (SBN 151990)
  bfreedman@ftllp.com
1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
Telephone: 310.201.0005
Facsimile: 310.201.0045

Attorneys for Optimum Productions and for John
Branca and John McClain as Executors of the
Estate of Michael J. Jackson

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# COUNTY OF LOS ANGELES

| | |
|---|---|
| OPTIMUM PRODUCTIONS, a California corporation; and JOHN BRANCA and JOHN MCCLAIN, in the respective capacities as CO-EXECUTORS OF THE ESTATE OF MICHAEL J. JACKSON,<br><br>Plaintiffs,<br><br>vs.<br><br>HOME BOX OFFICE, a Division of TIME WARNER ENTERTAINMENT, L.P., a Delaware Limited Partnership, and HOME BOX OFFICE, INC., a Delaware corporation, and DOES 1 through 5, business entities unknown, and DOES 6 through 10, individuals unknown,<br><br>Defendants. | Case No.  19SMCP00075<br><br>**PETITION TO COMPEL PUBLIC ARBITRATION OF CLAIMS OF**<br><br>1.  **BREACH OF CONTRACT (NON-DISPARAGEMENT CLAUSE); AND**<br><br>2.  **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**AND ALL OTHER RELATED ARBITRABLE CLAIMS AND ISSUES**<br><br>Code of Civil Procedure §§ 1281.2, 1290 |

PETITION TO COMPEL ARBITRATION

## INTRODUCTION

Michael Jackson is innocent. Period. In 2005, Michael Jackson was subjected to a trial—where rules of evidence and law were applied before a neutral judge and jury and where both sides were heard—and he was exonerated by a sophisticated jury. Ten years after his passing, there are still those out to profit from his enormous worldwide success and take advantage of his eccentricities. Michael is an easy target because he is not here to defend himself, and the law does not protect the deceased from defamation, no matter how extreme the lies are. Michael may not have lived his life according to society's norms, but genius and eccentricity are not crimes. Nothing and no one can rewrite the facts which show that Michael Jackson is indeed innocent of the charges being levied at him by HBO in its "documentary" *Leaving Neverland.* No one-sided "documentary" can substitute for a real documentary, or for a trial where both sides are heard, competent evidence is presented, and witnesses are cross-examined.

Those behind this posthumous character assassination are:

HBO: a company, recently acquired by AT&T, so desperate for eyeballs that its growing irrelevance to the cord-cutting generation was crystallized when its chief rival bluntly stated in its January earnings report that it considers a popular online game to be a more serious competitor than HBO. In producing this fictional work, HBO ignored its contractual obligations to Michael and his companies by disparaging both him and the Dangerous World Tour that HBO had previously profited from immensely.

Wade Robson and James Safechuck: two admitted perjurers, one of whom is a self-described "master of deception," whose litigations have played out in the courts as a failed melodrama for more than five years. With more holes in their stories than anyone can count, both view Michael Jackson, the man who they previously swore was an inspiration and did nothing to them, as a lottery ticket through accusations never brought during Michael's life. They never brought these claims during Michael's life, because they knew Michael would have held them both legally accountable for their defamation, just as Michael had held the "reporter" Victor Gutierrez—who seems to be the true author of these two men's fictional tales—liable before a jury for millions of dollars when he falsely made similar claims about Jackson.

2

Dan Reed: the HBO-deployed "documentarian" and director of *Leaving Neverland* who violated every rule of responsible journalism and documentary filmmaking. He all but embedded himself with the accusers' legal team to the point where he refused to devote even one minute of a 240-minute film to any of the mountainous evidence showing that Robson and Safechuck are lying. He refused to offer any counter-point to their fabrications, and refused to talk to anyone whose statements might not fit the storyline of the fictional film he was dead-set on making from the outset. Dan Reed made no attempt to review the legal records from Robson's and Safechuck's litigations with the Estate, where the judge found that Robson had lied under oath during the litigations on key issues; and where Robson was caught red-handed hiding crucial evidence from the court, from the Jackson Estate, and even *from his own lawyers*. Reed even ignored the fact that these men are *still* pursuing claims against the Jackson Estate for hundreds of millions of dollars so they have hundreds of millions of reasons to lie.

While the conduct of the above participants speaks for itself, special emphasis must be placed on HBO. HBO refused to even meet with representatives of the Jackson Estate—the primary beneficiaries of which are Michael's three children—who made no threats but just asked for a meeting to discuss problems with the "documentary." HBO is not in search of the truth— only in search of "content" and "engagement" as its bosses at AT&T have publicly ordered.

The real victims here are the primary beneficiaries of the Estate, Michael's three children, who are forced to endure this attack on their father, ten years after they buried him, and when he has no chance to respond.

Michael Jackson can never be silenced. His music and artistry live, as does his innocence. They will long outlast false claims, gossip, and allegations spread by those who seek to make money off him. In the end, this "documentary" will say much more about HBO than it ever could about Michael Jackson.

## GENERAL ALLEGATIONS REGARDING HBO'S BREACH OF ONGOING CONTRACTUAL OBLIGATIONS TO THE JACKSON ESTATE

*The just and proper jealousy with which the law protects the reputation of a living man forms a curious contrast to its impotence when the good name of a dead man is attacked. ... The dead cannot raise a libel action, and it is possible to bring grave charges against their memory without being called upon to justify these charges in a court of law or to risk penalties for slander and defamation. The possibilities of injustice are obvious.* – "Libeling the Dead," Glasgow Herald (July 27, 1926), as quoted in Don Herzog, *Defaming the Dead* (Yale Univ. Press 2017)

### A.    Michael Jackson Was Proven Innocent

1.    Michael Jackson passed away almost ten years ago on June 25, 2009, as a result of a criminal homicide by his "doctor." Almost exactly four years earlier, on June 14, 2005, Jackson was exonerated by a unanimous jury of twelve men and women in Santa Maria, California, on discredited charges that he had committed unspeakable acts.

2.    Michael Jackson's acquittal was not the result of some technical "reasonable doubt" argument. The phrase "reasonable doubt" appeared *only once* in Jackson attorney Tom Mesereau's opening statement (at the *very end* of it). Rather, much to the media's legal experts' ridicule at the time, Mesereau *affirmatively assumed the burden of proving Jackson innocent in the case*. Among his first words to the jury in his opening statement were: "I say to you right now, I am going to make some promises in this case, I am going to fulfill them, and I want you to judge me accordingly at the end. *These charges are fake, silly, ridiculous*." Mesereau left no doubt about what he was promising to prove: "*We will prove [that child molestation] never, ever happened*." Three-and-a-half months later, the jury found that Mesereau had kept his promises. The jury found that Michael Jackson was no child molester. The jury found that Mesereau was right: the charges against Jackson were "fake, silly, and ridiculous."

3.    The jury that cleared Michael was a diverse mix of American citizens, including several *highly educated persons and persons with particular expertise* in the subject matter—e.g., the head of the local Social Services Agency, a former high school principal with a Master's Degree in Counseling, a math teacher with a Master's Degree in mathematics, a civil engineer, and residents of a neighboring military base. And these jurors have confirmed in recent interviews that

they would reach the same decision today.

4.      Jackson's 2005 acquittal ended a 12 year crusade by Thomas Sneddon, the former district attorney for Santa Barbara County. Sneddon looked under every rock and pebble for supposed "victims" of Jackson. At taxpayer expense, he literally sent investigators all over the United States and all over the world to follow "leads" about supposed "victims." Sneddon's investigators went to the Philippines, to Australia, to England, etc. Sneddon orchestrated multiple raids of Jackson's homes at Neverland Ranch and in Los Angeles over the course of a decade. They found nothing. As *Rolling Stone*'s Matt Taibbi—no fan of Jackson as his other writings confirm—explained in an article shortly after the verdict: "Virtually every piece of [Sneddon's] case imploded in open court, and the chief drama of the trial quickly turned into a race to see if the DA could manage to put all of his witnesses on the stand without getting any of them removed from the courthouse in manacles."

5.      Given Sneddon's unsupported allegations in the years he chased Jackson, the FBI also investigated Michael Jackson extensively. The FBI's 300-page file on Jackson, made available through the Freedom of Information Act, makes clear that the FBI never found anything to show that Jackson was a child molester (because he was not).

6.      The legal analyst and author, Jeffrey Toobin, explained after the verdict that "you don't need a law degree to understand this verdict. It is an absolute and complete victory for Michael Jackson, utter humiliation and defeat for Thomas Sneddon, the district attorney who has been pursuing Michael Jackson for more than a decade, who brought a case that was not one that this jury bought at all. This one's over."

7.      Sneddon's crusade against Michael may have been "over" in Toobin's words, but the damage it caused to Michael was not.

**B.      Michael Jackson's Legacy and Humanitarian Efforts**

8.      Michael Jackson had long been a champion for the rights of children, giving *hundreds of millions of dollars* to children's charities during his lifetime, along with a substantial bequest of tens of millions of dollars to children's charities in his Will. In light of his commitment to improving the lives of children around the world, the fact that Michael was chased for twelve

years on frivolous molestation charges devastated him. As one writer wrote, he was "an emaciated mess" at the end of the trial.

9. Michael Jackson had no childhood of his own. From the age of 10, he was the primary breadwinner for his very large family, and never enjoyed a normal childhood. As he explained in the only medium (songwriting) where *he could* explain himself: "It's been my fate to compensate, for the childhood I've never known ... Before you judge me, try hard to love me, Look within your heart then ask, Have you seen my Childhood?" He was arguably the most famous person on the planet but possibly also one of the loneliest.

10. Almost immediately after his acquittal, Michael Jackson left the country and largely disappeared from public life for several years. In early 2009, he reemerged ready to embark on a comeback with a series of resident shows at London's O2 Arena to be called "This Is It." Despite his ordeals and absence from public life, Michael's magic had not left him. As we all saw in the posthumously released film, *Michael Jackson's This Is It*, documenting his rehearsals for the O2 shows in London, Michael Jackson could still dance, sing, and enchant an audience in a way that no one else ever has and no one else ever will again.

11. On June 25, 2009, Michael Jackson passed away. In the wake of Michael's death, the public outpouring and mourning throughout the world was unprecedented. AOL called it a "seminal moment in internet history." Approximately 15% of Twitter posts (5,000 tweets per minute) mentioned Jackson after the news broke. To this day, most still vividly recall where they were when they heard the news that Michael Jackson had died.

12. In Michael Jackson's death, there was hope that he finally was at peace, and that his name could no longer be smeared by a media who had spent decades obsessing over him and selling any story about him, no matter how outrageous. As a then 27-year-old dancer and protégé of Michael Jackson named Wade Robson summed up the mood of so many in a statement on June 26, 2009, the day after Michael's death. Michael Jackson is "one of the main reasons I believe in the pure goodness of human kind ... I will miss him immeasurably."

C.      **HBO, Netflix and the Changing "Pay Television" Business**

13. Meanwhile, about a year before Michael's death, a company called Netflix began to

6

PETITION TO COMPEL ARBITRATION

slowly move away from its highly-successful DVD rent-by-mail business towards an internet streaming business. To say that its move was successful would be among the greater understatements of the last decade. In the last several years, Netflix and those following a similar model like Amazon Prime and Hulu have completely disrupted the Pay Television business.

14. Netflix and other streamers are now at the forefront of original content and documentaries, and have even contracted directly with major movie studios for "first-run" motion picture content, which was once the entire lifeblood of Pay Television networks like HBO. In short, Netflix threatens the very survival of Pay Television. None are more threatened than the longtime pay industry leader, HBO.

15. As an entire generation of "cable cutters" has opted for "over the top" services, HBO has been struggling to play catch up. Nothing crystallized HBO's growing irrelevance more than a Netflix earnings report in January stating that Netflix considers the popular online game Fortnite a more serious competitor than HBO.

**D. HBO's Mandate from AT&T**

16. In June 2018, HBO's parent, Time Warner, was acquired by AT&T.

17. AT&T's CEO for its new "WarnerMedia" division (including Warner Brothers and HBO), John Stankey directed HBO to win the "streaming wars" and obtain substantially more content in an obvious recognition of the success of Netflix, Amazon and others. Stankey ordered HBO's CEO Richard Plepler: "We need hours a day," referring to the time he wanted viewers engaging with HBO content. "It's not hours a week, and it's not hours a month. We need hours a day." Moreover, according to Vanity Fair, Stankey "made clear that in the current era of mega scale, HBO on its own is not enough."

18. As the *New York Times* reported, in a July 2018 meeting with Plepler, "Stankey described a future in which HBO would substantially increase its subscriber base and the number of hours that viewers spend watching its shows. To pull it off, the network will have to come up with more content, transforming itself from a boutique operation, with a focus on its signature Sunday night lineup, into something bigger and broader."

19. Content has been a real problem during Richard Plepler's tenure as CEO of HBO.

7

With the one exception of *Game of Thrones*, all of the cutting-edge, and now classic, original content that is associated with HBO—*The Sopranos, The Wire, Deadwood, Six Feet Under, Entourage, Sex and the City, Curb Your Enthusiasm*, etc.—was from the era when Chris Albrecht ran HBO. With Albrecht's departure in 2007, Richard Plepler took over. And Plepler has almost entirely failed where Albrecht succeeded: original content. With Netflix and others in the industry now, HBO picked the wrong time to fail in original content.

20. The only HBO show left that can truly drive significant subscribers is *Game of Thrones*. And its final season, with just six episodes, will end in May 2019. After that, HBO will no longer carry any "must have" content. In short, HBO is facing existential problems.

21. Although recognizing that the programming budget of Netflix and Amazon dwarfs that of HBO's, Stankey has refused to commit to substantially increasing HBO's programming budget. Without a substantially increased budget, HBO will have to turn to a less expensive way to create buzz and content.

22. And so Richard Plepler needs content for HBO that will draw streamers, and he needs to obtain that content inexpensively. In that desperation, Plepler has been willing to violate just about all of his companies' internal policies and procedures. As relevant here, Plepler decided to willfully violate HBO's obligations to Michael Jackson, obligations that Plepler no doubt knew about given that he arrived at HBO in early 1992 as Senior VP of Communications and advisor to the CEO. That was the same year that HBO partnered with Jackson to broadcast a concert from the Dangerous World Tour, which was by far HBO's biggest event in the early years of Plepler's employment.

23. Like so many before him, Richard Plepler decided to turn on Michael Jackson for the money. In so doing, he and HBO teamed up with a documentarian that they had worked with for years, Dan Reed. And they decided to tell the "stories" of two serial perjurers—Wade Robson and James Safechuck. Those two men's stories had already been completely discredited in public lawsuits where they sought hundreds of millions of dollars from the Jackson Estate—lawsuits that these two men are *still pursuing today*, despite HBO's patently false protests that the two are not telling their stories for money. And the good news for HBO was that the script for the

documentary had already been written by Robson's and Safechuck's *shared* lawyers. The *same lawyer* drafted detailed declarations for both men. The salacious and false details of those declarations, written by the same lawyer for both men, are then used as the script for the "documentary."

E.    **HBO Covenants to a Broad Non-Disparagement Clause With Jackson In Exchange for a Historic Right to Air Jackson's Live Concert**

24.    HBO, on the one hand, and Michael Jackson and his entities, including Plaintiff Optimum Productions' predecessor entity, TTC Touring Corporation, on the other, have a longstanding contractual relationship. Under that relationship, HBO's production and airing of *Leaving Neverland* ("the Film") is not only reckless and irresponsible, it is also a violation of the express terms of HBO's and Optimum's contract.

25.    Following the release of his fourth studio album as an adult, *Dangerous*, Jackson appeared at a packed press conference at Radio City Music Hall to announce that he was embarking on the Dangerous World Tour in order to benefit Jackson's Heal the World Foundation and other charity groups.

26.    Jackson planned live performances on five continents. The tour was ultimately a huge success, reaching approximately 3.5 million fans through 69 live performances. The tour, however, did *not* include any performances in the United States.

27.    Jackson had never previously allowed any complete concerts to be aired or broadcast on television in the United States. For the Dangerous World Tour, however, Jackson decided to allow a full two-hour performance to be filmed and aired on television for his tens of millions of fans in the United States.

28.    The exclusive right to air the first-ever televised concert performance of the biggest star in the world was a huge prize for any network. Ultimately, in what was reported by the *New York Times* to be potentially the "largest financial deal for a concert performance on television," HBO secured the exclusive right to air Jackson's Bucharest concert. The terms of the license that Jackson and Optimum's predecessor entity granted to HBO were memorialized in a written contract (the "Agreement"), a copy of which is attached as Exhibit B (only the financial terms

9

PETITION TO COMPEL ARBITRATION

have been redacted).

29.    HBO's Chairman and CEO at the time, Michael Fuchs, touted the television event, explaining to the *New York Times* that, "With no U.S. tour planned in the near future, this special HBO event could be the only chance that American audiences will have to see Michael Jackson in full concert for years."

30.    HBO aired its two-hour television event, *Michael Jackson in Concert in Bucharest: The Dangerous Tour*, at 8 p.m. on Saturday, October 10, 1992. As *Variety* reported at the time, the airing of this concert from the Dangerous Tour was the network's highest-rated special ever, with approximately 3.7 million U.S. households tuning in to HBO to watch Jackson's performance.

31.    In addition to monetary consideration, HBO and its team of sophisticated lawyers agreed to certain covenants in the Agreement to air Jackson's first-ever televised live performance. Specifically, as "a material inducement to Licensor [TTC Touring Corporation] in granting the license to HBO" to air Jackson's Bucharest performance, HBO agreed to certain non-disparagement provisions detailed in an "Exhibit I" to the Agreement.

32.    By 1992, Michael Jackson was the most popular and most recognizable entertainer in the world. He had also long been the subject of outrageous tabloid reporting: he slept in a hyperbaric chamber, he beat his pet chimpanzee, he bought "the elephant man's" bones, etc. Because of that, it was important to him that the people he did business with not disparage him and feed these tabloids. There were plenty of other media outlets doing that, and Jackson had no need for outlets he worked with doing the same.

33.    In those non-disparagement provisions, HBO promised that "HBO shall not make any disparaging remarks concerning Performer or any of his representatives, agents, or business practices or do any act that may harm or disparage or cause to lower in esteem the reputation or public image of Performer." Other provisions in the Agreement require HBO to notify and consult with Jackson and Optimum Productions if it wishes to air additional programming about Jackson.

34.    HBO agreed that the covenants by which HBO promised to be bound would run both during and "after HBO's contact or HBO's relationship with Licensor and/or Performer."

35.    Richard Plepler began work at HBO in early 1992 as Senior VP of

PETITION TO COMPEL ARBITRATION

Communications and advisor to the CEO. Plepler must have known, or should have known, about HBO's contract with Jackson, as *Michael Jackson in Concert in Bucharest: The Dangerous Tour* was the biggest event for HBO that year. Yet in his desperation, Plepler willfully ignored HBO's obligations to Michael Jackson.

**F.      HBO Violates the Agreement's Non-Disparagement Covenant and Suggests, Among Many Other Things, That Jackson Was Abusing Children <u>In Connection With</u> the Dangerous World Tour**

36.      On January 25, 2018, at the Sundance film festival, the HBO produced "documentary" called *Leaving Neverland* (the "Film") premiered. The Film rehashes long discredited allegations that Jackson sexually assaulted children several decades ago.

37.      But the Film is no "documentary" at all. As HBO and the Film's director, Dan Reed, have *conceded*, they disregarded every norm of documentary filmmaking and journalistic integrity in producing this film. Despite the Film's *four hour* length—ample time for an exhaustive examination of the facts—HBO and Reed made *no effort* to investigate the veracity of Robson's and Safechuck's claims, nor to scrutinize them in the Film itself. Nor do HBO and Reed explore the men's motivations for making their allegations: they are currently pressing claims in the California courts against the Jackson Estate *for hundreds of millions of dollars*. HBO and Reed also do not bother to point out that these men *were caught lying under oath repeatedly in their litigations with the Jackson Estate* (set aside the fact that they also had previously testified for Jackson in criminal proceedings and explained that no inappropriate conduct between them and Jackson occurred). The trial judge found one of Robson's lies so incredible that the trial judge disregarded Robson's sworn declaration and *found that no rational trier of fact could possibly believe Robson's sworn statements*. Specifically, Robson falsely swore under oath that he did not know about the Jackson Estate until March 2013, despite having met with John Branca, the Co-Executor of the Jackson Estate in 2011 trying unsuccessfully to pitch himself to direct a Jackson-themed Cirque du Soleil show. When Robson learned about the existence of the Jackson Estate was *the key issue* on his attempt to get around the statute of limitations. Yet in his efforts to try to sue the Estate for hundreds of millions of dollars, Robson had no problem lying under oath about

11
PETITION TO COMPEL ARBITRATION

the key issue, as the trial judge found. HBO and Reed interviewed *no other witnesses*, despite the fact that several witnesses have contradicted Robson's and Safechuck's claims.

38.    Indeed, HBO and Reed failed to contact two named persons who are identified in the film as supposed victims of Jackson's abuse. Yet since the Film was announced, both of these other men have publicly and prominently stated that the Film's allegations that they were abused are utterly false. In fact, *one person mentioned repeatedly by name* in the Film as a supposed "victim" of Jackson's who "replaced" Robson has called the Film "a work of fiction." That person was *never* contacted by HBO or Reed to respond to what the Film says *about him*.

39.    HBO's Film violates the plain words of Agreement with Jackson and Optimum: The Film makes false and "disparaging remarks concerning [Michael Jackson] [and] disparage[s] or cause[s] to lower in esteem the reputation or public image of [Michael Jackson]."

40.    Worse still is HBO's duplicity with respect to *the very tour from which it profited*. The Film expressly alleges that Jackson was abusing children *in connection with and on the Dangerous World Tour*. For example, during one scene of the Film, Wade Robson's mother, Joy "Joey" Robson, explains that she got very upset with Michael when he told her that he would not be taking Wade on the Dangerous World Tour. Mrs. Robson continues that she was especially upset because Michael had taken another boy and his family on the tour. Footage of the boy and Jackson on the Dangerous World Tour is then shown. Wade Robson then says that that is when he realized he had been "replaced" by that boy, i.e., any reasonable viewer would interpret that to mean that Michael Jackson was sexually abusing the boy on the Dangerous World Tour. That young man, *mentioned by name repeatedly in the Film*, has publicly stated that the Film is "a work of fiction," and has stated repeatedly and eloquently that Michael Jackson never did anything inappropriate with him on the Dangerous World Tour, or at *any* other time. The Film effectively ignores that.

41.    To summarize, HBO profited off the Dangerous World Tour by airing a concert from the tour and promoting Michael Jackson's talents. Now, HBO is profiting off the Dangerous World Tour by airing a "documentary" that falsely claims Michael Jackson was abusing children on the same tour. It is hard to imagine a more direct violation of the non-disparagement clause.

12

PETITION TO COMPEL ARBITRATION

42. HBO decided to willfully violate its commitments and covenants to Jackson and his entities. In violation of both basic norms of documentary journalism and the explicit terms of the Agreement, HBO has disparaged Jackson's legacy by airing a one-sided hit piece against Jackson based *exclusively* on the false accounts of two proven, serial perjurers.

43. The fact that HBO's CEO, Richard Plepler was fully aware of HBO's contractual relationship with Jackson and Optimum and yet willfully ignored them is inexcusable. HBO's airing of the film, including its double-faced depiction of the Dangerous World Tour, constitutes a malicious and willful breach of the anti-disparagement covenants in the Agreement.

44. As Richard Plepler himself once said, "A lie goes halfway around the world before the truth puts its boots on, and we bear some responsibility for that." Indeed.

**G.     Wade Robson and James Safechuck**

45. HBO's and Plepler's willful violation of their non-disparagement obligations to Jackson and Optimum are made the worse given that the Film relies *solely* on the word of two serial perjurers.

46. Wade Robson and James Safechuck are admitted perjurers. They previously testified that Jackson never touched them inappropriately in any manner whatsoever. By 2013 and 2014, they were in financial dire straits. Safechuck was in serious need of money, the failed dreams of a successful acting and music career having long since passed him by. For his part, Robson was at the end of his choreography career. He had burned so many bridges that the only thing he had left was his connection with Michael Jackson. But in 2011, the Jackson Estate had turned him down for the lead choreography job in a Cirque du Soleil show, a job that he told Cirque he "wanted badly." By 2012, Robson's wife was threatening to divorce him because of his inability to work.

47. So, in 2013 and 2014, Robson and Safechuck changed their stories. No doubt reading reports from *Forbes* and others, and seeing programs like *60 Minutes* that reported on the unprecedented success of the Jackson Estate—stories that all ran in the year before these men changed their stories—Robson and Safechuck filed suits against the Jackson Estate.

48. Having claimed to have perjured themselves repeatedly prior to filing their suits

13

PETITION TO COMPEL ARBITRATION

against the Jackson Estate—and claiming to want to now "speak only the truth"—Robson and Safechuck still could not keep their stories straight after filing suit. Robson, in particular, *was caught committing perjury repeatedly in 2013 through 2017*, in his litigations against the Estate. For just a few examples among many that the Estate discovered:

a.      The trial judge in Robson's initial case against the Estate found one of Robson's lies—on *the* key issue in that case, i.e., when he learned about the Estate for statute of limitations purposes—so clear that the judge took the *extraordinary step* of disregarding Robson's sworn statements on a summary judgment motion. *The judge found that no rational fact-finder could possibly believe Robson's sworn statement* (i.e., his lie under oath) given the *unequivocal evidence* to the contrary and issued judgment in the Estate's favor as a result.

b.      In another of the many, many lies in which Robson was caught during his litigations with the Jackson Estate, he swore under oath in 2016 that he had but *one written communication* with anyone about his abuse allegations from May 2012 until the date of his sworn statement. Another Wade Robson fabrication. Through third party discovery— largely from Robson's mother, Joey, and his sister Chantal—it was revealed that Robson had *thousands* of such communications, talking to anyone and everyone about his evolving story of "abuse" (many of the communications were inquiries to his mother where he told her he was asking her to help him reconstruct "my story with Michael"). In fact, Robson had even written a book about his supposed abuse by Jackson in the year before filing his lawsuit—which he hid from the Jackson Estate *and hid from his own attorneys*. When shopping his book in late 2012 and early 2013, Robson communicated with numerous publishers about his supposed abuse (contrary to his lie under oath that he had had only *one* written communication about his "abuse"). Robson first met with his lawyers about filing a lawsuit against the Jackson Estate in March 2013, just a few weeks after being told by his book agent that no one was interested in publishing Robson's ludicrous story.

49.      More precisely, no one was interested in publishing Robson's fabricated and internally inconsistent tale *until* HBO, Channel 4 (UK), and Dan Reed came along.

14

PETITION TO COMPEL ARBITRATION

50.    In all, owing to HBO's and Reed's willful blindness, the Film neglects to subject the accusations against Jackson to *any scrutiny whatsoever*, and it ignores the countless facts and circumstances evincing that these stories have been trumped up by Robson, Safechuck, and their shared litigation attorneys as part of an ongoing campaign of lawsuits where they are attempting to recover hundreds of millions of dollars in damages against the Jackson Estate and affiliated companies for the *supposed* abuse they suffered.

51.    A critical consideration by HBO of Robson and his accusations against Jackson would have revealed the absurdity of these claims. When Jackson faced criminal prosecution in 2005 for a now-discredited accusation of abuse as to which he was fully exonerated, an adult Robson testified *under oath* that Jackson had not molested him or engaged in any other inappropriate behavior. Robson never wavered in the face of withering cross-examination from one of our State's finest prosecutors (a senior deputy to Sneddon).

52.    Many other times in the past, Robson similarly spoke out to defend Jackson and deny that he was abused. Robson maintained his support of Jackson even after the singer's death. Consistent with his belief in Michael's innocence, for years after Jackson's death, Robson solicited work relating to Jackson—for a Jackson tribute on *So You Think You can Dance*; from Kenny Ortega asking whether he could help on the film *Michael Jackson's This Is It*; on an MTV tribute produced by Janet Jackson; and from the Jackson Estate itself in 2011 on a Jackson-themed Cirque du Soleil show, all so that he could further honor his friend and mentor, and make money doing it. Had he actually been horrifically abused as he now claims, why would he want to spend at least a year of his life dedicated to creating a show centered around his abuser's life and art?

53.    Wade Robson has proudly declared himself in writing to be a "master of deception." At her deposition, his own mother said that she agreed, explaining that Wade should "have had an Oscar" because of his ability to stare people in the face and spin lies. Mrs. Robson is right of course: Wade Robson should win an Oscar for his acting in *Leaving Neverland*.

54.    Although Robson and Safechuck now claim to want to speak the truth publicly to help out other "victims," their prior actions show otherwise. Robson first filed his lawsuit "under seal" in the hope that the Estate would quickly pay him off before it could be unsealed and made

15

PETITION TO COMPEL ARBITRATION

public. The Estate had no interest in being extorted, and the suit was then unsealed.

55.    Safechuck followed the same dubious playbook. He *had also testified under oath years before that Jackson did not molest him*. Not until decades later, when Safechuck saw Robson on the *Today Show* in May 2013 discussing his multi-million dollar lawsuit against the Jackson Estate, did Safechuck suddenly discover that he had been abused as a child. Hoping to cash in as well, Safechuck hired *the same attorneys* who represent Robson and filed copycat claims for abuse, again seeking hundreds of millions of dollars in damages.[1]

**H.    Dan Reed and His Idea to Make a Documentary About Michael Jackson**

56.    A real documentarian would have explored the above, including the many lies in which Robson and Safechuck were caught *even after* they supposedly discovered their "truth" in 2013 and 2014 respectively. A real "documentarian" would have explored the financial motivations of these two men, including the fact that they continue to seek hundreds of millions of dollars from the Jackson Estate and only brought their claims when they were in serious financial trouble (in Robson's case because the Estate refused to hire him as lead choreographer for a Cirque show). Yet the "documentarian" hired by HBO had no interest in the truth.

57.    Dan Reed is a self-described "documentarian" who has a history of making documentaries about salacious sexual topics, such as like *Babies: Britain's Super Sperm Donors* and *Celebrity Sexploitation*. Reed became especially well known for producing a film glorifying a vigilante "pedophile hunter" who once entrapped a man online who had been suffering from severe depression due to the breakup of his marriage, financial strains, and the separation from his son. After the subject of Reed's film orchestrated the man's arrest, the suspect committed suicide.

58.    According to an interview, Dan Reed was looking for subjects for a documentary when a friend asked him, "What are the big, unresolved stories that everyone's heard of?"

---

[1] The sheer frivolousness of Safechuck's lawsuits led them to be thrown out so early that he had fewer chances to lie under oath. He successfully avoided having his deposition taken or producing any documents. Nevertheless, his sworn declaration in support of his lawsuit contained numerous *proven lies*. One need only check Wikipedia and the record of Jackson's 2005 trial in Santa Maria to see that Safechuck was lying about several issues.

16

According to Reed, the friend then said, "What about Michael Jackson? That's a big story and no one really knows what happened." Of course, as explained above, we do know what happened. The FBI investigated Michael Jackson and found nothing. A district attorney in Santa Barbara County prosecuted Jackson, and it was a total failure. The jury completely exonerated Jackson.

59.     But Reed and HBO ignored the facts of the prior allegations. Rather, they turned their focus to two men alone—Wade Robson and James Safechuck, who as discussed above, have lied repeatedly under oath (both before and after filing their lawsuits) and whose motivation for making allegations is seeking hundreds of millions against the Jackson Estate (claims that they are continuing to press today).

60.     And Reed and HBO knew exactly what graphic story they could tell. Robson and Safechuck had laid out their accusations in writing against Jackson in *vivid* detail, i.e., all the lurid "shocking" details of their abuse were in public declarations *written by their shared lawyers*. The fact that stories are told in lurid and salacious detail does not make them true, as some in the media apparently believe. This is especially the case when the stories were first written out by lawyers *whose very job it is to litigate child sexual abuse cases*.

I.     **HBO Turns a Blind Eye to Facts Made Available To Them**

61.     HBO and Reed willfully disregarded *mountains of other evidence* eviscerating Robson's and Safechuck's credibility, all of which the Jackson Estate would have provided if the filmmakers had sought a comment on these claims, which they did not.

62.     HBO and Reed never approached the Estate, Jackson's family, Jackson's friends or children, or anyone else, to scrutinize Robson's and Safechuck's claims. The two inter-related reasons they kept their hit piece secret are rather obvious: (1) They knew that Robson's and Safechuck's stories would collapse on scrutiny; and (2) They knew that if the Jackson Estate had known such a documentary was coming, they could have had time to prepare for it with a piece of their own. This is also why neither was identified in the announcement of the Film; and it was *the Estate* in its initial public statement that "outed" the subjects of the Film.

63.     In a perhaps naïve hope that HBO would do the right thing, the Jackson Estate wrote Richard Plepler a detailed, ten-page letter explaining many (but far from all) of the problems

with the Film and the two men at the center of it. The Jackson Estate did not make threats; it just asked to sit down with HBO so that it could be heard before the documentary aired on HBO.[2]

64.     HBO never even had the decency to respond to the letter. The day after sending the letter, however, HBO's programming President Casey Bloys arrogantly told the press that:

"There are no plans to take a meeting [with the Jackson Estate]. We are airing the 'documentary' and the letter is not going to change that."

65.     Casey Bloys explained that he and HBO had decided *not to even explore potential credibility problems with the Film* because "it's a very powerful documentary." Any halfway decent filmmaker can make a "powerful documentary" about anything if the filmmaker *admittedly refuses* to consider the credibility of the persons in the documentary. A "documentary" that *willfully ignores any evidence contrary to its thesis* can of course still be a "powerful documentary." But at the same time, any such "powerful documentary" would have more in common with tabloid sensationalism than with *bona fide* journalism. We challenge HBO and the public to name a *reputable* documentarian and a *reputable* network that would willfully refuse to discuss such serious accusations *with no one other than the accusers*. Name one.

66.     Other than ethics and journalistic norms, the main check on making a "powerful documentary" with false accusations, without talking to anyone other than the accusers and their families, is the law of defamation. And *that* is the heart of the issue. As noted at the beginning of this pleading, it has long been the rule in Anglo-American law that there is no civil liability for defamation of the deceased. HBO and Dan Reed are using that very unfortunate rule of law to ignore all norms of journalism, and to justify *their abject refusal to talk to anyone* who might discredit Robson and Safechuck's made-up stories.

67.     Casey Bloys bragged to a publication that the Film had been vetted by HBO's "many lawyers." We assume HBO's "many lawyers" did two minutes of legal research to discover that HBO had nothing to worry about—*you can literally say anything about a dead person and*

_____

[2] That letter is attached as Exhibit A to this Petition. Notably, every single assertion in it can be backed up by source documents for anyone interested in actually learning the truth.

PETITION TO COMPEL ARBITRATION

*you face no civil liability whatsoever*. You do not need Westlaw to understand that; Google will suffice. The fact that HBO's lawyers figured that out is nothing for Casey Bloys to brag about.

68.    But HBO's "many lawyers" missed their non-disparagement obligations to Jackson and Optimum. And HBO cannot just "blame the lawyers" for this mistake. Its CEO, Richard Plepler was almost certainly aware of why the Film violated obligations HBO had to Michael Jackson, yet Plepler appears to have willfully ignored those obligations. Sadly, Plepler's mandate from AT&T, and his need to find content no matter what, seems to have led him to ignore the company's obligations and basic ethics and decency.

**J.    HBO Refuses to Communicate with Petitioners**

69.    The Agreement includes a mandatory arbitration clause. It reads as follows:

> (iv) Arbitration. Any dispute arising out of, in connection with or relating to this Agreement shall be submitted for binding and final arbitration before a retired judge of the Superior Court of the state of California for the County of Los Angeles who shall be mutually selected by the parties. In the event that the parties cannot agree on the selection of such a retired judge within 30 days after one of the parties notifies the other in writing that there is any such dispute to be resolved, each party shall select such a retired judge, and the two retired judges so selected shall then select a third retired judge who shall serve as the sole judge in connection with such dispute. If the two party-appointed judges are unable to select a third judge within 30 days after their appointment, the sole retire judge in connection with such dispute shall be selected by the Superior Court of the State of California for the County of Los Angeles. The retired judge so selected shall conduct the arbitration in conformity with the rules of, and as if it were conducted by, the American Arbitration Association.

70.    On February 7, 2019, through their counsel, the Co-Executors of the Estate of Michael Jackson and Optimum Productions sent a letter to HBO's Chief Executive Officer regarding *Leaving Neverland*. Though HBO was surely already aware of them, the letter catalogued the many glaring deficiencies with and recklessness of the Film, as well as the mountain of evidence disproving the false story peddled by Robson and Safechuck.

71.    In the letter, counsel for the Co-Executors of the Jackson Estate and Optimum Productions requested a meeting with HBO to discuss a solution. HBO has never responded. Rather, *HBO stated publicly and in no uncertain terms that it will not communicate with the Jackson Estate or its related entities with respect to any issues relating to the Film*. As noted

19

PETITION TO COMPEL ARBITRATION

above, HBO's Casey Bloys made it unequivocally clear that HBO has no interest in the truth or in discussing the film with Petitioners.

72.    HBO has therefore completely shut down Petitioners' attempt to reach out to HBO and request arbitration of this dispute.

73.    HBO's spin machine may argue that the Jackson Estate is only demanding arbitration in order to shroud proceedings in secret. False. The Jackson Estate is demanding arbitration because that is what its contract with HBO requires. Unlike HBO, Michael Jackson, his successors, and affiliated companies keep their promises. They agreed to arbitrate and that is what they will do. However, in order to alleviate the predictable nonsense that will come from HBO's spin machine that the Jackson Estate only wants an arbitration so that proceedings are shrouded in secrecy, the Jackson Estate expressly requests that HBO agree to a *public* arbitration. Indeed, the Robson and Safechuck litigations were carried out in the public courts, and all of the *false, graphic and detailed* statements about how Jackson supposedly abused Robson and Safechuck— which have caused such a stir in the press—were all available in the public records. Had HBO actually looked at the public records of the lawsuits, it would have discovered that, along with the fact that the credibility of Robson and Safechuck were absolutely devastated in the trial court. Unfortunately, however, it is obvious HBO did no diligence at all.

## PARTIES, JURISDICTION AND VENUE

74.    Jurisdiction is proper in the Superior Court of the State of California for the County of Los Angeles pursuant to section 410.10 of the Code of Civil Procedure. Venue is proper in Los Angeles County, California, pursuant to section 1292 of the Code of Civil Procedure because the agreement was made in Los Angeles County, the arbitration clause calls for performance in Los Angeles County, and all parties do substantial business in Los Angeles County.

75.    Petitioner Optimum Productions ("Optimum") is a California corporation. Optimum is the successor in interest to TTC Touring Corporation ("TTC"), a California corporation. TTC and Optimum merged in or around December 2010, with Optimum as the successor corporation. A true and correct copy of the "Agreement of Merger" on file with the California Secretary of State is attached hereto as Exhibit C. Petitioners John Branca and John

20

PETITION TO COMPEL ARBITRATION

McClain are the duly-appointed and currently-serving Co-Executors of the Estate of Michael Jackson, and are parties in that capacity.

76. Respondent Time Warner Entertainment, L.P., is a Delaware limited partnership. As of 1992, "Home Box Office" was a Division of Time Warner Entertainment, L.P. Respondent Home Box Office, Inc., is a Delaware corporation. On information and belief, it is the successor-in-interest to the "Home Box Office" Division of Time Warner Entertainment, L.P.

77. Respondent Does 1 through 5 are business entities whose identities or roles are unknown who induced the two named Respondents to breach their contractual obligations to Petitioners and intentionally or negligently interfered with those obligations.

78. Respondent Does 6 through 10 are individuals whose identities or roles are unknown who induced the two named Respondents to breach their contractual obligations to Petitioners and intentionally or negligently interfered with those obligations.

**FIRST CAUSE OF ACTION TO BE ARBITRATED: BREACH OF CONTRACT**

**(Against all Defendants)**

79. Petitioners incorporate by reference all prior allegations of this pleading.

80. Petitioner Optimum's predecessor entity, TTC, entered into a valid and enforceable contract with "Home Box Office" a Division of Respondent Time Warner Entertainment, L.P. A true and correct copy of the Agreement is attached hereto as Exhibit B. Michael Jackson was an intended third party beneficiary of the Agreement.

81. Petitioners John Branca and John McClain are the duly-appointed and currently-serving Co-Executors of the Estate of Michael Jackson, and have therefore succeeded to Michael Jackson's rights under the Agreement.

82. On information and belief, Respondent Home Box Office, Inc., is the successor-in-interest to the "Home Box Office" Division of Respondent Time Warner Entertainment, L.P., and has therefore succeeded to the obligations of the "Home Box Office" Division of Respondent Time Warner Entertainment, L.P.

83. Respondents have breached their obligations to Petitioners under the Agreement for the reasons set out above, including but not limited to by disparaging Michael Jackson and

disparaging the Dangerous World Tour.

84.     Petitioners have performed all their material obligations under the Agreement, which may be dependent upon the breached obligations, except as may have been excused or waived.

85.     Respondents' breaches of the Agreement have caused damages to Petitioners in an amount to be prove in an arbitration, with such damages potentially exceeding $100 million should Respondents' succeed in the damage they are intending to cause to the legacy of Michael Jackson and the businesses associated with the Jackson Estate.

## SECOND CAUSE OF ACTION TO BE ARBITRATED:

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against all Defendants)

86.     Petitioners incorporate by reference all prior allegations of this pleading.

87.     In the Agreement, as in every contract or agreement, there is an implied promise of good faith and fair dealing such that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

88.     Respondents have breached the duty of good faith and fair dealing by unfairly interfering with Petitioners' right to receive the benefits of the Agreement.

89.     Petitioners have performed all their material obligations under the Agreement, which may be dependent upon the breached duty of good faith and fair dealing, except as may have been excused or waived.

90.     Respondents' breaches of the duty of good faith and fair dealing have caused damages to Petitioners in an amount to be prove in an arbitration, with such damages potentially exceeding $100 million should Respondents' succeed in the damage they are intending to cause to the legacy of Michael Jackson and the businesses associated with the Jackson Estate.

### PRAYER FOR RELIEF

WHEREFORE, Petitioners pray for relief against Respondent as follows:

1.     That the Court compel HBO to participate in a non-confidential arbitration consistent with the terms of the Agreement to arbitrate claims for breach of the non-disparagement

clause in the Agreement and breach of the covenant of good faith and fair dealing therein. In that arbitration, the Jackson Estate will seek all damages proximately caused by HBO's reprehensible disparagement of Michael Jackson, which could exceed $100 million should HBO succeed in the damage it is intending to cause to the legacy of Michael Jackson. Petitioners further pray that the arbitrator award punitive damages in the maximum amount permissible if and when Petitioners show their entitlement to such damages.

DATED: February 21, 2019

KINSELLA WEITZMAN ISER
KUMP & ALDISERT LLP


By:      /s/Howard Weitzman
_____
Howard Weitzman
Attorneys for Optimum Productions and John
Branca and John McClain as Executors of the
Estate of Michael J. Jackson

10386.00347/623076

# EXHIBIT A


KINSELLA
WEITZMAN
ISER
KUMP &
ALDISERT LLP

**Howard Weitzman**
Direct Dial: (310) 566-9811
Direct Fax: (310) 566-9871
E-Mail: hweitzman@kwikalaw.com

February 7, 2019

## VIA E-MAIL AND OVERNIGHT DELIVERY

Richard Plepler
Chief Executive Officer
Home Box Office, Inc.
1100 Avenue of the Americas - 15th Floor
New York, NY 10036
.(212) 512-1960
E-Mail: richard.plepler@hbo.com

   Re:  <u>Michael Jackson</u>

Dear Mr. Plepler:

   We are counsel to the Co-Executors of the Estate of Michael J. Jackson, as well as various wholly-owned entities which own intellectual property and other intangible rights associated with the late Michael Jackson (collectively the "Estate" or the "Jackson Estate").

   We write regarding *Leaving Neverland*, an admittedly one-sided, sensationalist program—referred to as a "documentary" by HBO and others—that HBO apparently funded and intends to air this Spring. The Estate first learned about this program in early January when its premiere at Sundance was announced in the press. As you must know, contrary to all norms of documentary filmmaking, the Estate was *never* contacted by the supposed "documentarian," Dan Reed (or anyone else associated with the program) to provide the Estate's views on, and responses to, the absolutely false claims that are the subject matter of the program. Likewise, no one else who might offer evidence to contradict the program's premise was consulted either, as Dan Reed has publicly admitted.

   When the program was first announced, HBO and its producing partners did not disclose the identities of the two subjects of the documentary, but referred to them only as "two men." However, from even the brief descriptions of the "two men" in the announcement, the Estate knew exactly who they were: Wade Robson and James Safechuck. The Estate knew this not because it had any inside "sources" about the documentary—it had none—but because these two men have been peddling their false "story" for years now, most notably in a series of failed legal actions against the Estate. The Estate did not hesitate to advise the media of their identity. The Estate was one-hundred percent confident that there were no other purported "victims" who this documentary could be about (because, contrary to Robson's and

Richard Plepler
February 7, 2019
Page 2

Safechuck's lawyers' predictions when they first filed their lawsuits for hundreds of millions of dollars in 2013, no "flood" of further identifiable "victims" ever came forward beyond these two). HBO and its producing partners were then forced to acknowledge that the Estate had "guessed right" and that the two subjects of the film were indeed those two admitted perjurers who had filed lawsuits against the Estate, all of which have now been dismissed with prejudice (but as noted below are pending on appeal).

The Estate spent years litigating with Robson and Safechuck, and had *four different lawsuits* by these two men *dismissed with prejudice*. (Today, Robson owes the Estate almost seventy thousand dollars in court costs, and Safechuck owes the Estate several thousand dollars as well.) In those litigations, the Estate discovered troves of information about Robson and Safechuck that made it unequivocally clear that they had no credibility whatsoever. We discuss some of that information below, but the information discussed in this letter is just the tip of the iceberg on these two. Had HBO actually complied with the most basic of journalistic ethics—rather than just accept their salacious allegations at face value—it would have discovered so much more long before it ever got involved in this disgraceful project. Obviously, *that* is the reason that Dan Reed and HBO's producing partners *initially tried to hide the identities of Robson and Safechuck*. This ambush was carried out because Dan Reed knew that Michael Jackson's family and friends, his Estate, and his millions of fans who are *deeply knowledgeable* about the case would have discredited Robson and Safechuck before filming began.

### HBO Is Being Used As Part of Robson's and Safechuck's Litigation Strategy

Robson and Safechuck are pursuing appeals of the judgments against them, appeals that will probably be heard this year. As *many* other press outlets noted when their lawsuits were still pending in the trial court, Robson, Safechuck, and their shared attorneys have long engaged in a deliberate campaign to try their case in the media, most often through leaks of false information to some of the most salacious online tabloids. Had HBO done any research into this, it would have easily discovered that every year or so while the litigation was pending, before a major issue was to be decided, the tabloids would suddenly be full of false claims being peddled by Robson's and Safechuck's attorneys about Michael Jackson. The trial court never let this avalanche of false claims affect it, and we have no doubt that the Court of Appeal will not be affected by it either. That said, Robson's and Safechuck's lawyers will continue attempting to try their cases in the media.

As noted, Robson and Safechuck are now appealing the dismissal of their multi-million dollar lawsuits. Not coincidentally, their appeals are likely to be heard later this year. HBO's "documentary" is simply just another tool in their litigation playbook, which they are obviously using in a (very misguided) effort to somehow affect their appeals. Sadly, it appears that HBO—a once great and respected network—has now been reduced to the pay television version of *Hard Copy* (with a little mix of *The Jerry Springer Show*). Most pathetically, HBO has been reduced to a pawn in part of Robson's and Safechuck's attorneys' litigation strategy.

Richard Plepler
February 7, 2019
Page 3

### HBO and Dan Reed Intentionally Chose Not to Interview Anyone Who Would Detract From Their Story

*Leaving Neverland* rehashes accusations against the late Michael Jackson of committing the most heinous crimes any person can be accused of in modern society. Given the seriousness of those allegations, one would have expected that HBO and its producing partners would contact: (1) the Jackson family; (2) persons who worked with Jackson during the relevant time period; (3) other young men and women who spent time with Jackson as children (including ones mentioned by name in the "documentary"); (4) friends of Michael Jackson who knew him for his whole life; (5) the many persons who know Safechuck and Robson well but do not believe them; (6) Tom Mesereau and his investigator, Scott Ross, who Robson happily met with for hours in 2005 to tell them about his experiences with Michael, with Mesereau finding Robson so credible that he made Robson the first witness for the defense in Jackson's 2005 trial; and (7) the Estate, who spent years litigating *the very claims* discussed in the "documentary" by Safechuck and Robson. Yet, shockingly, HBO and its producing partners *never attempted to contact* any of these people. The fact that HBO and its producing partners did not even deign to reach out to any of these people to explore the credibility of the false stories Robson and Safechuck told violates all norms and ethics in documentary filmmaking and journalism. It is a disgrace.

In fact, Dan Reed admitted in the question and answer session at Sundance that he *never* even attempted to contact the many, many other young men and women who spent time with Jackson as children, yet continue to defend him to this very day. And at least two of these young men are *referenced by name in the film* with the implications that they "replaced" Robson and Safechuck as Jackson's "abuse victims." Both have gone on record since the documentary was announced to explain that they were never abused by Jackson. One of them, who Robson *explicitly* claimed in the film "replaced" him, has released several "tweets" denouncing the documentary as a work of fiction. Yet neither of them—among the many others who spent time with Jackson as children—were ever approached by Dan Reed and HBO.

In other words, HBO's "documentary" is based *solely* on the word of two admitted perjurers. HBO and its partner, Dan Reed, never even attempted to explore whether these two men might not be telling the truth. We have read reports that these two men are supposedly "credible" in the documentary because they tell their story so fluidly. Yet they have been practicing their stories and rehearsing their lines (which changed throughout the litigation as discussed below) for years now. Thus, it is no surprise that these two men—who have also both acted professionally—tell their false story well. The bottom line is that any halfway skilled filmmaker could make a "documentary" telling any outrageous story about a dead man if they can just find two people willing to tell that story *and then not challenge those two at all*. That is particularly the case when one of the men—Wade Robson—is a self-described "master of deception"; and his own mother testified under oath that he should "have had an Oscar" given how good a liar he is (as discussed below).

Richard Plepler
February 7, 2019
Page 4

### In Interviews, Dan Reed Is Using HBO in Order to Bolster the Credibility of the Program Despite Making Blatantly False Statements in Those Same Interviews

Notably, HBO's reputation is being used as one of the main reasons that the "documentary" should be taken seriously. The producer of this program, Dan Reed, is telling the media that one of *the principal reasons* the documentary is credible is because of HBO's reputation. When asked whether an attorney had vetted the film, he responded, "that's what happens on every single film I make or, to my knowledge, that anyone makes, *certainly for HBO.*"[1] The usual checks on filmmakers are ethical and normative ones, such as fact-checking (e.g., are their stories consistent? *see* below), investigating the motivations of people (e.g., do they have a financial motivation to say what they are saying?), talking to others with knowledge who may have something different to say, etc. But as is apparent from our discussion below, HBO apparently no longer cares about these ethical and normative checks on documentary filmmaking and journalism anymore. If HBO does care about such things, this documentary will never air on HBO.

In the same interviews where he touts HBO's involvement as a reason for his "documentary's" supposed "credibility," Mr. Reed has also made *blatantly false statements* about Robson and Safechuck in an effort to bolster their credibility. For example, in the same *Huffington Post* interview discussed above, Mr. Reed agrees with the interviewer that "one of the most impactful things in the documentary is the way [Robson's and Safechuck's] stories align ... even though they didn't know each other until now." In another interview, Reed "confirms" that "for legal reasons, [Robson and Safechuck] were kept apart, long before you even approached them about making the movie." Reed expands on that and says that this was done so "they couldn't exchange stories. Sundance was the first time [as adults] that they'd met. It's the first time they've had any significant time together."[2] *This is utterly false.* In Robson's 2016 deposition, he testified that he had spoken to Safechuck in 2014, the year Safechuck filed his lawsuit against the Estate. When asked what the two men had spoken about, Robson refused to answer the question—his attorney instructed him to remain silent because Robson's and Safechuck's common attorneys were involved in the conversations between the two men in 2014. Accordingly, we can never know what they talked about and how they aligned their stories with their attorneys' help. Given that they were both seeking hundreds of millions of dollars against the Estate, they had hundreds of millions of reasons for aligning their stories.

---

[1] https://www.huffingtonpost.com/entry/leaving-neverland-michael-jackson-dan-reed_us_5c500044e4b0d9f9be689ab0

[2] https://www.rollingstone.com/movies/movie-features/leaving-neverland-director-dan-reed-michael-jackson-interview-785817/

Richard Plepler
February 7, 2019
Page 5

In any event, the idea that two men who are represented by the same attorneys for the last six years would have stories that "align" is hardly surprising. You really cannot be so naïve that you would not understand this.

Finally, we must note that we can only assume that the legendary Sheila Nevins had nothing to do with the decision to go forward with this "documentary." It is a shame that she is no longer involved in these types of decisions for HBO. That HBO, the once iconic network, would fund, produce and distribute this pathetic and untruthful vehicle for these admitted liars to revisit false allegations made *as part of their effort to revive their dismissed lawsuits* is just plain sad.

### Robson and Safechuck Were Repeatedly Caught Lying During Their Failed Lawsuits Against the Jackson Estate

Wade Robson testified *in detail* as an adult before a jury in 2005 that Michael Jackson never did anything wrong with or to him. He was then subjected to a withering cross-examination by Ron Zonen, one of California's most-seasoned prosecutors. Yet, despite that, Wade Robson never wavered. Moreover, even after his testimony, there are many videos of him (readily available online) where he praises Michael Jackson as an inspiration and denies that Michael ever molested him.

But even setting that aside, Robson was also caught *lying repeatedly* in the dismissed litigations with the Estate. For example, in order to try to get around the statute of limitations for monetary claims against the Estate, Robson testified under oath that "[p]rior to March 4, [2013,] I did not understand or was even aware that an Estate [of Michael Jackson] had been opened for administration." That was a lie. In truth, Robson had personally met with John Branca, one of the Estate's executors, at Mr. Branca's office in 2011 in a (failed) effort to solicit work with the Estate on a Michael Jackson-themed *Cirque du Soleil* show. Prior to meeting with Mr. Branca, Robson's talent agent told him that he had to contact "John Branca, the person in charge of MJ's estate." Not surprisingly, the trial judge dismissed Robson's claims against the Estate, finding that *no rational person* could believe Robson's declaration that he did not know about Michael Jackson's Estate until March 4, 2013 when he, in fact, had met with John Branca, the Co-Executor of the Estate. In plain English, the judge found that Robson had lied in his sworn declaration. (The idea that Robson would want to spend years of his life creating and directing a Michael Jackson-themed show, when he was in fact a victim of horrendous abuse by Jackson, is itself hard to take seriously.)

Robson's meeting with Mr. Branca was hardly the first time that he tried to capitalize on his relationship with Michael Jackson after Michael's death when he thought it would help him make money. In the days after Michael's death, Robson released a statement praising Michael as *"one of the main reasons I believe in the pure goodness of human kind."* He then tried to solicit work from Kenny Ortega, the director of *Michael Jackson's This Is It*, to help work on the movie. Robson was able to secure work with Janet Jackson, in her 2009 MTV Video Music Awards tribute to Janet's late brother Michael. In videos behind the scenes

Richard Plepler
February 7, 2019
Page 6

of the tribute show (easily found online), Robson is seen praising Michael Jackson in the most effusive terms.

During the litigation with Jackson's companies, Robson was also caught trying to hide evidence before his cases were dismissed. For example, Robson *lied under oath* and stated that, other than one brief email in late 2012, he had had *"no written communications"* with anyone (other than his attorneys) about his newly-concocted allegations that he was abused by Jackson. This turned out to be a complete and utter lie. Robson had actually shopped a book about his allegations in the year prior to filing his lawsuit—a book he tried to hide from the Estate. That book told a completely different story of how he was first abused by Jackson. When asked about some of these discrepancies at his deposition, Robson explained that his memories had "evolved" since writing the draft of the book in late 2012 and early 2013. He explained that "post disclosing the abuse in 2012 and beginning that healing journey, they've evolved as far as I remember more details about scenarios. As it goes along, you know, it evolves, *details get added to.*"[3]

Moreover, despite lying under oath in his lawsuit that he had had *"no written communications"* with anyone about his supposed abuse, he was eventually ordered by the trial court to produce all such documents. Robson produced hundreds (if not thousands) of written communications (emails, texts, etc.) with his family and friends about his false abuse allegations. He never explained why he lied and said he had *no* such communications.

Most notably, many of these communications were with his mother where he *admittedly* was trying to reconstruct his own "memories" of the time period when he was supposedly abused—i.e., in his own words, to "add" the "details" that he did not know when he was drafting his book. In one email, he lists over twenty different questions to his mother asking her about the specific details of his interactions with Michael Jackson. Some of these include: "Can you explain all that you remember of that first night at Neverland? What happened when we drove in what did we do? And that first weekend at Neverland?" Notably, in the "documentary," Robson now recounts "his" supposed "memories" of these events in great detail. But Mr. Reed and Robson never explain that he had to first ask his mother scores of questions before he could tell his story. Indeed, despite telling the story of his first night at Neverland in the documentary as if it is his own memory, at his deposition, he admitted that he "did not know" if his memory of that night "came from [his] own recollection or [if] it was told to [Robson] by someone else."

Simply put, Robson is an *admitted perjurer* who proudly called himself (in his draft book) a "master of deception." Robson is such a good liar that *his own mother* testified under

---

[3] We would be happy to provide you with any source documents, such as depositions, documents produced in discovery, etc. It is a shame Mr. Reed and your colleagues at HBO were not interested in such documents when producing their "documentary."

Richard Plepler
February 7, 2019
Page 7

oath at her deposition that she could not tell when he was lying; she even *volunteered* that "*he should have had an Oscar*" given how convincing his lies were. It may just be that he deserves an Oscar for HBO's "documentary" as well.

Robson's fabricated story, of course, is that Jackson's abuse caused him to have two self-described nervous breakdowns in 2011 and 2012. Those breakdowns, according to Robson, caused him to realize that he had been abused by Jackson decades before. But there is a much more simple explanation for Robson's breakdowns. He has a family history of suicidal, major depression on his father's side. Robson's father committed suicide in 2002. Robson's first cousin on his father's side committed suicide in 2012. Unfortunately, major depression is a very heritable disease. Thus, it is no surprise that Robson had these breakdowns. And it is even less surprising that he has continued to have breakdowns given that when Robson saw a psychiatrist in 2011 he was prescribed anti-depressant medication. But he *refused to ever take that medication*. To be clear, we ascribe no "fault" or "weakness" whatsoever to those who suffer or who have suffered from clinical depression. That said, we must note Robson's mental illness, and his abject and stubborn refusal to get appropriate medical treatment for it, *because* Robson's claim is that his "nervous breakdowns" are *strong evidence* of his abuse by Jackson. But those breakdowns are much more easily explained by Robson's family history of major depression and his own (apparent) diagnosis of depression *for which he stubbornly and irrationally refused to take the medication prescribed to him* by a medical doctor to treat it.

As for Safechuck, by his own admission, he did not "realize" that he had been abused until after he saw Robson on the *Today Show* in May 2013 being interviewed by Matt Lauer about Robson's newly-concocted story of abuse. All of a sudden, Safechuck realized that he had been abused. He then contacted Robson's lawyers and filed copycat lawsuits against the Estate for millions of dollars. And like Robson, he too had testified under oath that Jackson never did anything inappropriate with him. His two cases against the Estate were also dismissed.

Safechuck's frivolous lawsuits were dismissed so early in the proceedings that significant discovery was never taken in his case, and he was able to avoid having his deposition taken and producing documents. But even in his sworn declarations in the litigations, there are clear signs that he is lying and trying to construct a false story of abuse from his vague memories of his interactions with Jackson. For example, Safechuck claimed in his sworn declaration that he was first abused on the Paris leg of the *Bad* Tour, which he correctly identifies as taking place in late June 1988 (as a simple Wikipedia search would reveal). He later says that after the *Bad* tour ended, Michael flew him out to New York "in February 1989" where Michael was performing at the Grammy's. Safechuck states in his declaration that he was abused on this New York trip for the Grammy's. However, the Grammy's were not in New York in 1989; they were in Los Angeles that year (and in 1990). And Michael did not perform at the Grammy's in 1989. However, Michael *did* perform at the Grammy's in New York in *February 1988*, i.e., *before* Safechuck claims he was first abused

Richard Plepler
February 7, 2019
Page 8

in June 1988. Yet he somehow claims that he was abused on a New York trip to the Grammy's *that occurred before he claims he was first abused*. Safechuck's "error" here is obviously reflective of an effort to create a story of abuse out of whole cloth. Or in other words, Safechuck is just making it up as he goes along.

In the "documentary" and in his declaration for the litigation, Safechuck spins a tale about how he refused to testify for Jackson in 2005, despite threats from Jackson and his legal team. Setting aside the absurdity of Jackson and his sophisticated legal team trying to convince an unwilling and unstable witness to testify on such a sensitive issue, Safechuck's story is demonstrably false. In particular, Safechuck declares that Michael and his legal team called him "*towards the end of the criminal trial*" trying to pressure him to testify. But this statement cannot be true. Early on in the trial, the Judge precluded the prosecution from allowing *evidence* regarding alleged molestation of Safechuck and others because the "evidence" of such molestation was unreliable. The exceptions were that the Judge did allow testimony from certain disgruntled workers that they had heard that Michael had molested Wade Robson, Macaulay Culkin and Brett Barnes. That is why *those three specifically* testified, and all of them denied the molestation (including Robson of course), and were subject to cross-examination by prosecutors but did not waver. And *that is why* Jackson and his attorneys would *not* have ever tried to pressure an unwilling and unstable Safechuck to testify, particularly "towards the end of the criminal trial" as Safechuck so falsely claims in the documentary and under oath.

* * *

Given all of this, which are facts readily available to anyone doing minimal due diligence, why would HBO produce a documentary based solely on the words of these two liars and director/producer Dan Reed? Why would HBO produce this documentary *without even seeking comment and response* from the Jackson Estate who spent years successfully litigating these false allegations with Robson and Safechuck? Is there any other artist who HBO would do this to? Is there any other artist who HBO would not even seek comment from when making such serious accusations?

Michael Jackson was subjected to a decade-long investigation by an overly-zealous, ethically-challenged, and ultimately disgraced prosecutor in Santa Barbara County, Tom Sneddon, who looked anywhere and everywhere for supposed "victims" of Jackson's. Yet, he never found those "victims." Indeed, the 2005 criminal trial of Jackson was a complete farce, and Michael Jackson was completely exonerated. As anyone who has studied that trial knows, the jury utterly repudiated the prosecution's case. In both his opening and closing statements, Jackson's attorney, Tom Mesereau, took the unusual step of telling the jury that they should acquit Jackson because Mesereau and his team *had proven Jackson innocent*. In other words, he did not try the case as a "reasonable doubt" case. Mr. Mesereau tried the case with the purpose and goal of proving Jackson innocent. And he did exactly that. As recently as 2017, several jurors were re-interviewed about the case in light of Robson's about-face, and they all agreed that they would still acquit Jackson today. The jurors have been interviewed many

Richard Plepler
February 7, 2019
Page 9

times; they are articulate bright people, not the gullible idiots that Dan Reed tries to paint them as in his "documentary." Yet HBO is relying on the uncorroborated stories of two admitted perjurers over the weight of the American justice system.

Of course, the tabloid media's fascination with Michael Jackson and telling more-and-more ridiculous stories about him is nothing new. The great American intellectual, James Baldwin, wrote about "the Michael Jackson cacophony" all the way back in 1985 when the media first began subjecting him to "the jaws of a carnivorous success." As Baldwin saw it, Michael "will not swiftly be forgiven for having turned so many tables, for he damn sure grabbed the brass ring, and the man who broke the bank at Monte Carlo has nothing on Michael." By 1985, when Baldwin wrote those words, Michael Jackson was a 27-year-old African-American from Gary, Indiana who had "turned the tables" on the entire power structure in the music business. Leveraging his unprecedented success, Michael insisted that MTV and mainstream radio play his music and that of other African-American artists like him. Michael also insisted that his record company assign him ownership of his own master recordings. In other words, Michael Jackson, the young artist, insisted on controlling his own art and not leaving it to the whims of big business. And more still—the 27 year-old Michael did not just own his own music publishing, he had the gall to outbid other more established players in the industry for one of the crown jewels of music publishing, the ATV catalogue (which famously included the Beatles catalogue).

We suspect that even James Baldwin could not have imagined that his words would still ring so true today, over thirty years later. Michael Jackson has yet to "be forgiven for having turned so many tables" even ten years after he left this world forever. Even the once great HBO—who had partnered with Michael to immense success—is subjecting the deceased Michael Jackson to "the jaws of a carnivorous success" in death, devoting *four hours* of its programming to the words of two serial perjurers, whose sole agenda has been to extract money from Jackson's rightful heirs and chosen beneficiaries.

That HBO has now joined the tabloid media's "Michael Jackson cacophony"—ten years after his death—is truly sad. We know that HBO is facing serious competitive pressures from Netflix, Amazon and other more modern content providers, but to stoop to this level to regain an audience is disgraceful. We know HBO and its partners on this documentary will not be successful. We know that this will go down as the most shameful episode in HBO's history. We know that Michael's devoted fans, and all good people in the world, will not swiftly forgive HBO for its conduct.

Richard Plepler
February 7, 2019
Page 10

Mr. Plepler, as you yourself said in late 2017: "A lie goes halfway around the world before the truth puts its boots on."[4] The media coverage alone of this disgraceful "documentary" has proven you right.

We would be happy to meet with HBO to discuss a solution. We have plenty of further information and witnesses that would expose these two for who they are. If HBO wants to maintain its industry position as a valid source of news and fact, it owes an obligation to the public—not to mention the deceased Michael Jackson with whom HBO had previously partnered with during his lifetime—to actually investigate these matters.

Barring that, this "documentary" will say a lot more about HBO than it ever could about Michael Jackson.

Very truly yours,

/s/

Howard Weitzman

HW/JPS

cc:    Jonathan P. Steinsapir, Esq.
       Bryan Freedman, Esq.
       Eve Konstan, Esq. General Counsel, HBO
       Glenn Whitehead, Esq., EVP, Business & Legal Affairs, HBO

10386.00347/618197

---

[4] https://deadline.com/2017/10/hbo-richard-plepler-confederate-backlash-vanity-fair-summit-1202181519/

# EXHIBIT B

TCV. BY:GREENBERG, GLUSKER       ; 7-31-92 ; 2:48PM ;HBO              →        3105530687;# 2



MICHAEL JACKSON
Jack792.la
VE073192(2)

As of July 22, 1992

TTC Touring Corp.
c/o Greenberg, Glusker, Fields, Claman & Machtinger
1900 Avenue of the Stars
Suite 2000
Los Angeles, CA  90067

Attention: Sandra A. Dewey, Esq.

RE:  MICHAEL JACKSON IN CONCERT

Gentlemen:

The following shall confirm the terms and conditions of the agreement between Home Box Office, a Division of Time Warner Entertainment Company, L.P. ("HBO") and TTC Touring Corp. ("Licensor") for the above-mentioned program.

Performer:  Michael Jackson.

Program:  An approximately 120 minutes in length in-concert program featuring Performer (the "Program"), which Licensor shall record at Performer's live concert in Bucharest, Romania currently scheduled for October 1, 1992 (the "Performance").  The Program shall thereafter be delivered to HBO for exhibition by HBO on October 10, 1992 (or at such later date as set forth in the "Cancellation" paragraph below).  The Program shall contain up to approximately ten (10) minutes (but in no event more than twelve (12) minutes) of footage (which shall include, if it is used, the video, approximately three (3) minutes in length, featuring Performer which is shown at the beginning of the Performance before Performer appears on stage) other than in-concert footage of Performer during the Performance (the "Non-Concert Footage"); provided that (i) the entirety of the Non-Concert Footage shall be placed immediately at the beginning of the Program; and (ii) the remainder of the Program shall consist solely of uninterrupted in-concert footage of Performer during the Performance.

Delivery:  The Program shall be delivered to HBO no later than October 8, 1992; provided that Licensor shall use reasonable efforts to deliver the Program earlier (the "Delivery Date").  The Program shall be held by HBO for the sole purpose of preparing for HBO's use hereunder such videotapes of the Program as HBO requires. HBO is not granted the right to own the Program.  After delivery of

-1-

RCV. BY:Greenberg Glusker et  ; 7-31-92 ; 1:31PM ;HBO NY 14 FL          →          5530687;# 5

TTC Touring Corp.
As of July 22, 1992

the Program, HBO may not alter or edit the Program in any way.  If
there are technical or legal reasons why the Program requires
alteration or editing, HBO shall immediately notify Licensor of
such problems, and Licensor shall be responsible for the immediate
correction thereof.  Within thirty (30) days after the Exhibition
Date (as hereinafter defined), HBO shall return to Licensor all
videotapes of the Program in its possession and any promotional or
advertising materials delivered to HBO by Licensor in connection
with this Agreement; provided that HBO may keep a videotape for
archival purposes only.

**Rights:**  Licensor hereby irrevocably licenses to HBO, its
successors and assigns, the exclusive rights to exhibit the Program
one time only on each transmission feed (without overlap) on the
HBO programming service without regard to the number of channels
comprising such service by means of Non-Standard Television in the
Territory on October 10, 1992 (or at such later date as set forth
in the "Cancellation" paragraph below (the "Exhibition Date")) and
at no other time.

**License Fee:**  In consideration for the license granted by Licensor
to HBO hereunder, HBO shall pay to Licensor ███████████████████
██████████████████████████████, payable as follows:

     (i)    one third (1/3) by wire transfer within five (5) days
after Licensor's execution and delivery of this Agreement;

     (ii)   one third (1/3) two weeks prior to the Delivery Date;
and

     (iii) one third (1/3) within five (5) days after the Delivery
Date.

**Holdbacks:**  (A) Neither Performer, nor Licensor, nor any entity or
person owned or controlled by Performer and/or Licensor shall
cause, authorize, or permit any exhibition, distribution,
promotion, publicity or advertisement of the Program, any portion
thereof, or any outtakes from the videotaping of the Performance,
as follows:

          (i) in the Territory, by means of Non-Standard
Television, during the twelve (12) month period immediately
following the Exhibition Date (the "Holdback Period");

          (ii) in the Territory, by means of Standard Television
until after the Holdback Period;

-2-

RCV BY:Greenberg Glusker et  ; 7-31-92 ; 1:31PM ;HBO NY 14 FL          →            5530687;# 5

TTC Touring Corp.
As of July 22, 1992

(iii) in the Territory, by means of Non-Theatrical Distribution, until after the Holdback Period;

(iv) in the Territory, by means of Consumer Video Devices until thirty (30) days after the Exhibition Date; and

(v) outside the Territory by means of any media until one (1) day after the Exhibition Date; provided that it is understood and agreed between the parties hereto that Licensor has entered into an arrangement with Radio Vision International, Inc. pursuant to which Radio Vision International, Inc. has been granted the right to record the Performance and to authorize the broadcast of such recordation twice in certain territories in Europe only (once "live" and once during the six (6) month period following the live broadcast).

(B) Notwithstanding anything to the contrary contained in clause (A), above, Performer or Licensor shall have the right to cause, authorize and permit the exhibition, promotion, publicity or advertisement of the following:

(i) Excerpts from Performer's 1992/1993 tour for purposes of advertising or promoting the 1992/1993 tour or the sale of Performer's records; provided that, no one excerpt or clip of such footage shall exceed two (2) songs in the aggregate;

(ii) a "making of" documentary of Performer's 1992/1993 tour containing not more than twenty (20) minutes of concert footage from Performer's 1993/1993 tour; provided, that such documentary shall not be promoted, advertised or exhibited in the Territory by any means or media until three (3) months after the Exhibition Date;

(iii) any outtakes from the Program, to be used solely in connection with Performer's commercial endorsements (except as set forth in clause (iv) below), not to exceed thirty (30) seconds in length each; and

(iv) any outtakes from the Program, to be used solely in connection with mini documentaries about Performer (except as set forth in clause (iii), above), provided that such outtakes shall not exceed (A) thirty (30) seconds in length each and (B) five (5) minutes in length in the aggregate, for inclusion in each such mini documentary.

Cancellation: (i) If the Performance is canceled for any reason within Licensor's or Performer's control, or within the control of

-3-

RCV.BY:Greenberg Glusker et  ; 7-31-92 ; 1:32PM ;HBO NY 14 FL          →          5530687;# 7

TTC Touring Corp.
As of July 22, 1992

any employee, agent, representative or designee of either of them, Licensor shall, within ten (10) business days after receipt of an invoice therefor, reimburse HBO for any portion of the License Fee heretofore paid.   For purposes of this Agreement, any strike, epidemic, act of God, illness, injury or any other condition beyond Licensor's or Performer's control causing a cancellation (each, a "Force Majeure Event") shall be deemed an event beyond Licensor's and Performer's control.  (ii) If the Performance is canceled as a result of any Force Majeure Event, neither Licensor nor HBO shall have any liability whatsoever to the other; provided, that if and only if the Performance and the videotaping thereof are not rescheduled (as set forth in this paragraph), Licensor shall, within ten (10) business days after receipt of an invoice, reimburse HBO for any portion of the License Fee heretofore paid which has not been expended or irrevocably committed by Licensor on the actual production of the Program by the date of cancellation of the Performance.   Licensor shall account to HBO in writing simultaneously with said reimbursement for any amounts so expended. Notwithstanding the foregoing, Licensor shall have the right to reschedule the videotaping of the Program during one of the performances during Performer's 1992/1993 tour; provided that the Exhibition Date must be within two (2) weeks following October 10, 1992; and provided further that the venue of such rescheduled performance shall be subject to HBO's approval.

As used throughout this Agreement:

"Non-Standard Television" means any and all forms of television exhibition, whether now existing or developed in the future, other than exhibitions by means of Standard Television, Consumer Video Devices, and Non-Theatrical Distribution. Non-Standard Television shall include, without limitation, exhibition by means of cable, wire or fibre of any material, "over-the-air pay" or STV in any frequency band, any and all forms of regular or occasional scrambled broadcast for taping, master antenna, satellite master antenna, low power television, closed-circuit television, single and multi-channel multi-point distribution service, and direct to TVRO satellite transmission, and radio (only for purposes of simulcast), all on a subscription, pay-per-view, license, rental, sale or any other basis.

"Standard Television" means television distributed by a UHF or VHF television broadcast station, the video and audio portions of which are intelligibly receivable without charge by means of standard home roof-top or television set built-in antennas.

-4-

RCV.BY:Greenberg Glusker et  ; 7-31-92 ; 1:33PM ;HBO NY 14 FL        →        5530687;# 8

TTC Touring Corp.
As of July 22, 1992

"TVRO" means a television earth station capable of receiving satellite transmissions.

"Consumer Video Devices" means any form of video device, now existing or hereafter devised, including video discs and video cassettes, for exhibition by means of a playback device causing a visual image of the Program on the screen of a television receiver or any comparable device, whether now existing or hereafter developed, located in consumer homes, including, without limitation, distribution for sale or rent, on a retail subscription, club, mail order or other direct consumer basis.

"Non-Theatrical Distribution" means distribution of the Program by any means or method to educational and/or institutional organizations, airlines for in flight and trains for in-transit distribution, ships-at-sea, remote corporate locations and U.S. military bases.

"Territory" means the United States of America, its territories, possessions and commonwealths.

Promotional Activities: For purposes of advertising, promoting and publicizing the Program, HBO shall have the right to: (i) use and authorize others to utilize Performer's name, approved likeness; approved recorded singing voice and approved recorded speaking voice; provided, that Performer's recorded singing and/or speaking voice as contained in the Performance and in any interviews conducted by HBO with Performer are hereby deemed approved; and provided further that all other approvals must be obtained from Licensor, and shall be given within five (5) business days of receipt by Licensor of HBO's submission for approval of such likeness and recorded singing and/or speaking voice and failure by Licensor to respond within such five (5) business day period shall be deemed approval; (ii) require Licensor to provide a reasonable number of photographs of Performer; and (iii) screen and utilize audio/visual materials as are reasonably available to Licensor or Performer (as well as clips from the Program) for purposes of creating and airing commercials and on-air promotion. In the event that HBO shall determine that such audio/visual materials are not sufficient, Licensor agrees to videotape additional materials as requested by HBO of Performer on stage, subject to Performer's availability; provided that  HBO shall be responsible for reimbursing Licensor for out-of-pocket expenses incurred in videotaping such additional materials. After the Exhibition Date and until the expiration of the Holdback Period, for purposes of advertising, promoting and publicizing the fact that the Program and Performer have appeared on the HBO programming service (but not

-5-

RCV BY:Greenberg Glusker et  ; 7-31-92 ; 1:34PM ;HBO NY 14 FL         →           5530687;# 9

TTC Touring Corp.
As of July 22, 1992

for the purpose of directly soliciting new subscribers, e.g., in connection with a specific special offer or an "800" or "900" telephone number), HBO shall have the right to use (i) excerpts from the Program, each excerpt not to exceed ten (10) seconds in length; provided, however, that Licensor shall have the right to approve (A) such excerpt(s), provided that Licensor shall supply at least five (5) minutes in the aggregate of such excerpts (consisting solely of Performer's performance in the Program) on or before the Exhibition Date and (B) the material which contains any such excerpt(s) (which approval of such material shall not be unreasonably withheld); and (ii) Performer's name and/or approved likeness in printed promotional or advertising material, provided that Licensor shall have the right to approve the material which contains any such name and/or likeness.   In connection with Licensor's approval of material created by HBO and containing excerpts from the Program, the name and/or likeness of Performer, such approval shall be notified to HBO no later than five (5) business days of receipt by Licensor of HBO's submission for approval; and provided further that failure by Licensor to respond within such five (5) business day period shall be deemed approval.

Copyright:  Licensor shall be the sole and exclusive owner of all right, title and interest in, to and with respect to the Program including, without limitation, the copyright therein and thereto. Licensor shall register or cause to be registered the copyright in the Program in the United States Copyright Office and shall protect the copyright in the Program throughout the Territory.  Licensor shall deliver to HBO an executed and notarized Memorandum of Exclusive License, in the form attached hereto.  For such purpose only, HBO is hereby irrevocably appointed the attorney-in-fact of Licensor to execute, verify, acknowledge and deliver any and all such instruments which Licensor shall fail or refuse to execute, verify, acknowledge or deliver within ten (10) business days.  HBO shall deliver to Licensor copies of any documents or instruments executed, verified, acknowledged and delivered by HBO as attorney-in-fact of Licensor.

Licensor's Representations and Warranties:  Licensor represents and warrants that:

(i)  The Program, any element thereof, or any advertising, promotional or publicity material supplied by Licensor hereunder will not contain any language or material which, to the best of Licensor's knowledge, is libelous, slanderous or defamatory and will not, to the best of Licensor's knowledge, violate, infringe upon, or give rise to any adverse claim with respect to, any common law or other right whatsoever (including, without

-6-

·RCV·BY:Greenberg Glusker et  ; 7-31-92 ; 1:34PM ;HBO NY 14 FL          →          5530687;#10

TTC Touring Corp.
As of July 22, 1992

limitation, any copyright, trademark, service mark, literary, dramatic, comedic, musical or photoplay right, right of privacy or publicity or contract right) of any person, firm or corporation, or violate any applicable law;

(ii) Licensor has the right to enter into this Agreement, to grant the rights herein licensed and to perform fully all of its obligations hereunder;

(iii)    Licensor has acquired all rights necessary to Licensor's license of rights to HBO hereunder including, without limitation, music synchronization rights, music master recording rights, still photos, film or videotape footage licenses or other appropriate licenses of all elements of the Program; and

(iv) None of the rights herein licensed to HBO has been transferred to any third party; to the best of Licensor's knowledge, said rights are free of any liens, claims and encumbrances whatsoever in favor of any other party; and to the best of Licensor's knowledge, there are no claims, litigation or other proceedings pending or threatened which would adversely affect HBO's rights hereunder.

HBO's Representations and Warranties:  HBO represents and warrants that it has the right to enter into this Agreement and perform fully all of its obligations hereunder.

Indemnification:  (i)  Licensor shall indemnify and hold harmless HBO, its parent, subsidiary and affiliated companies, distributors, assigns, licensees and the respective shareholders, directors, officers, employees and agents of the foregoing (the "HBO Indemnified Parties") from and against any and all claims, actions, suits, costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, reasonable outside legal fees and expenses) of whatsoever kind and nature imposed on, incurred by or asserted against any of the HBO Indemnified Parties arising out of any breach by Licensor of any representation, warranty or covenant made, or obligation assumed, by Licensor pursuant to this Agreement.  The provisions of this subsection (i) shall apply, without limitation, to claims brought by HBO against Licensor.

(ii) HBO shall indemnify and hold harmless Licensor, its parent, subsidiary and affiliated companies, distributors, assigns, licensees and the respective shareholders, directors, officers, employees and agents of the foregoing (the "Licensor Indemnified Parties") from and against any and all claims, actions, suits,

-7-

RCV·BY:Greenberg Glusker et  ; 7-31-92 ; 1:35PM ;HBO NY 14 FL        →        5530687;#11

TTC Touring Corp.
As of July 22, 1992

costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, reasonable outside legal fees and expenses) of whatsoever kind and nature imposed on, incurred by or asserted against any of the Licensor Indemnified Parties arising out of (A) any breach by HBO of any representation, warranty or covenant made, or obligation assumed, by HBO pursuant to this Agreement; (B) any use by HBO of any advertising or promotional materials not approved by Licensor or Performer; or (C) the production, exploitation or exhibition of any materials created by HBO. The provisions of this subsection (ii) shall apply, without limitation, to claims brought by Licensor against HBO.

Miscellaneous:

(1)  Notices.  All notices and other communications between the parties hereto shall be in writing and deemed received (i) when delivered in person or by telex or electronic means, or (ii) five (5) days after deposited in the United States mails, postage prepaid, certified or registered mail, addressed to the other party at the address set forth below (or at such other address as such other party may supply by written notice):

Licensor ("Licensor's Address"):

TTC Touring Corp.
c/o Greenberg, Glusker, Fields, Claman & Machtinger
1900 Avenue of the Stars
Suite 2000
Los Angeles, CA  90067

Attention: Bertram Fields, Esq. and
            Sandra A. Dewey, Esq.

with copies to:     MJJ Productions, Inc.
                    10960 Wilshire Boulevard, Ste. 2206
                    Los Angeles, California  90024

                    Attention:  Ms. Norma Staikos

                    Breslauer, Jacobson, Rutman & Sherman
                    10345 Olympic Boulevard
                    Los Angeles, California  90064

                    Attention:  Mr. Richard Sherman

-8-

RCV·BY:Greenberg Glusker et  ; 7-31-92 ; 1:36PM ;HBO NY 14 FL          →          5530687;#12

TTC Touring Corp.
As of July 22, 1992


HBO:

Home Box Office, a Division of
Time Warner Entertainment Company, L.P.
1100 Avenue of the Americas
New·York, New York   10036

Attention:  Senior Vice President, Business Affairs

with a separate copy delivered to:

Senior Vice President and General Counsel

(ii) Confidential Information.  It is understood that HBO shall comply with the confidentiality provisions set forth in Exhibit I attached hereto and incorporated herein by this reference.

(iii) Governing Law.  This Agreement should be governed by, and construed in accordance with, the laws of the State of California, applicable to contracts entered into and to be fully performed therein.

(iv) Arbitration.  Any dispute arising out of, in connection with or relating to this Agreement shall be submitted for binding and final arbitration before a retired judge of the Superior Court of the State of California for the County of Los Angeles who shall be mutually selected by the parties.  In the event that the parties cannot agree on the selection of such a retired judge within 30 days after one of the parties notifies the other in writing that there is any such dispute to be resolved, each party shall select such a retired judge, and the two retired judges so selected shall then select a third retired judge who shall serve as the sole judge in connection with such dispute.  If the two party-appointed judges are unable to select a third judge within 30 days after their appointment, the sole retired judge in connection with such dispute shall be selected by the Superior Court of the State of California

-9-

RCV BY:GREENBERG GLUSKER    ; 7-29-92 ; 1:27PM ;512 5587              →              31055306871#28

TTC Touring Corp.
As of July 22, 1992

for the County of Los Angeles.  The retired judge so selected shall
conduct the arbitration in conformity with the rules of, and as if
it were conducted by, the American Arbitration Association.

Very truly yours,

HOME BOX OFFICE, A division of
Time Warner Entertainment Company, L.P.

By:

ACCEPTED AND AGREED TO:

TTC TOURING CORP.

By:
Federal ID #_____

-10-

RCV BY:GREENBERG GLUSKER    ; 7-29-92 ; 1:27PM ;512 5587    →    3105530687;#29

MEMORANDUM OF EXCLUSIVE LICENSE

KNOW ALL PERSONS BY THESE PRESENTS;

In consideration of Ten Dollars, receipt of which is hereby
acknowledged, paid by Home Box Office, a Division of Time Warner
Entertainment Company, L.P. ("HBO"), and for other good and
valuable consideration, the undersigned ("Licensor") does hereby
irrevocably license to HBO, its successors and assigns, the
exclusive rights to distribute the television program tentatively
entitled "MICHAEL JACKSON IN CONCERT" (the "Program") as follows:

Licensor hereby irrevocably licenses to HBO, its successors
and assigns, the exclusive rights to exhibit the Program one time
only on each transmission feed (without overlap) on the HBO
programming service without regard to the number of channels
comprising such service by means of Non-Standard Television in the
Territory (the "Exhibition Date").

Licensor shall not cause, authorize, license or permit any
exhibition, distribution, promotion, publicity or advertisement of
the Program, or any portion thereof, as follows:

(i) in the Territory, by means of Non-Standard
Television, during the twelve (12) month period immediately
following the Exhibition Date (the "Holdback Period"), subject to
the terms and provisions of a certain arrangement between Licensor
and Fox/MTV;

(ii) in the Territory, by means of Standard Television,
until after the Holdback Period;

(iii) in the Territory, by means of Non-Theatrical
Distribution, until after the Holdback Period;

(vi) in the Territory, by means of Consumer Video
Devices, until thirty (30) days after the Exhibition Date; and

(v) outside the Territory by means of any media, until
one (1) day after the Exhibition Date; provided that it is
understood and agreed between the parties hereto that Licensor has
entered into an arrangement with Radio Vision International, Inc.
pursuant to which Radio Vision International, Inc. has been granted
the right to record the September 29th concert and to authorize the
broadcast of such recordation thereof twice in certain territories

-1-

RCV BY:GREENBERG GLUSKER     ; 7-29-92 ; 1:27PM ;512 5587          →          31055306871#30

in Europe only (once "live" and once during the six month period following the live broadcast).

"Non-Standard Television" means any and all forms of television exhibition, whether now existing or developed in the future, other than exhibitions by means of Standard Television, Consumer Video Devices and Non-Theatrical Distribution. Non-Standard Television shall include, without limitation, exhibition by means of cable, wire or fibre of any material, "over-the-air pay" or STV in any frequency band, any and all forms of regular or occasional scrambled broadcast for taping, master antenna, satellite master antenna, low power television, closed-circuit television, tape, cassette and disc distribution (excluding Consumer Video Devices), single and multi-channel multi-point distribution service, and direct to TVRO satellite transmission, and radio (only for purposes of simulcast) all on a subscription, pay-per-view, license, rental, sale or any other basis.

"Standard Television" means television distributed by a UHF or VHF television broadcast station, the video and audio portions of which are intelligibly receivable without charge by means of standard home roof-top or television set built-in antennas.

"TVRO" means a television earth station capable of receiving satellite transmissions.

"Consumer Video Devices" means any form of video device, now existing or hereafter devised, including video discs and video cassettes for exhibition by means of a playback device causing a visual image of the Program on the screen of a television receiver or any comparable device, whether now existing or hereafter developed, located in consumer homes, including, without limitation, distribution for sale or rent, on a retail subscription, club, mail order or other direct consumer basis.

"Non-Theatrical Distribution" means distribution of the Program by any means or method to educational, institutional organizations, airlines for in flight and trains for in-transit distribution, ships-at-sea, remote corporate locations and U.S. military bases.

"Territory" means the United States of America, its territories, possessions and commonwealths.

This memorandum of exclusive license is executed in accordance with and is subject to the terms and conditions of the license

-2-

RCV BY:GREENBERG GLUSKER ....; 7-29-92 ; 1:28PM ;512 5507    →    3105530687;#31

agreement dated as of July 22, 1992 between the undersigned and HBO (the "Agreement") relating to the license to HBO of the above-mentioned rights in the Program. All capitalized terms used herein and not defined shall have the meanings set forth in the Agreement.

IN WITNESS WHEREOF, the undersigned has caused these presents to be signed by its duly authorized officer on the ____ day of ____ July ____, 1992.

TTC TOURING CORP.

By _____

STATE OF California    )
                       : SS.:
COUNTY OF Los Angeles  )

On the ____ day of ____ July ____, 1992 before me personally came ____ Richard Stanton ____, to me known, who, being by me duly sworn, did depose and say that he/she resides at ____ 10345 O N MOIC Blvd ____; that he/she is the ____ Secretary ____ of TTC Touring Corp., the corporation described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by order of the board of directors of said corporation.

_____
Notary Public

OFFICIAL NOTARY SEAL
KATHY A. SHANNON
Notary Public — California
LOS ANGELES COUNTY
My Comm. Expires OCT 06,1995

-3-

RCV BY:GREENBERG GLUSKER    ; 7-29-92 ; 1:28PM ;512 5587    →    31055306871;#32

EXHIBIT I
to
Agreement between Home Box Office
and TTC Touring Corp. dated as of
July 22, 1992

## CONFIDENTIALITY PROVISIONS:

Prior to and/or during HBO's contact or relationship with Licensor, HBO (which shall be deemed to include HBO's officers, directors, agents and employees) may be given access to or become acquainted with Performer and/or with "Confidential Information" (as such term is defined below) which is of great value to Licensor and Performer. HBO further acknowledges that maintaining the confidentiality of all such Confidential Information is critically important to Licensor and Performer, and that HBO's agreement to these confidentiality provisions is a material inducement to Licensor in granting the license to HBO which is the subject of this agreement.

HBO shall not, in any manner nor at any time (either during or after HBO's contact or HBO's relationship with Licensor and/or Performer), use or disclose, directly or indirectly, even in the course of casual discussions, to anyone other than representatives of Licensor or other persons designated by Licensor any of the following described information (the "Confidential Information"): any information, data, documents, or other materials of any kind or nature in any way related to Performer from any source or for any reasons, including without limitation, as acquired by HBO in the course of HBO's contact with Licensor and Performer. Confidential Information shall also include, without limitation, any information relating to Licensor's business affairs or operations, the business affairs, operations and/or personal life of Performer, the business affairs, operations and/or private lives of any and all members of Performer's family, and/or the business affairs or operation of any and all entities in which Performer has a controlling interest, which information is generally not known to the public. Confidential Information shall also include, without limitation, any and all photographs, films, videos, music or other recordings, including negatives, prints or copies thereof, relating to Performer or his likeness or any of his corporations and/or other entities, and/or corporations or other entities doing business or in any way related to Performer, and/or any of his or their activities. All such Confidential Information shall be deemed to be private, secret and sensitive and shall be kept confidential and secret unless Licensor otherwise advises HBO in writing in each instance. HBO acknowledges that Confidential Information may be contained in written materials, in written or verbal communications, and/or in HBO's unwritten knowledge.

HBO shall not photograph, tape, film or otherwise record (i) the voice or any likeness or activities of Performer, (ii) any concert performances or other musical performances of Performer, or rehearsals therefor, or (iii) any other activities related to Performer, without Licensor's written consent in each instance, and HBO acknowledges that any such photographs, tapes, film or other recordings, if approved in writing, shall be owned by Licensor and shall be deemed Confidential Information.

4548701729-155650.210

RCV BY:GREENBERG, GLUSKER   ; 7-29-92 ; 1:29PM ;512 5587   →   3105530607;#33

HBO shall not, without Licensor's prior written consent in each instance, publish, directly or indirectly, or cause or induce the publication of, any Confidential Information, including, without limitation, give any interviews, write or prepare or assist in the preparation of any books, articles, programs or any other oral or written communications concerning Performer or any corporations or entities doing business with or in any way related to Performer and/or any of his or their activities. HBO understands and acknowledges that if HBO has any question as to whether a particular piece of information is confidential, HBO is obligated to obtain Licensor's written approval prior to disclosing any such information. HBO shall not make any disparaging remarks concerning Performer or any of his representatives, agents or business practices or do any act that may harm or disparage or cause to lower in esteem the reputation or public image of Performer or any person, firm or corporation related to or doing business with Performer.

HBO acknowledges and agrees that HBO does not have, nor shall HBO at any time claim, any interest whatsoever in the name "Michael Jackson" or in any name similar thereto or in any goodwill associated therewith. Further, any and all Confidential Information, including, without limitation, any and all pictures, photographs, tapes, music, recordings, records, documents or other information relating to any entertainment services, or other services performed by Performer or by any other firm or corporation doing business with or in any way related to Performer, whether prepared by HBO or otherwise coming into HBO's possession or control, shall be and remain Licensor's and/or Performer's sole and exclusive property, free of any claim or interest of any third party, and shall not be removed, reproduced, summarized, copied, excerpted or utilized in any manner whatsoever without Licensor's prior written consent in each instance. HBO hereby irrevocably and perpetually assigns to Licensor and/or Performer all rights, title and interest of every kind or nature, both tangible and intangible, in or arising out of such Confidential Information or other material which is created by HBO (including, without limitation, any photographs, videos and/or recordings of Performer) to the extent that Licensor and/or Performer do not already own such rights. HBO agrees to immediately return all such Confidential Information to Licensor immediately on discovery of possession thereof, or following request therefor by Licensor.

HBO acknowledges that a breach of the provisions of these confidentiality provisions will cause Licensor and/or Performer irreparable harm for which there is no adequate remedy at law, and therefore, in addition to any and all other rights or remedies available to Licensor and/or Performer, Licensor and/or Performer shall be entitled to injunctive relief and all other remedies provided in such event by law or equity. Such remedies shall include, without limitation, the right to prevent dissemination of any Confidential Information before such Confidential Information is published. In the event of any unauthorized publication of Confidential Information, Licensor and/or Performer shall automatically own the copyright thereto.

4543701729-155620.210

2

RCV BY:GREENBERG GLUSKER     ; 7-29-92 ; 1:30PM ; 512 5587     →     3105530687;#34

HBO agrees to indemnify and hold Licensor, Performer and any of its and his corporations or other entities harmless from and against any claims, losses, liabilities, damages and expenses (including, without limitation, attorneys' fees and related costs) incurred by the foregoing parties as a result of HBO's breach, or the breach of HBO's agents, employees or representatives, of any covenants, representations or warranties contained herein.

In the event that either party to this agreement brings an action to enforce the terms of these confidentiality provisions or to declare rights with respect to such provisions, the prevailing party in such action shall be entitled to an award of costs of litigation, including attorneys' fees and related costs, to be paid by the losing party in such amount as may be determined by the court having jurisdiction in such action.

** TOTAL PAGE.034 **

# EXHIBIT C

D1052044

THE COMPLETE MERGER FILING IS UNDER
CORPORATE NUMBER_1211598_

1309469 out

**FILED**

in the office of the Secretary of State
of the State of California

**DEC 2 9 2010**

Agreement of Merger

This Agreement of Merger is entered into between Optimum Productions, a California corporation (herein "Surviving Corporation") and TTC Touring Corp, a California corporation (herein "Merging Corporation).

1. Merging Corporation shall be merged into Surviving Corporation.

2. The outstanding shares of Merging Corporation shall be canceled without consideration.

3. The outstanding shares of Surviving Corporation shall remain outstanding and are not affected by the merger.

4. Merging Corporation shall from time to time, as and when requested by Surviving Corporation, execute and deliver all such documents and instruments and take all such action necessary or desirable to evidence or carry out this merger.

5. The effect of the merger and the effective date of the merger are as prescribed by law.

IN WITNESS WHEREOF the parties have executed this Agreement.

Optimum Productions

John Branca, President/CEO

John McClain, Secretary/CFO

TTC Touring Corp

John Branca, President/CEO

John McClain, Secretary/CFO

{00465822.DOCX \ 1}

Electronically FILED by Superior Court of California, County of Los Angeles on 02/21/2019 10:02 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mariscal,Deputy Clerk

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Howard Weitzman  SBN: 38723  Kinsella Weitzman Iser Kump & Aldisert LLP (See Attachment hereto)  808 Wilshire Blvd. Third Floor, Santa Monica, CA 90401  TELEPHONE NO. 310-566-9800   FAX NO. 310-566-9850  ATTORNEY FOR *(Name)* Plaintiffs Optimum Productions, John Branca and John McClain | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS: 1725 Main Street
MAILING ADDRESS: 1725 Main Street
CITY AND ZIP CODE: Santa Monica, 90401
BRANCH NAME: Santa Monica Courthouse

CASE NAME: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited   [ ] Limited  (Amount demanded exceeds $25,000)  (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder  Filed with first appearance by defendant  (Cal. Rules of Court, rule 3.402) | 19SMCP00075 |
| | | JUDGE:  DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[X] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[ ] monetary   b.[X] nonmonetary; declaratory or injunctive relief   c.[ ] punitive
4. Number of causes of action *(specify):* (1) Breach of Contract (2) Breach of Covenant of Good Faith and Fair Dealing
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: February 21, 2019

Howard Weitzman
(TYPE OR PRINT NAME)

▶ /S/ Howard Weitzman
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use  Judicial Council of California  CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;  Cal. Standards of Judicial Administration, std. 3.10  www.courtinfo.ca.gov  Westlaw Doc & Form Builder™ |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
 Asbestos Property Damage
 Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
 Medical Malpractice– Physicians & Surgeons
 Other Professional Health Care Malpractice
Other PI/PD/WD (23)
 Premises Liability (e.g., slip and fall)
 Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
 Intentional Infliction of Emotional Distress
 Negligent Infliction of Emotional Distress
 Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
 Legal Malpractice
 Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
 Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
 Contract/Warranty Breach–Seller Plaintiff (*not fraud or negligence*)
 Negligent Breach of Contract/ Warranty
 Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
 Collection Case–Seller Plaintiff
 Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
 Auto Subrogation
 Other Coverage
Other Contract (37)
 Contractual Fraud
 Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
 Writ of Possession of Real Property
 Mortgage Foreclosure
 Quiet Title
 Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
 Writ–Administrative Mandamus
 Writ–Mandamus on Limited Court Case Matter
 Writ–Other Limited Court Case Review
Other Judicial Review (39)
 Review of Health Officer Order
 Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
 Abstract of Judgment (Out of County)
 Confession of Judgment (*non-domestic relations*)
 Sister State Judgment
 Administrative Agency Award (*not unpaid taxes*)
 Petition/Certification of Entry of Judgment on Unpaid Taxes
 Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
 Declaratory Relief Only
 Injunctive Relief Only (*non-harassment*)
 Mechanics Lien
 Other Commercial Complaint Case (*non-tort/non-complex*)
 Other Civil Complaint (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
 Civil Harassment
 Workplace Violence
 Elder/Dependent Adult Abuse
 Election Contest
 Petition for Name Change
 Petition for Relief From Late Claim
 Other Civil Petition

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER |
|---|---|

| **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|

**Non-Personal Injury/ Property Damage/Wrongful Death Tort**

| **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|
| Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
|  | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |

**Employment**

| | | |
|---|---|---|
| Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
|  | ☐ A6109  Labor Commissioner Appeals | 10 |

**Contract**

| | | |
|---|---|---|
| Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
|  | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
|  | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
|  | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
|  | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
|  | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
|  | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
|  | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |

**Real Property**

| | | |
|---|---|---|
| Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2, 6 |
| Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
|  | ☐ A6032  Quiet Title | 2, 6 |
|  | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |

**Unlawful Detainer**

| | | |
|---|---|---|
| Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☒ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON:  ☐ 1. ☐ 2. ☐ 3. ☐ 4. ☒ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | ADDRESS: 1801 Century Park West |
|---|---|

| CITY: Los Angeles | STATE: CA | ZIP CODE: 90067 |
|---|---|---|

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the WEST _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: February 21, 2019

/S/ Howard Weitzman

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

| SHORT TITLE: OPTIMUM PRODUCTIONS v. HOME BOX OFFICE | CASE NUMBER: |
|---|---|

## ATTACHMENT TO CIVIL COVER SHEET

Additional Attorneys for Optimum Productions and for John Branca and John McClain as Executors of the Estate of Michael J. Jackson

FREEDMAN + TAITELMAN LLP
Bryan J. Freedman (SBN 151990)
  bfreedman@ftllp.com
1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
Telephone: 310.201.0005
Facsimile: 310.201.0045

*(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, **not** line numbers)*:

This page may be used with any Judicial Council form or any other paper filed with the court.

Page _____

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper

Westlaw Doc & Form Builder

CRC 201, 501

### Unlimited Civil - General Independent Calendar (IC)

1.  Alternative Dispute Resolution (ADR) Information Packet (3/1/17)         4 pages
2.  Voluntary Efficient Litigation Stipulations (4/1/11)                      9 pages

# Superior Court of California
# County of Los Angeles



# ALTERNATIVE DISPUTE RESOLUTION (ADR)
# INFORMATION PACKET

The person who files a civil lawsuit (plaintiff) must include the ADR information Packet with the complaint when serving the defendant. Cross-complainants must serve the ADR Information Packet on any new parties named to the action together with the cross-complaint.

There are a number of ways to resolve civil disputes without having to sue someone. These alternatives to a lawsuit are known as alternative dispute resolution (ADR).

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediations, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help resolve disputes without having to go to court.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

## Advantages of ADR

- Often faster than going to trial
- Often less expensive, saving the litigants court costs, attorney's fees and expert fees.
- May permit more participation, allowing parties to have more control over the outcome.
- Allows for flexibility in choice of ADR processes and resolution of the dispute.
- Fosters cooperation by allowing parties to work together with the neutral to resolve the dispute and mutually agree to remedy.
- There are fewer, if any, court appearances. Because ADR can be faster and save money, it can reduce stress.

## Disadvantages of ADR - ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.
- ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.
- The neutral may charge a fee for his or her services.
- If the dispute is not resolved through ADR, the parties may then have to face the usual and traditional costs of trial, such as attorney's fees and expert fees.

## The Most Common Types of ADR

- **Mediation**

  In mediation, a neutral (the mediator) assists the parties in reaching a mutually acceptable resolution of their dispute. Unlike lawsuits or some other types of ADR, the parties, rather than the mediator, decide how the dispute is to be resolved.

  - **Mediation is particularly effective** when the parties have a continuing relationship, like neighbors or business people. Mediation is also very effective where personal feelings are getting in the way of a resolution. This is because mediation normally gives the parties a chance to express their feelings and find out how the other sees things.

  - **Mediation may not be effective** when one party is unwilling to cooperate or compromise or when one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

- **Arbitration**

  In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is typically less formal than a trial, and the rules of evidence may be relaxed. Arbitration may be either "binding" or "non-binding." Binding arbitration means the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Non-binding arbitration means that the parties are free to request a trial if they reject the arbitrator's decision.

  Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

- **Mandatory Settlement Conference (MSC)**

  **Settlement Conferences are appropriate in any case where settlement is an option.** Mandatory Settlement Conferences are ordered by the Court and are often held near the date a case is set for trial. The parties and their attorneys meet with a judge who devotes his or her time exclusively to preside over the MSC. The judge does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement.

  The Los Angeles Superior Court Mandatory Settlement Conference (MSC) program is free of charge and staffed by experienced sitting civil judges who devote their time exclusively to presiding over MSCs. The judges participating in the judicial MSC program and their locations are identified in the List of Settlement Officers found on the Los Angeles Superior Court website at http://www.lacourt.org/. This program is available in general jurisdiction cases with represented parties from independent calendar (IC) and Central Civil West (CCW) courtrooms. In addition, on an ad hoc basis, personal injury cases may be referred to the program on the eve of trial by the personal injury master calendar courts in the Stanley Mosk Courthouse or the asbestos calendar court in CCW.

  In order to access the Los Angeles Superior Court MSC Program the judge in the IC courtroom, the CCW Courtroom or the personal injury master calendar courtroom must refer the parties to the program. Further, all parties must complete the information requested in the Settlement Conference Intake Form and email the completed form to mscdept18@lacourt.org.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

## Additional Information

To locate a dispute resolution program or neutral in your community:

- Contact the California Department of Consumer Affairs (www.dca.ca.gov) Consumer Information Center toll free at 800-952-5210, or;
- Contact the local bar association (http://www.lacba.org/) or;
- Look in a telephone directory or search online for "mediators; or "arbitrators."

There may be a charge for services provided by private arbitrators and mediators.


A list of approved State Bar Approved Mandatory Fee Arbitration programs is available at http://calbar.ca.gov/Attorneys/MemberServices/FeeArbitration/ApprovedPrograms.aspx#19


To request information about, or assistance with, dispute resolution, call the number listed below. Or you may call a Contract Provider agency directly. A list of current Contract Provider agencies in Los Angeles County is available at the link below.

http://css.lacounty.gov/programs/dispute-resolution-program-drp/


County of Los Angeles Dispute Resolution Program
3175 West 6th Street, Room 406
Los Angeles, CA 90020-1798
TEL: (213) 738-2621
FAX: (213) 386-3995


LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
   (INSERT DATE)                                    (INSERT DATE)
complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____          > _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR PLAINTIFF)
Date:

_____          > _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR DEFENDANT)
Date:

_____          > _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR DEFENDANT)
Date:

_____          > _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR DEFENDANT)
Date:

_____          > _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR _____)
Date:

_____          > _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR _____)
Date:

_____          > _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| COURTHOUSE ADDRESS: | |
|---|---|
| PLAINTIFF: | |
| DEFENDANT: | |

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

  iii. Be filed within two (2) court days of receipt of the Request; and

  iv. Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

 c. No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

 d. If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

 e. If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4. If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5. The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6. Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7. Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

## The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR _____ )

➢ _____
(ATTORNEY FOR _____ )

➢ _____
(ATTORNEY FOR _____ )

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:    FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

## The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

_____
(ATTORNEY FOR PLAINTIFF)

_____
(ATTORNEY FOR DEFENDANT)

_____
(ATTORNEY FOR DEFENDANT)

_____
(ATTORNEY FOR DEFENDANT)

_____
(ATTORNEY FOR _____ )

_____
(ATTORNEY FOR _____ )

_____
(ATTORNEY FOR _____ )

## THE COURT SO ORDERS.

Date:     _____

_____
JUDICIAL OFFICER

| HAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY· | STATE BAR NUMBER | Reserved for Clerk's File Stamp · |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| INFORMAL DISCOVERY CONFERENCE (pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

LACIV 094 (new)
LASC Approved 04/11
For Optional Use

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Santa Monica Courthouse<br>1725 Main Street, Santa Monica, CA 90401 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**02/21/2019**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____Marcos Mariscal_____ Deputy |
| NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL CASE | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>19SMCP00075 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|
| ✓ | Craig D. Karlan | N | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record    Sherri R. Carter, Executive Officer / Clerk of Court

on 02/22/2019 _____                                By Marcos Mariscal _____, Deputy Clerk
    (Date)

LACIV 190 (Rev 6/18)          **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**
LASC Approved 05/06

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

# **Exhibit C**

Case 2:19-cv-01862-GW-PJW    Document 3    Filed 03/13/19    Page 170 of 173    Page ID #:234

# NYS Department of State

## Division of Corporations

## Entity Information

The information contained in this database is current through March 12, 2019.

Selected Entity Name: TIME WARNER ENTERTAINMENT COMPANY, L.P.

Selected Entity Status Information

**Current Entity Name:** TIME WARNER ENTERTAINMENT COMPANY, L.P.

**DOS ID #:** 1643998

**Initial DOS Filing Date:** JUNE 15, 1992

**County:** NEW YORK

**Jurisdiction:** DELAWARE

**Entity Type:** FOREIGN LIMITED PARTNERSHIP

**Current Entity Status:** INACTIVE - Surrender of Authority (Dec 27, 2012)

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

C/O TIME WARNER CABLE
60 COLUMBUS CIRCLE
NEW YORK, NEW YORK, 10023

**Registered Agent**

REGISTERED AGENT REVOKED

, ,

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| No Information Available | | |

*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUN 15, 1992 | Actual | TIME WARNER ENTERTAINMENT COMPANY, L.P. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results  New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS Homepage  |  Contact Us

# Exhibit D

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
GetCorporate Status
Submitting a Request
How to Form a New Business Entity
Certifications, Apostilles & Authentication of Documents

View Search Results

## Entity Details

| | | | |
|---|---|---|---|
| File Number: | 2289527 | Incorporation Date / Formation Date: | 2/28/1992 (mm/dd/yyyy) |
| Entity Name: | **TIME WARNER ENTERTAINMENT COMPANY, L.P.** | | |
| Entity Kind: | **Limited Partnership** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **State:** |
| Status: | **Merged** | Status Date: | **9/30/2012** |

**TAX INFORMATION**

| | | | |
|---|---|---|---|
| Last Annual Report Filed: | **0** | Tax Due: | **$ 0** |
| Annual Tax Assessment: | **$ 250** | Total Authorized Shares: | |

**REGISTERED AGENT INFORMATION**

| | |
|---|---|
| Name: | **THE CORPORATION TRUST COMPANY** |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** |
| City: | **WILMINGTON** County: **New Castle** |
| State: | **DE** Postal Code: **19801** |
| Phone: | **302-658-7581** |

**FILING HISTORY (Last 5 Filings)**

| Seq | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|
| 1 | Merger; Non-Survivor [Non-Survivor] [Survivor Name] TIME WARNER CABLE ENTERPRISES LLC | 1 | 9/28/2012 | 12:13 PM | 9/30/2012 |
| 2 | Merger [Survivor] | 1 | 12/31/2009 | 2:26 PM | 12/31/2009 |
| 3 | Merger [Survivor] | 1 | 12/31/2009 | 2:25 PM | 12/31/2009 |
| 4 | Merger [Survivor] | 1 | 12/31/2009 | 2:24 PM | 12/31/2009 |
| 5 | Amendment | 1 | 1/5/2009 | 11:17 AM | 1/5/2009 |

Back to Entity Search    Email Status

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov